## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOURNAL PUBLISHING COMPANY, INC. | : | |
| | : | |
| *Plaintiff* | : | CIVIL ACTION NO. |
| | : | 3:11-CV-00188 (RNC) |
| --against-- | : | |
| | : | |
| THE HARTFORD COURANT COMPANY | : | |
| | : | |
| *Defendant.* | : | March 28, 2011 |
| | : | |
| | : | |

## MEMORANDUM OF LAW IN SUPPORT OF
## THE HARTFORD COURANT PUBLISHING COMPANY'S
## <u>MOTION TO DISMISS AND/OR STRIKE THE COMPLAINT</u>

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

Cameron Stracher (Bar No. ct 28146)
4 North Pasture Road
Westport, CT 06880
(203) 222-7169

Of Counsel:
Robert Penchina
Levine Sullivan Koch & Schulz, LLP
321 West 44th Street, Suite 510
New York, NY 10036
t: (212) 850-6109; f: (212) 850-6299


*Attorneys for The Hartford Courant Company*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

STATEMENT OF PLEADED FACTS .......................................................................................2

ARGUMENT ................................................................................................................................4

I.      JPC'S COPYRIGHT INFRINGEMENT
        CLAIMS SHOULD BE DISMISSED ..............................................................................4

        A.      Courant's Reports Are Not Infringing Because They Are Not
                Substantially Similar To JPC's Reports As A Matter of Law ...............................4

        B.      Courant's Reports Make Non-Infringing Fair Use Of JPC's Reports
                As A Matter Of Law ...............................................................................................8

        C.      JPC May Not Recover Statutory Damages or Attorney's Fees For
                Five Of Its Copyright Claims ...............................................................................12

II.     PLAINTIFF'S STATE LAW CLAIMS ARE PREEMPTED BY THE
        FEDERAL COPYRIGHT LAW .....................................................................................15

        A.      JPC's Works Fall Within the Subject Matter of Copyright ..................................17

        B.      The Rights Asserted by JPC Are Equivalent to Those Set Forth in the
                Copyright Act .......................................................................................................18

CONCLUSION ............................................................................................................................25

APPENDIX

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*A.V. ex rel. Vanderhye v. iParadigms, LLC,*
    562 F.3d 630 (4th Cir. 2009) ...................................................................11

*Allen v. Scholastic Inc.,*
    2011 WL 43448 (S.D.N.Y. Jan. 6, 2011) .............................................2

*Arica Institute, Inc. v. Palmer,*
    970 F.2d 1067 (2d Cir. 1992) ................................................................11

*Ashcroft v. Iqbal,*
    129 S. Ct. 1937 (2009).........................................................12, 23, 24

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,*
    489 U.S. 141 (1989)................................................................................15

*Briarpatch Ltd. v. Phoenix Pictures, Inc.,*
    373 F.3d 296 (2d Cir. 2004) ...............................................16, 17, 20

*Campbell v. Acuff-Rose Music, Inc.,*
    510 U.S. 569 (1994)............................................................................9, 11

*Cassetica Software, Inc. v. Computer Sciences Corp.,*
    2009 WL 1703015 (N.D. Ill. June 18, 2009)...............................14

*Chicago Record-Herald Co. v. Tribune Association,*
    275 F. 797 (7th Cir. 1921) ....................................................................5

*Community for Creative Non-Violence v. Reid,*
    490 U.S. 730 (1989)................................................................................15

*Cognotec Services, Ltd. v. Morgan Guaranty Trust Co.,*
    862 F. Supp. 45 (S.D.N.Y. 1994) ......................................................13

*Computer Associates International, Inc. v. Altai, Inc.,*
    982 F.2d 693 (2d Cir. 1992) ................................................................16

*Dun & Bradstreet Software Services, Inc. v. Grace Consulting, Inc.,*
    307 F.3d 197 (3d Cir. 2002) ................................................................17

*Ez-Tixz, Inc. v. Hit-Tix, Inc.,*
    919 F. Supp. 728 (S.D.N.Y. 1996) ...................................................13

*Feist Publications, Inc. v. Rural Telephone Service Co.*,
    499 U.S. 340 (1991)......................................................................................4, 5, 6, 15

*Frontier Group, Inc. v. Northwest Drafting & Design, Inc.*,
    493 F. Supp. 2d 291 (D. Conn. 2007)...........................................16, 18, 21, 22

*Hanft Byrne Raboy & Partners v. Matsushita Electric Corporation of America*,
    2001 WL 456346 (S.D.N.Y. May 1, 2001) ...............................................2

*Healix Infusion Therapy, Inc. v. HHI Infusion Services, Inc.*,
    2011 WL 291063 (N.D. Ill. Jan. 27, 2011)............................................14

*Hustler Magazine, Inc. v. Moral Majority Inc.*,
    796 F.2d 1148 (9th Cir. 1986) ....................................................................9

*Jewell v. Medical Protective Co.*,
    2003 WL 22682332 (D. Conn. Oct. 30, 2003) .........................................24

*Journal Publishing Co. v. Hartford Courant Co.*,
    3:10-CV-00187-RNC (D. Conn.) ...............................................................1

*Journal Publishing Co. v. Hartford Courant Co.*,
    HHD-CV09-5034313-S (Conn. Super. Ct.)...............................................1

*Kelly v. Arriba Soft Corp.*,
    336 F.3d 811 (9th Cir. 2003) ....................................................................10

*Kulik Photography v. Cochran*,
    975 F. Supp. 812 (E.D. Va. 1997) ..............................................................8

*Laws v. Sony Music Entertainment, Inc.*,
    448 F.3d 1134 (9th Cir. 2006) ..................................................................17

*Leadsinger, Inc. v. BMG Music Publishing*,
    512 F.3d 522, 530 (9th Cir. 2008) ..............................................................8

*Mattel Inc. v. Walking Mountain Productions*,
    353 F.3d 792 (9th Cir. 2003) ..............................................................10, 11

*Mayer v. Josiah Wedgwood & Sons, Ltd.*,
    601 F. Supp. 1523 (S.D.N.Y. 1985) .........................................................17

*Moser Pilon Nelson Architects, LLC v. HNTB Corp.*,
    2006 WL 2331013 (D. Conn. Aug. 8, 2006) .................................19, 20, 22

*Nationwide Mutual Insurance Co. v. Mortenson*,
    606 F.3d 22 (2d Cir. 2010) ......................................................................24

*Netzer v. Continuity Graphic Associates, Inc.*,
    963 F. Supp. 1308 (S.D.N.Y. 1997) .........................................................20

*New York Times Co. v. Tasini,*
    533 U.S. 483 (2001) ..................................................................................17, 18

*Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc.,*
    166 F.3d 65 (2d Cir. 1999) ..........................................................................4, 5, 7

*NXIVM Corp. v. Ross Institute,*
    364 F.3d 471 (2d Cir. 2004) ........................................................................9, 10

*Orange County Choppers, Inc. v. Olaes Enterprises, Inc.,*
    497 F. Supp. 2d 541 (S.D.N.Y. 2007) .........................................................22, 23

*Patrick v. Francis,*
    887 F. Supp. 481 (W.D.N.Y. 1995) .............................................................16, 23

*Peckarsky v. ABC,*
    603 F. Supp. 688 (D.D.C. 1984) .................................................................5, 6

*Peter F. Gaito Architecture, LLC v. Simone Development Corp.,*
    602 F.3d 57 (2d Cir. 2010) ..........................................................................4, 5

*R.D. Wolf, Inc. v. Brancard,*
    2004 WL 728936 (Conn. Super. Mar. 8, 2004) ..................................16, 19, 20, 22

*RBC Nice Bearings, Inc. v. Peer Bearing Co.,*
    676 F. Supp. 2d 9 (D. Conn. 2009) .............................................................16, 17, 22

*Righthaven LLC v. Realty One Group, Inc.,*
    2010 WL 4115413 (D. Nev. Oct. 19, 2010) ................................................8

*S&L Vitamins, Inc. v. Australian Gold, Inc.,*
    521 F. Supp. 2d 188 (E.D.N.Y. 2007) .........................................................11

*Secunda v. Time Warner Cable,*
    1995 WL 675464 (S.D.N.Y. Nov. 14, 1995) ...............................................13

*Shepard v. Miler,*
    2010 WL 5205108 (E.D. Cal. Dec. 15, 2010) .............................................8

*Sira v. Morton,*
    380 F.3d 57 (2d Cir. 2004) ..........................................................................2

*Stewart v. Abend,*
    495 U.S. 207 (1990) ....................................................................................10

*Stewart v. World Wrestling Federation Entertainment, Inc.,*
    2005 WL 66890 (S.D.N.Y. Jan. 11, 2005) ..................................................21

*Stromback v. New Line Cinema,*
    384 F.3d 283 (6th Cir. 2004) .......................................................................18

*Summit Machine Tool Manufacturing Corp. v. Victor CNC Systems, Inc.*,
    7 F.3d 1434 (9th Cir. 1993) .................................................................................15

*Video Pipeline, Inc. v. Buena Vista Home Entertainment, Inc.*,
    210 F. Supp. 2d 552 (D.N.J. 2002) ....................................................................19

*Wright v. Warner Books, Inc.*,
    953 F.2d 731 (2d Cir. 1991) ..................................................................................9

## STATUTES

17 U.S.C. § 101 ............................................................................................................17

17 U.S.C. § 102(a)(1) ...................................................................................................17

17 U.S.C. § 106 ......................................................................................................17, 19

17 U.S.C. § 107 ........................................................................................................9, 10

17 U.S.C. § 107(1) .........................................................................................................9

17 U.S.C. § 107 (4) ......................................................................................................11

17 U.S.C. § 301(a) .......................................................................................................15

17 U.S.C. § 412 ......................................................................................................12, 13

17 U.S.C. § 504(c)(1) ...................................................................................................12

17 U.S.C. § 504(c)(2) ...................................................................................................12

17 U.S.C. § 505 ............................................................................................................12

Conn. Gen. Stat. § 41-110g(a) .....................................................................................24

## OTHER AUTHORITIES

Federal Rule of Civil Procedure 12(b)(6) .............................................................1, 4, 8

Federal Rule of Civil Procedure 8 ...............................................................................24

Federal Rule of Civil Procedure 12(f) ...........................................................................1

1 M. Nimmer, The Law of Copyright § 1.01[B][3] (1984) ..........................................16

The Hartford Courant Publishing Company ("Courant") respectfully submits this memorandum of law in support of its motion, pursuant to Federal Rule of Civil Procedure 12(b)(6), to dismiss, and alternatively pursuant to Rule 12(f) to strike portions of, the Complaint asserted against it by Journal Publishing Company, Inc. ("JPC"). This case arises in connection with Courant's publication of local news reports containing public domain facts that previously were revealed in reports published by JPC.

This case is JPC's fourth attempt to assert the very same claims against Courant. On November 23, 2009, JPC filed an action attempting to assert copyright infringement claims against Courant in the Connecticut Superior Court, then submitted an amended complaint in that case on January 5, 2010, but withdrew the action following Courant's submission of a motion to dismiss. *Journal Publ'g Co. v. Hartford Courant Co.*, HHD-CV09-5034313-S (Conn. Super. Ct.); *see* Penchina Dec. Exs. Z, AA, BB. On February 5, 2010, JPC filed its third complaint, this time in federal court, asserting the same claims. After, in compliance with the court's individual practice rules, Courant informed JPC of its intention to move to dismiss the federal complaint, JPC once again withdrew its complaint without prejudice—this time over Courant's objection. *Journal Publ'g Co. v. Hartford Courant Co.*, 3:10-CV-00187-RNC (D. Conn.); *see* Penchina Dec. Exs. CC, DD. JPC has now filed yet another case and its fourth complaint attempting to assert the very same misguided claims. Its current Complaint should be dismissed with prejudice, however, because

- it purports to assert a series of copyright infringement claims, but the accused works are not substantially similar to the copyrightable aspects of JPC's works;

- Courant's reports, in any event, constitute non-infringing fair use of JPC's work;

- even if JPC could demonstrate unlawful copying, its claims for statutory damages and attorney's fees are barred as to five of JPC's claims because JPC failed to timely register its copyrights in the works at issue; and

- JPC's attempt to assert a series of state-law claims arising from the alleged reproduction by Courant of written reports is barred because these claims expressly are preempted by the federal Copyright Act and otherwise fail to state a claim.

## STATEMENT OF PLEADED FACTS

The following facts are alleged in the Complaint and are accepted as true solely for the purposes of this motion. Courant does not accept legal conclusions in the Complaint as true.

JPC is publisher of the *Journal Inquirer* newspaper. JPC asserts that "[r]ecently the defendant plagiarized local news stories published by the plaintiff, and misattributed those stories as the defendant's own work." Compl. ¶ 8. The Complaint identifies ten instances in which items published in the print edition of the *Hartford Courant* allegedly were "plagiarized" from news reports in which JPC holds a copyright registration. *Id.* ¶¶ 14 - 32 & Ex. A. These articles reported facts relating to local news items. *See id.* For example, one of the allegedly copied articles identified by JPC is a more-than-380-word report published by JPC on August 12, 2009, headlined "PZC extends special-use permit for one year allowing condo project to finish." *Id.* ¶ 26; *see* Penchina Dec. Ex. M.[1] Nearly a week later, on August 18, 2009, Courant ran a short, less-than-90-word, item headlined "Coleman Farms Condos Get Permit Extension" which included public-domain facts that had been revealed in JPC's article. Compl. ¶ 26; *see* Penchina Dec. Ex. N. Similarly, JPC identified a more-than-400-word report headlined "Greenway trail plan gets green light from East Windsor selectmen" that it published on August 5, 2009, Compl. ¶ 20, as having

---

[1] In deciding a motion to dismiss, a court may consider "materials incorporated [into the complaint] by reference, and documents that, although not incorporated by reference, are integral to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (internal quotation marks and citations omitted). Here, by putting its and Courant's reports at issue (*see* Compl. ¶¶ 14-32 & Ex. A), the text of those reports and their copyright registrations are necessarily incorporated by reference and are integral to the complaint, and may be considered on a motion to dismiss. *See, e.g., Allen v. Scholastic Inc.*, 2011 WL 43448, at *8 (S.D.N.Y. Jan. 6, 2011) ("The Second Circuit has recently underscored that, where the works in questions are attached to [or referenced in] a plaintiff's complaint, it is entirely appropriate for the district court to consider the similarity between those works in connection with a motion to dismiss") (brackets in original, internal quotation marks omitted); *Hanft Byrne Raboy & Partners v. Matsushita Elec. Corp. of Am.*, 2001 WL 456346, at *3 (S.D.N.Y. May 1, 2001) (considering copyright registrations on motion to dismiss, even where they were not attached to the complaint, since they were "integral" to copyright infringement case). Copies of the parties' reports that are identified in the Complaint, of the relevant Copyright Registration certificates, and records from the prior cases brought by JPC are attached as exhibits to the Declaration of Robert Penchina. For the Court's convenience, side by side copies of the text of the news reports at issue are attached as an Appendix to this memorandum.

been copied by a brief, less-than-70-word recitation of facts published by Courant on August 7, 2009. *Id.*; *see* Penchina Dec. Exs. G, H. The Complaint identifies eight other similar instances. *See* Compl. ¶¶ 14, 16, 18, 22, 24, 28, 30, 32.

In addition to the ten instances of alleged copying from the print edition of the *Journal Inquirer*, JPC also identified a number of instances in which it alleges Courant was "using published stories from the JI on its website," which stories supposedly "were reproduced in substance on the Courant's Internet site." Compl. ¶ 34 & Ex. B. The Complaint does not identify which stories from the JI website allegedly were used, and does not allege that those website stories, in contrast to the ten previously identified items from JPC's printed paper, are covered by any copyright registrations. *See id.* Moreover, although JPC alleges that Courant "misattributed" material from the *Journal Inquirer* as its "own work," *id.* ¶ 8, JPC's Exhibit B to its own Complaint shows that each of the accused works contain clear statements *attributing the news items to the Journal Inquirer. See id.* Ex. B ("[T]he Journal Inquirer reported . . . ."; "Information from: Journal Inquirer, http://www.journalinquirer.com"; "[T]he Journal Inquirer has reported . . . .").[2]

JPC contends that Courant's conduct with respect to each of the ten items allegedly copied from the print edition of its paper "constitutes a . . . violation of the copyright laws of the United States." *Id.* ¶ 11. The Complaint also contains three state law claims—for conversion (Eleventh Count), unjust enrichment (Twelfth Count) and violation of the Connecticut Unfair Trade Practices Act ("CUTPA") (Thirteenth Count)—all premised on Courant's alleged reproduction of news reports published by JPC on its website.

---

[2] While Exhibit B purports to list items appearing on Courant's website that allegedly were copied from the *Journal Inquirer*, the list includes items where Courant merely reported about and thus mentions the *Journal Inquirer*, such as a news item entitled "Organizing Chaos At Class LL Track Meet" which reported that "[a]s the afternoon wore on, one event rolled into another as Journal-Inquirer reporter and public address announcer Matt Buckler reeled off the winners and provided stride-by-stride commentary." Compl. Ex. B; *see id.* ("Journal Inquirer To Charge For Using Its Website"). Exhibit B also appears to list items that are not proprietary to the *Journal Inquirer*, but that were distributed by the third-party wire service the Associated Press. *See, e.g., id.* ("Former Conn. FOI Lawyer Tasered 2 more times[.] Associated Press").

## ARGUMENT

## I.   JPC'S COPYRIGHT INFRINGEMENT CLAIMS SHOULD BE DISMISSED

The first ten counts of the Complaint attempt to assert copyright infringement claims based on allegations that news reports published by Courant were based on prior reports contained in the printed edition of the *Journal Inquirer*.  All of these claims should be dismissed because there is no substantial similarity between Courant's reports and the copyrightable aspects of JPC's work, and because Courant's works are in any event non-infringing under the doctrine of fair use.  In addition, JPC's first five claims also are subject to dismissal on the independent legal basis that the only relief sought by JPC, statutory damages and attorney's fees, is barred by JPC's failure to timely register copyrights in the subject works.

### A.   Courant's Reports Are Not Infringing Because They Are Not Substantially Similar To JPC'S Reports As A Matter Of Law

JPC's copyright infringement claims should be dismissed at the outset because the only similarity between the parties' works relates to their reporting the same unprotectible facts.[3]

To establish copyright infringement, a plaintiff must demonstrate "copying of constituent elements of the work that are original."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  Thus, "'a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the *protectable elements of plaintiff's.*'"  *Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*, 602 F.3d 57, 63 (2d Cir. 2010) (emphasis added, citation omitted); *see, e.g., Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.*, 166 F.3d 65, 70 (2d Cir. 1999) ("a plaintiff must establish that the copying was improper or unlawful by showing that the

---

[3] The Second Circuit recently has confirmed that it is appropriate "to resolve the question of substantial similarity as a matter of law on a Rule 12(b)(6) motion to dismiss."  *Gaito*, 602 F.3d at 65; *see, e.g., id.* at 63 ("it is entirely appropriate for a district court to resolve [substantial similarity] as a matter of law, either because the similarity between two works concerns only non-copyrightable elements of the plaintiff's work, or because no reasonable jury, properly instructed, could find that the two works are substantially similar.").

second work bears a 'substantial similarity' to protected expression in the copyrighted work.").

Generally, to determine whether there is a "substantial similarity" between works, courts consider

"whether an average lay observer would overlook any dissimilarities between the works and would

conclude that one was copied from the other." *Nihon*, 166 F.3d at 70.  But, "when faced with

works that have both protectible and unprotectible elements, [a court's] analysis must be more

discerning, and . . . instead must attempt to extract the unprotectible elements from [its]

consideration and ask whether the protectable elements, standing alone, are substantially similar."

*Gaito*, 602 F.3d at 66 (internal quotation marks and citations omitted); *see, e.g., Nihon*, 166 F.3d at

70 ("Where the work at issue contains both protectible and unprotectible elements, the test must be

'more discerning,' excluding the unprotectible elements from consideration.").

It is fundamental "that facts are not copyrightable." *Feist*, 499 U.S. at 344.  As the Supreme

Court has made abundantly clear,

> No one may claim originality as to facts.  This is because facts do not
> owe their origin to an act of authorship. The distinction is one
> between creation and discovery: The first person to find and report a
> particular fact has not created the fact; he or she has merely
> discovered its existence. To borrow from *Burrow-Giles*, one who
> discovers a fact is not its "maker" or "originator."  The discoverer
> merely finds and records.  Census takers, for example, do not
> "create" the population figures that emerge from their efforts; in a
> sense, they copy these figures from the world around them. Census
> data therefore do not trigger copyright because these data are not
> "original" in the constitutional sense. *The same is true of all facts-*
> scientific, historical, biographical, and *news of the day. [T]hey may
> not be copyrighted and are part of the public domain* available to
> every person.

*Id*. at 347-48 (internal quotation marks and citations omitted, emphasis added).  Thus, "[i]t is well

recognized that federal copyright laws provide only limited protection for news reports."

*Peckarsky v. ABC*, 603 F. Supp. 688, 694 (D.D.C. 1984); *see, e.g., Chicago Record-Herald Co. v.

Tribune Ass'n*, 275 F. 797, 798 (7th Cir. 1921) ("It is true that news as such is not the subject of

copyright").  "Although a reporter's mode of expression is protected by copyright, the facts

reported are not themselves so protected." *Peckarsky*, 603 F. Supp. at 694.  Therefore, "[n]o matter how much original authorship [a report] displays, the facts and ideas it exposes are free for the taking," and the "very same facts and ideas may be divorced from the context imposed by the author, and restated or reshuffled by second comers, even if the author was the first to discover the facts." *Feist*, 499 U.S. at 349 (internal quotation marks and citations omitted).

Here, review of the parties' news reports demonstrates no substantial similarity between Courant's articles and any *protectible* elements of JPC's reports.  Although conveying the same factual information, Courant presents summaries of the facts and reports the news with a different sentence structure, phrasing and organization.  For example, Courant's item headlined "GOP Candidates Form Tea Party Committee" is a straightforward recitation of key facts about this news item.  It uses over 400 less words (only 179 compared to 651) to describe the facts revealed in JPC's report headlined "New party gets place on East Hartford ballot," and does not go into the level of detail that JPC did—for example it lacks the quotes interspersed in JPC's reports.  *See* Appendix; Penchina Dec. Exs. C, D.  Courant's work is a bare-bones recitation of pure facts. Similarly, Courant's 102-word item headlined "Emergency Center Gets Grant For Equipment" contains just a brief abstraction of facts conveyed in JPC's 355-word report headlined "Construction of regional emergency center to begin."  *See* Appendix; Penchina Dec. Exs. E, F. Likewise, Courant's item "Board Extends Contract" consists of just three sentences and less than 80 words, and does no more than restate facts that were revealed in JPC's more-than-325-word item headlined "Hebron Ed Board happy with superintendent" that was published four days earlier. *See* Appendix; Penchina Dec. Exs. O, P.  Courant's short summaries of selected facts appearing in JPC reports simply do not reproduce anything from JPC's work that is protectable by copyright. *See* Appendix.

In *Nihon*, 166 F.3d at 69, the Second Circuit considered infringement claims asserted by a publisher of business news against a company who sold unauthorized translations of the plaintiff's reports. The court found that a number of the defendant's items were infringing because they "appear[ed] to be direct, if not word-for-word, translations," using "about two thirds of the protectable material in the corresponding Nikkei article," and they "track[ed] the information in the articles sentence by sentence, in sequence; only occasionally [did] the abstracts combine two Nikkei sentences, divide a sentence, or rearrange the facts among different sentences." *Id.* at 71. In contrast, the court found that another of the defendant's items was *not* infringing because it was "truly an abstract only of the factual information in the corresponding Nikkei article." *Id.* As the court observed, in this item, the defendant used "a different sentence structure and different phrasing" and "only repeat[ed] facts, which by their nature cannot receive legal protection." *Id.* The court additionally found another of the defendant's items was "not substantially similar to the Nikkei article in a quantitative sense," and thus non-infringing, where it "copied approximately twenty percent of the material in the article; in contrast the other, infringing abstracts typically copied well over half of the text of the corresponding articles." *Id.* As the court opined, "[w]here, as here, the copyrighted work contains both original and unprotected elements, a higher quantity of copying is required to support a finding of substantial similarity than when the infringed work is wholly original. *Id.*

Here, Courant's reports are like the ones held non-infringing by the Second Circuit in *Nihon*, and unlike those found to be infringing in that case. Courant's work reproduces a small fraction of what appeared in JPC's articles, and none of what was reproduced amounted to protectable expression. The Courant's articles use different sentence structure, at times combining ideas expressed in multiple sentences by JPC,[4] and at other times dividing or rearranging multiple

---

[4] *Compare, e.g.,* Penchina Dec. Ex. Q ("The water company serves over 7,000 customers in the Hazardville section of Enfield, about 400 in Somers, and 10 in East Windsor. Most are residential. It has 300

items from a single JPC sentence.[5]  Courant focused on the bare facts it deemed important, and omitted material that JPC intermingled with those facts.  In sum, Courant's work shared similar non-protected facts with JPC's work, but bears no substantial similarity to any protected aspect of JPC's work as a matter of law.

**B.  Courant's Reports Make Non-Infringing Fair Use Of JPC'S Reports As A Matter Of Law**

Even if Courant's reports had included some copyrightable expression contained in JPC's works, Courant's articles constitute fair use and thus are non-infringing.

Although fair use generally is a mixed question of fact and law, "an assertion of fair use 'may be considered on a motion to dismiss, which requires the court to consider all allegations to be true, in a manner substantially similar to consideration of the same issue on a motion for summary judgment, when no material facts are in dispute.'"  *Shepard v. Miler*, 2010 WL 5205108, at *3 (E.D. Cal. Dec. 15, 2010) (quoting *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 530 (9th Cir. 2008)); *see, e.g., Righthaven LLC v. Realty One Group, Inc.*, 2010 WL 4115413, at *2-3 (D. Nev. Oct. 19, 2010) (finding fair use as a matter of law on Rule 12(b)(6) motion); *Kulik Photography v. Cochran,* 975 F. Supp. 812, 814 (E.D. Va. 1997) (granting motion to dismiss on ground that contested use "was a legal and proper 'fair use.'").  Here, the facts alleged in the Complaint demonstrate that Courant's incidental capturing of any protectable elements while

---

commercial and 23 municipal customers.  The rate hike is necessary, Hazardville President Jonathan Avery testified due to increased operation and maintenance expenses, including payroll, pension, purchased power, and rent expenses rising over what DPUC allowed, 'and the overall continuing decline over the last 10 years in average consumption per customer.'") *with id.* Ex. R ("The water company—which serves about 7,000 customers in the Hazardville section of Enfield, about 400 in Somers and 10 in East Windsor—said it needs the rate hike because of increased expenses.").

[5] *Compare, e.g.* Penchina Dec. Ex. C ("Former Mayor Susan Kniep is running for Town Council on the ticket, joined by Republican Jonathan Searles and Republican Patricia Harmon, who serves on the council but wasn't nominated for re-election when the town committee met last week.") *with id.* Ex. D ("Former Mayor Susan Kniep, Jonathan Searles, Patricia Harmon and Eileen Powers formed the committee.  Searles was endorsed by the Republicans for the town counsel and Powers for treasurer.  Harmon serves on the council but wasn't nominated for re-election.").

gathering public domain facts for news reporting purposes was a non-infringing fair use as a matter of law.

Not every unauthorized use of a copyrighted work amounts to infringement. The doctrine of "fair use," codified at 17 U.S.C. § 107, "is a means of balancing the need to provide individuals with sufficient incentives to create public works with the public's interest in the dissemination of information." *Hustler Magazine, Inc. v. Moral Majority Inc.*, 796 F.2d 1148, 1151 (9th Cir. 1986). The Copyright Act expressly provides that, notwithstanding other provisions of the statute, "the fair use of a copyrighted work . . . for purposes such as criticism, comment, [or] *news reporting*, . . . is not an infringement of copyright." 17 U.S.C. § 107 (emphasis added). In addition, the statute specifies four factors that must be taken into account to determine whether a particular use is fair: (i) the purpose of the use; (ii) the nature of the copyrighted work; (iii) the amount and substantiality of the portion used; and (iv) the effect of the use on the market for the original. *Id.* Application of the statutory factors demonstrates that Courant made fair use of any protectable element of JPC's work that may have been reproduced.

The first factor in the fair use inquiry is "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes." 17 U.S.C. § 107(1). "The enquiry here may be guided by the examples given in the preamble to § 107, looking to whether the use is for criticism, or comment, or *news reporting*, and the like." *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 578-79 (1994) (emphasis added). "[T]here is a strong presumption that factor one favors the defendant if the allegedly infringing work fits the description of uses described in section 107." *Wright v. Warner Books, Inc.*, 953 F.2d 731, 736 (2d Cir. 1991); *see, e.g., NXIVM Corp. v. Ross Inst.*, 364 F.3d 471, 477 (2d Cir. 2004) ("As we held in *Wright*, 'there is a strong presumption that factor one favors the defendant if the allegedly infringing work fits the description of uses described in section 107.'"). Courant's use was for the First

Amendment-protected activity of news reporting, one of the purposes expressly listed in section

107.  Moreover, the fact that Courant reports news as a for-profit business does not rebut that

Courant's use was for a proper purpose:

> The Supreme Court in *Campbell* rejected the notion that the commercial nature of the use could by itself be a dispositive consideration. The *Campbell* opinion observes that "nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research ... 'are generally conducted for profit,'" *Campbell*, 510 U.S. at 584, . . . (quoting *Harper & Row* [*Publ., Inc. v. Nation Enters.*, 471 U.S. 539, 592 (1985)] (Brennan, J., dissenting), and that Congress "could not have intended" a rule that commercial uses are presumptively unfair. *Id.* The commercial objective of the secondary work is only a subfactor within the first factor.

*NXIVM*, 364 F.3d at 477-78.

The second factor requires examination of two issues:  whether the original work was

published, and whether it is informational in nature.  Works that previously have been published are

more susceptible to fair use than unpublished works.  *E.g., Kelly v. Arriba Soft Corp.*, 336 F.3d

811, 820 (9th Cir. 2003).  Here, the Complaint makes clear that JPC's reports were published prior

to any use of them made by Courant.  *See, e.g.*, Compl. ¶ 8 ("defendant plagiarized local news

stories *published* by the plaintiff" (emphasis added)).  In addition to assessing whether a work was

published, the second factor in the fair use analysis also takes into account that "[a]pplication of the

fair use defense [is] greater . . . in the case of factual works than in the case of works of fiction or

fantasy" and "[t]he law generally recognizes a greater need to disseminate factual works than works

of fiction or fantasy." *Stewart v. Abend*, 495 U.S. 207, 237 (1990) (internal quotation marks and

citation omitted).  Here, the allegedly copied works consist of factual news reporting.  *See, e.g.*,

Compl. ¶ 8 ("defendant plagiarized local *news stories* published by the plaintiff" (emphasis

added)).  Thus, the second factor, too, favors fair use.

"The third factor in the fair use analysis asks whether 'the amount and substantiality of the

portion used in relation to the copyrighted work as a whole are reasonable in relation to the purpose

of copying.'" *Mattel Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 803 (9th Cir. 2003) (internal quotation marks and citation omitted). This factor also weighs in favor of fair use. Courant's articles merely extracted factual information from JPC's reports and did not include the vast majority of text contained in JPC's works. *See* Appendix. But, even if it turned out that Courant in fact reproduced the entirety of any copyrightable aspect of JPC's articles, courts recognize that the third factor does not weigh against fair use of an entire copyrighted work where, as here, the use is reasonable in view of its proper purpose. *See, e.g., A.V. ex rel. Vanderhye v. iParadigms, LLC*, 562 F.3d 630, 642 (4th Cir. 2009) (finding reproductions of entirety of students' works to be fair use); *S&L Vitamins, Inc. v. Australian Gold, Inc.*, 521 F. Supp. 2d 188, 215 (E.D.N.Y. 2007) ("Although S&L used the entire work, such use was reasonable in light of the purpose").

The fourth factor in the fair use analysis concerns the effect of the challenged use upon the market for or value of the copyrighted work. 17 U.S.C. § 107 (4). For this factor, "the relevant market effect is that which stems from defendant's use of plaintiff's 'expression,' not that which stems from defendant's work as a whole," and a court should not take into account the effect of having to compete over distribution of unprotectible facts because a "[d]efendant, after all, is perfectly entitled to create a competing work." *Arica Inst., Inc. v. Palmer*, 970 F.2d 1067, 1078 (2d Cir. 1992). Moreover, the Supreme Court has made clear that in applying the fourth factor there can be "[n]o 'presumption' or inference of market harm" unless the use at issue is a "mere duplication for commercial purposes." *Campbell*, 510 U.S. at 591. Not only can harm not be presumed, "'[t]he existence of [a] potential market cannot be presumed'" either. *Mattel Inc.*, 353 F.3d at 805 (citation omitted). Thus, a plaintiff must demonstrate an actual market for the protectable aspects of its work. Here, the Complaint is utterly devoid of facts demonstrating the existence of markets for any *protectible elements* of JPC's work, as distinct from the news itself. And even if such a market had been identified, the Complaint presents no allegation that the use

11

made by Courant has interfered with that market.  To the contrary, JPC *does not allege* it suffered even a penny's worth of actual damages for its copyright claims in the eighteen months since Courant's works were published, and it does not seek to recover any actual damages (it seeks only awards of statutory damages and attorney's fees).  *See* Compl. ¶¶ 11, 12 & p.11.  Any assertion now that Courant's reports detrimentally affected the market for JPC's work would be utterly speculative and implausible.  *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949-51 (2009) (requiring a complaint to state well-pleaded factual allegations that could plausibly give rise to an entitlement to relief in order to survive a motion to dismiss).  Thus, like the other factors, the fourth factor weighs in favor of a fair use.

Accordingly, even if Courant incidentally copied some protectible aspect of JPC's work while obtaining the uncopyrightable facts, such copying amounts to fair use.

### C.   JPC May Not Recover Statutory Damages or Attorney's Fees For Five of Its Copyright Claims

JPC's copyright claims do not seek actual damages or injunctive relief.  *See* Compl. ¶¶ 3 -32 & p. 11.  Rather, the *only* relief requested in the Complaint for JPCs' copyright claims is: "damages pursuant to 17 U.S.C. § 504(c)(2) and attorney's fees pursuant to 17 U.S.C. § 505" or, in the event JPC cannot demonstrate willful infringement, "damages pursuant to 17 U.S.C. § 504(c)(1)."  Compl. ¶¶ 11, 12 & p.11.  But, because JPC failed to register the copyright for five of its works either within three months of first publication of those works or before the alleged infringements, JPC may not recover either statutory damages or attorney's fees for those works even if it could demonstrate infringement.  Moreover, because JPC seeks no other relief, those copyright claims should be dismissed outright.

The Copyright Act expressly states that: "*no* award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for . . . any infringement of copyright commenced after first publication of the work and before the effective date of its registration,

unless such registration is made within three months after the first publication of the work." 17

U.S.C. § 412 (emphasis added); *see, e.g., Secunda v. Time Warner Cable*, 1995 WL 675464, at *2

(S.D.N.Y. Nov. 14, 1995) ("No award of statutory damages or attorney's fees may be made for an

infringement of copyright occurring prior to the effective date of copyright registration.");

*Cognotec Servs., Ltd. v. Morgan Guar. Trust Co*., 862 F. Supp. 45, 52 (S.D.N.Y. 1994) ("Any

awards of statutory damages or of attorneys fees are precluded when the infringement occurs prior

to the effective date of registration.").

Here, all of JPC's copyright registrations were issued with an effective date of November

12, 2009 (*see, e.g.*, Penchina Dec. Exs. U - Y)—after the alleged infringements by Courant

allegedly occurred. *E.g.*, Compl. ¶¶ 14, 16 ("August 4, 2009"); ¶ 18 ("August 6, 2009"); ¶¶ 20, 22

("August 7, 2009"). Thus, unless the effective date of registration was within the grace period of

three months from first publication of the allegedly infringed works, JPC cannot recover statutory

damages or attorney's fees.

The works at issue in JPC's First through Fifth Counts were, according to the Complaint,

published by JPC respectively on July 31, 2009 (Compl. ¶¶ 14, 16), August 1, 2009 (*id.* ¶ 18), and

August 5, 2009 (*id.* ¶¶ 20, 22). Thus, JPC's registrations effective as of November 12, 2009 were

*not issued within three months* of first publication as was required, and JPC's First through Fifth

Counts asserting claims for statutory damages and attorneys fees should be dismissed. *See, e.g.,*

*Ez-Tixz, Inc. v. Hit-Tix, Inc.*, 919 F. Supp. 728, 736 (S.D.N.Y. 1996) ("The defendants' motion to

dismiss the plaintiff's claim for statutory damages and attorney's fees is therefore granted, and the

plaintiff's request for statutory damages and attorney's fees is stricken.").

Furthermore, because JPC seeks no relief beyond statutory damages and attorney's fees to

which it is not entitled, its first five Counts should be dismissed in their entirety. And, because the

Complaint here is JPC's fourth attempt to plead the very same claims, the dismissal should be with prejudice.

For example, in *Healix Infusion Therapy, Inc. v. HHI Infusion Services, Inc.*, 2011 WL 291063 (N.D. Ill. Jan. 27, 2011), the court outright dismissed a plaintiff's copyright infringement claims when the only relief sought was for statutory damages and attorney's fees but the plaintiff lacked timely registrations.  First, the court concluded that the plaintiff did not have a viable claim for statutory damages or attorney's fees pursuant to sections 504 and 505 of the Copyright Act because the plaintiff's registrations were made after the alleged infringement and beyond the three-month grace period from initial publication.  *Id*. at *2.  Then, the court observed that "no actual damages are sought for the copyright infringement claim," *id*. at *3, and accordingly dismissed outright the plaintiff's copyright claims, explaining that:

> Healix [the plaintiff] requested that in the event that I find statutory damages unobtainable, I grant leave to amend its complaint to plead for actual damages. Healix has already filed four complaints in this case, and has never sought actual damages. Accordingly, I will not permit a fourth amended complaint to be filed.

*Id*. at *3 n.1; *see also, e.g., Cassetica Software, Inc. v. Computer Sciences Corp.*, 2009 WL 1703015, at *2 (N.D. Ill. June 18, 2009) ("the infringement commenced before Cassetica registered the copyright. Therefore, § 412 prevents Cassetica from recovering the damages it seeks. Accordingly, Count I of Cassetica's Complaint [asserting a claim for copyright infringement but not seeking actual damages] must be dismissed.").

The result should be no different here.  JPC has now asserted the identical copyright infringement claims in four complaints—an original and amended complaint in state court, a complaint in civil action number 3:10 CV 00187-RNC before this Court, and now this action—and none of JPC's complaints ever sought any relief for copyright infringement other than statutory damages and attorney's fees.  *See* Penchina Dec. Exs. Z - BB.  Accordingly, JPC's current First through Fifth Counts should be dismissed with prejudice.

## II.   PLAINTIFF'S STATE LAW CLAIMS ARE PREEMPTED BY THE FEDERAL COPYRIGHT LAW

JPC's Eleventh, Twelfth and Thirteenth Counts attempt to assert state law claims for conversion, unjust enrichment and violation of CUTPA based upon Courant's alleged unauthorized reproduction and publication of written reports created by JPC. These claims are preempted by the federal copyright law.

The United States Supreme Court has made clear that "state law is preempted when it enters 'a field of regulation which the [applicable federal] laws have reserved to Congress.'" *Summit Mach. Tool Mfg. Corp. v. Victor CNC Sys., Inc.*, 7 F.3d 1434, 1439 (9th Cir. 1993) (quoting *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 167 (1989)). Section 301 of the federal copyright statute expressly reserves to Congress the field of regulation over claims relating to works of authorship which claims seek to vindicate rights equivalent to those provided by the copyright law. *See* 17 U.S.C. § 301(a); *see also, e.g., Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 740 (1989) (Copyright Act creates uniform law "by broadly pre-empting state statutory and common-law copyright regulation"). Although the doctrine of preemption may sometimes leave a plaintiff without a remedy, that is not an unintended consequence, but the method which Congress chose to ensure uniformity of the copyright law. *Cf. Feist*, 499 U.S. at 349 ("It may seem unfair that much of the fruit of the compiler's labor may be used by others without compensation. . . . [H]owever, this is not 'some unforeseen byproduct of a statutory scheme.' It is, rather, 'the essence of copyright . . . .'") (citation omitted). Thus, Section 301 states, in pertinent part:

> [A]ll legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by sections 102 and 103, . . . are governed exclusively by this title. . . . [N]o person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a).

As explained by a court within this district, the

> Copyright Act exclusively governs a claim when: (1) the particular
> work to which the claim is being applied falls within the types of
> works protected by the Copyright Act under 17 U.S.C. §§ 102 and
> 103, and (2) the claim seeks to vindicate legal or equitable rights that
> are equivalent to one of the bundle of exclusive rights already
> protected by copyright law under 17 U.S.C. § 106.  The first prong of
> this test is called the subject matter requirement, and the second
> prong is called the general scope requirement.

*Frontier Group, Inc. v. Nw. Drafting & Design, Inc.*, 493 F. Supp. 2d 291, 297-98 (D. Conn. 2007)

(internal quotation marks omitted); *see, e.g.*, *R.D. Wolf, Inc. v. Brancard*, 2004 WL 728936, at *3

(Conn. Super. Mar. 8, 2004) ("the state law claim is preempted if the work falls under § 102 or §

103 (which it does here) and, 'the state law seeks to vindicate "legal or equitable rights that are

equivalent" to one of the bundle of exclusive rights already protected by copyright law.'").  Hence,

> [a] right which is "equivalent to copyright" is one which is infringed
> by the mere act of reproduction, performance, distribution or display.
> . . . If under state law the act of reproduction, performance,
> distribution or display  . . . will *in itself* infringe the state created
> right, then such right is preempted.

*Patrick v. Francis*, 887 F. Supp. 481, 483 n.3 (W.D.N.Y. 1995) (quoting 1 M. Nimmer, The Law of

Copyright § 1.01[B][3], at 1-11-12 (1984)).

Generally, a claim is preempted unless it includes an extra element that makes it

"qualitatively different from a copyright infringement claim."  *Briarpatch Ltd. v. Phoenix Pictures,*

*Inc.*, 373 F.3d 296, 305-06 (2d Cir. 2004); *see, e.g.*, *R.D. Wolf, Inc.*, 2004 WL 728936, at *3

("[T]he question is whether for each of RDW's four claims, is the action that caused the alleged tort

'qualitatively different' from the conduct that arises under the Copyright Act.").  The "'extra

element'" must be something in addition "'to the acts of reproduction, performance, distribution or

display.'"  *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 982 F.2d 693, 716 (2d Cir. 1992).  Moreover,

"[t]he Second Circuit takes 'a restrictive view' of the extra elements that transfer an otherwise

equivalent claim into one that is qualitatively different from a copyright infringement claim."  *RBC*

*Nice Bearings, Inc. v. Peer Bearing Co.*, 676 F. Supp. 2d 9, 34 (D. Conn. 2009).  Accordingly, "[n]ot every extra element is sufficient to establish a qualitative variance between rights protected by federal copyright law and that by state law." *Dun & Bradstreet Software Servs., Inc. v. Grace Consulting, Inc.*, 307 F.3d 197, 218 (3d Cir. 2002).  Rather, only elements "which change[ ] the nature of the action so that it is *qualitatively* different from a copyright infringement claim" may escape preemption.  *Mayer v. Josiah Wedgwood & Sons, Ltd.*, 601 F. Supp. 1523, 1535 (S.D.N.Y. 1985).  Where, as here, the subject matter of a claim falls within the subject matter of copyright, a state law cause of action is preempted unless the rights it seeks to vindicate are "qualitatively different" from those provided by the Copyright Act, such as claims which require "such elements as breach of fiduciary duty, or possession and control of chattels." *Briarpatch*, 373 F.3d at 306; *see, e.g.*, *Laws v. Sony Music Entm't, Inc.*, 448 F.3d 1134, 1144 (9th Cir. 2006) ("The mere presence of an additional element ('commercial use') . . . is not enough to qualitatively distinguish Laws's right of publicity claim from a claim in copyright. The extra element must transform the nature of the action.").

Here, JPC's state-law claims relate to a type of work, written news reports, that falls squarely within the protection of the Copyright Act, and assert rights equivalent to those set forth in Section 106 of the Copyright Act, specifically the rights to reproduce, prepare derivatives of and distribute written works.

### A.     JPC's Works Fall Within the Subject Matter of Copyright

It could not be clearer that the works upon which JPC's claim is based fall within the quintessential subject matter of copyright.  Section 102 of the Copyright Act expressly lists the types of works that are the "Subject Matter of Copyright," and listed first among them are "literary works." 17 U.S.C. § 102(a)(1); *see also id.* §101 (defining "literary works").  Here, the basis for JPC's state-law claims is its assertion that Courant "us[ed] published stories from the JI." Compl. ¶ 34.  Accordingly, the works at issue fall squarely within the subject matter of copyright. *See, e.g.*,

*New York Times Co. v. Tasini*, 533 U.S. 483, 488 (2001) (enforcing copyright in "21 articles" published in daily newspapers).

### B.   The Rights Asserted by JPC Are Equivalent to Those Set Forth in the Copyright Act

Similarly, the Complaint makes clear that the rights which JPC seeks to vindicate are equivalent to rights provided by the copyright law.  JPC's state-law claims contain no extra elements and merely seek additional remedies for the same acts that are covered by the Copyright Act.[6]

### 1.   The Conversion Claim is Preempted

JPC's Eleventh Count alleges that "JI stories were reproduced in substance on the Courant's Internet site" and that this "constitute[s] conversion of the plaintiff's property." Compl. ¶¶ 34, 35. The essence of JPC's conversion claim, like any copyright claim, is that Courant allegedly was using written materials created by the plaintiff which allegedly were "reproduced in substance." Such a claim is identical to and in no way qualitatively different from a claim asserting infringements through acts of reproduction and distribution or display and accordingly is preempted.

In *Frontier Group*, the court rejected as preempted a conversion claim asserted under Connecticut law based on the unauthorized use of a copyrighted work (in that case, architectural plans).  493 F. Supp. 2d at 291.  Dismissing that claim, the court indicated that: "It is clear from the Complaint, then, that the Plaintiff alleges acts of reproduction, or otherwise wrongful usage, of the Plans.  This conduct constitutes infringement of the exclusive rights provided by the federal

---

[6] The preemptive effect of the Copyright Act is not lessened because JPC elected not to register any copyrights in its website or pursue infringement claims based on Courant's alleged use of web content. Courts have made clear that "for purposes of preemption, the scope of the Copyright Act's subject matter is broader than the scope of its protection," *Stromback v. New Line Cinema*, 384 F.3d 283, 300 (6th Cir. 2004), and preemption applies so long as plaintiff's work fits within the subject matter of copyright whether or not a copyright claim actually is pursued.

copyright law, which preempts a conversion claim based on such conduct." *Id.* at 299.   Similarly, in *R.D. Wolf*, the Superior Court rejected as preempted another claim for conversion based on the reproduction and use of architectural plans.  There, the court concluded that the complaint had "not sought relief for the actual physical deprivation of the Plans (the property), but for subsequent actions taken with the Plans by [defendant]," and thus "the conversion claim is preempted by § 106 as it fails to meet the 'extra element' test and lies within the ambit of the Copyright Act."  2004 WL 728936, at *5.

Here, it is clear that JPC's claim is not based on its having been deprived of the physical property in which its news reports were embodied, but is entirely directed at the reproduction and use of those reports.  Accordingly, the Eleventh Count, alleging conversion of those reports, is preempted by the Copyright Act and should be dismissed. *See, e.g., Moser Pilon Nelson Architects, LLC v. HNTB Corp.*, 2006 WL 2331013, at *12, (D. Conn. Aug. 8, 2006) ("Plaintiffs do not allege that Defendants took possession of the original renderings, but rather that Defendants copied Plaintiffs' work.  Accordingly, the 'conversion claim [is] preempted by the Copyright Act since it is based solely on copying, *i.e.*, wrongful use, not wrongful possession.'").

### 2.    The Unjust Enrichment Claim is Preempted

JPC's Twelfth Count, which purports to assert a claim for unjust enrichment, also is preempted.  This claim merely seeks a remedy for the alleged "plagiarizing of local news" and the "reproduc[tion] in substance" of "published stories."  Compl. ¶¶ 8, 34, 36.  Based on those alleged acts, JPC contends that "[t]he defendant has been unjustly enriched by virtue of its misconduct." *Id.* ¶ 38.  Courts, however, uniformly reject such state law unjust enrichment claims as preempted by federal copyright law. *See, e.g., Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc.*, 210 F. Supp. 2d 552, 567 (D.N.J. 2002) ("'Courts have generally concluded that the theory of unjust enrichment protects rights that are essentially "equivalent" to rights protected by the Copyright Act;

thus, unjust enrichment claims relating to the use of copyrighted material are generally preempted.'") (citations omitted).

For instance, in *Briarpatch, Ltd.*, the Second Circuit rejected as preempted a claim for unjust enrichment based upon the unauthorized reproduction and adaptation of a novel and a screenplay. 373 F.3d at 306-07. The court found that the defendant's alleged act of turning the plaintiffs' novel and screenplay into a motion picture "without compensating Briarpatch or obtaining Briarpatch's permission" was an act that "would, in and of itself, infringe the adaptation rights protected by § 106(2)." *Id.* at 306. Holding the unjust enrichment claim to be preempted, the court explained that: "While enrichment is not required for copyright infringement, we do not believe that it goes far enough to make the unjust enrichment claim qualitatively different from a copyright infringement claim. Like the elements of awareness or intent, the enrichment element here limits the scope of the claim but leaves its fundamental nature unaltered." *Id.*; *see, e.g., R.D. Wolf, Inc.*, 2004 WL 728936, at *6 ("whether the theory of unjust enrichment involves state-created rights that are qualitatively different from the federal rights protected by the Copyright Act . . . [v]irtually without exception, courts have concluded that they are not.") (internal quotation marks omitted); *Moser Pilon Nelson Architects, LLC*, 2006 WL 2331013, at *11 ("Plaintiffs' unjust enrichment claim is based on Defendants' alleged wrongful copying of their copyright-protected expression, and in such cases the Second Circuit has held that neither misappropriation nor enrichment, without more, is sufficient to avert preemption.").

Here, plaintiff's allegations of plagiarization and reproduction of its news items and stories present no extra elements to make its unjust enrichment claim qualitatively different from a claim for copyright infringement. *See, e.g., Netzer v. Continuity Graphic Assocs., Inc.*, 963 F. Supp. 1308, 1322 (S.D.N.Y. 1997) ("While Defendants may have been enriched by the exploitation of [the work], Netzer's claim of unjust enrichment is preempted by the federal Copyright Act.");

*Stewart v. World Wrestling Fed'n Entm't, Inc.*, 2005 WL 66890, at *5 (S.D.N.Y. Jan. 11, 2005)

("The overwhelming majority of courts in this circuit have held that an unjust enrichment claim

based upon the copying of subject matter within the scope of the Copyright Act is preempted.")

(internal quotation marks omitted).

### 3.    The CUTPA Claim is Preempted and Otherwise Fails to State a Claim

JPC's Thriteenth Count purporting to assert a claim under CUTPA is based entirely on the

same conduct that underlies copyright claims; namely the alleged "pirating of the plaintiff's local

news stories"—*i.e.*, "the defendant plagiarized local news stories published by the plaintiff."

Compl. ¶¶ 8, 39, 44.  The law, however, is clear: CUTPA claims seeking to address rights

equivalent to those provided by the Copyright Act such as the reproduction and use of written work

are preempted.

In *Frontier Group*, 493 F. Supp. 2d at 301, the court "concluded that both the Plaintiff's

conversion claims and the Plaintiff's CUTPA claim are preempted by the Copyright Act because

they sound in federal copyright law, and are, in fact, claims for copyright infringement."  The court

recognized that "'unfair competition claims based upon breaches of confidential relationships,

breaches of fiduciary duties and trade secrets have been held to satisfy the extra-element test,'" but

that "the Copyright Act 'preempts unfair competition and misappropriation claims grounded solely

in the copying of a plaintiff's protected expression.'"  *Id.* at 300-01.  Rejecting the plaintiff's

CUTPA claim, the court explained that

> Plaintiff does not allege that it had a confidential or fiduciary
> relationship with the Defendant, nor does the Plaintiff allege that the
> defendant violated a trade secret.  The wrongful (or, as the Plaintiff
> states, "unfair and deceptive") conduct alleged here is the same
> conduct that served as a basis for Plaintiff's conversion claim—the
> unauthorized copying and use of the Plans.  Allegations of such
> conduct, without more, are governed by federal copyright law
> exclusively, regardless of a plaintiff's attempts to sound a claim in
> state unfair trade practices law.  The Plaintiff's CUTPA claim
> contains no element to qualitatively differentiate it from those areas
> protected by copyright.  Consequently, the Plaintiff's CUTPA claim

> fails to meet the "extra element" test, and is thus preempted by the
> Copyright Act.

*Id.* at 301.

Similarly, in *RBC*, 2009 WL 3642770, at *18 the court held the plaintiff's CUTPA claim to be preempted by federal copyright law. In *RBC*, the plaintiff accused a competitor of copying elements of plaintiff's product catalog for use in competition with the plaintiff, and asserted, as plaintiff does here, that these acts violated CUTPA. Dismissing this CUTPA claim, the court noted that "review of the . . . Complaint reveals that Plaintiffs' state law claims [including under CUTPA] are based upon the same allegations supporting their federal trademark and copyright claims." *Id.* Finding no extra elements to transform the plaintiff's CUTPA claim into a claim qualitatively different from copyright infringement, the court held that the CUTPA claim was "preempted by the Copyright Act." *Id.*

Of course, not all CUTPA claims are preempted by the copyright law. When a CUTPA claim seeks to enforce a right that is different in kind from the rights protected by copyright, such as claims alleging use of unauthorized copies causing "subversion of the public bidding process," preemption does not apply. *Moser Pilon Nelson Architects, LLC*, 2006 WL 2331013, at *12-13; *see, e.g.*, *R.D. Wolf, Inc.*, 2004 WL 728936, at *13 (claims that "sound in 'deliberate misrepresentations'" not preempted). But where, as here, a CUTPA claim is based on the same conduct supporting a claim for copyright infringement, the claim lacks the requisite "extra elements" to escape preemption, as was the case in *Frontier Group* and *RBC*. There simply is nothing in JPC's complaint to distinguish its CUTPA claim from a run-of-the-mill infringement claim.

The cases in Connecticut finding CUTPA claims to be preempted by copyright law are consistent with the treatment by courts within the Second Circuit of claims made under other states' unfair competition and trade practices laws. Thus, for example, in *Orange County Choppers, Inc.*

*v. Olaes Enterprises, Inc.*, 497 F. Supp. 2d 541 (S.D.N.Y. 2007), the plaintiff contended that the defendant made unauthorized copies of plaintiff's designs, and used these copies in direct competition with the plaintiff in violation of New York's unfair competition law. Finding that claim to be preempted by copyright law, the court stated that: "It is axiomatic that unfair competition and misappropriation claims grounded solely in the copying of a plaintiff's protected expression are preempted by [the Copyright Act]." *Id.* at 556 (internal quotation marks omitted, alteration in original). Similarly to plaintiff's CUTPA claims here, the court concluded that "[c]learly, ODM's unfair competition and copyright infringement claims are duplicative in substance and objective and are thus governed exclusively by the Copyright Act." *Id.*; *see, e.g.*, *Patrick*, 887 F. Supp. at 482, 484 (Unlawful competition claim based on unauthorized publication of plaintiff's research paper misattributed to defendants and used "for their own purposes and to further their own careers" held to be "equivalent to copyright" and thus preempted.).

The result should be no different here. The conduct addressed by JPC's CUTPA claim is the alleged "pirating" and "plagiarizing" of JPC's work. This is the essence of copyright, and JPC's CUTPA claim is preempted.

Even if JPC's CUTPA claim could somehow avoid preemption, it nevertheless should be dismissed because the complaint does not allege facts necessary to establish a CUTPA claim. The complaint just parrots the language of CUTPA in a conclusory allegation that defendant supposedly "offended public policy; was immoral, oppressive, unethical and unscrupulous." Compl. ¶ 45. But, as the Supreme Court has underscored, "labels and conclusions" or "a formulaic recitation of a cause of action's elements will not do." *Iqbal*, 129 S. Ct. at 1949 (internal quotation marks omitted). JPC's complaint falls far short of providing any facts capable of establishing any right to relief. And, to the extent that JPC's CUTPA claim is based on any assertion that Courant "misattributed . . . stories as the defendant's own work" (Compl. ¶ 8), the complaint's own Exhibit

23

B conclusively demonstrates that Courant identified the *Journal Inquirer* as the source of each of the news items challenged under CUTPA by JPC.

The complaint also falls short of establishing that JPC even has standing to assert a CUTPA claim. "The private right of action under CUTPA is limited by its terms to a 'person who suffers any ascertainable loss of money or property, real or personal' as a result of a violation of CUTPA." *Jewell v. Med. Protective Co.*, 2003 WL 22682332, at *1 (D. Conn. Oct. 30, 2003) (quoting Conn. Gen. Stat. § 41-110g(a)); *see, e.g., Nationwide Mut. Ins. Co. v. Mortenson*, 606 F.3d 22, 30 (2d Cir. 2010) ("CUTPA . . . also requires proof of an 'ascertainable loss' resulting from the allegedly unfair business practice."). Thus, "[t]o bring a CUTPA claim, a plaintiff must at least allege some economic loss." *Jewell*, 2003 WL 22682332, at *1. Moreover, Rule 8 demands "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 129 S. Ct. at 1949. Here, the complaint alleges no loss of any kind to JPC. Rather, JPC makes the factually deficient assertion that Courant "caused substantial injury to readers, competitors and advertisers" (Compl. ¶ 45), and contends that Courant was unjustly enriched (*id.* ¶ 38),  but identifies no ascertainable loss *to itself*. Indeed, JPC does not seek to recover—and does not identify—any actual damages it might have suffered, and seeks only statutory damages under the Copyright Act. The complaint, for example, "points to no evidence that [Courant's] actions caused them to lose customers," *Mortensen*, 606 F.3d at 31, does not allege that JPC lost advertisers or any other business whatsoever, or otherwise present any facts from which the requisite ascertainable loss might be found. Thus, as the court stated in *Jewell*, "defendant's motion to dismiss the CUTPA count must be granted because plaintiff failed to allege economic loss, an essential element of a CUTPA claim." 2003 WL 22682332, at *2.

## CONCLUSION

For all of the reasons set forth above, defendant respectfully requests that this Court grant its motion to dismiss or, alternatively, to strike the Complaint in its entirety with prejudice, together which such other relief the Court deems proper.

Respectfully submitted,

LEVINE SULLIVAN KOCH & SCHULZ, L.L.P.

By _____
Cameron Stracher (Bar No. ct 28146)
4 North Pasture Road
Westport, CT 06880
t: (203) 222-7169; f: (203) 222-7169

Of Counsel:
Robert Penchina
Levine Sullivan Koch & Schulz, L.L.P.
321 West 44th Street, Suite 510
New York, NY 10036
t: (212) 850-6109; f: (212) 850-6299

*Attorneys for Defendant The Hartford Courant Company*

# APPENDIX

| **Journal Inquirer Article** | **Hartford Courant Article** |
|---|---|
| July 31, 2009 | August 4, 2009 |

| | |
|---|---|
| <u>Bolton Lakes sewer project denied funding for next phase of work</u> | <u>Sewer Project Funding Pulled By USDA</u> |
| | Federal funding for the last two phases of a sewer project around Lower and Middle Bolton Lakes that would serve the town and Vernon has been pulled because federal officials decided that Vernon's population exceeds the limit set under new policy guidelines. |
| The Bolton Lakes Regional Water Pollution Control Authority this month lost $2.5 million in federal funding that had previously been granted for the last two phases of a massive sewer project spanning three towns. | |
| The grant from the U.S. Department of Agriculture's rural development water and wastewater program was pulled because Vernon's population exceeds the limit under new policy guidelines, federal officials said in a July 15 letter. | In a letter sent to the Bolton Lakes Regional Water Pollution Control Authority on July 15, the U.S. Department of Agriculture pulled the $2.5 million it had previously earmarked for the fourth and fifth phases of the project through a rural water and wastewater program. |
| For Bolton and Vernon officials, losing the money for part of phase four and all of phase five came as a shock. | The sewer system, which would serve about 360 homes in Bolton and 140 homes in Vernon, would run along Route 44 and feed into the wastewater treatment plant in Manchester. |
| "We worked very hard to put this funding In place, and now we feel like the rug is being pulled out from under us," Bolton Town Administrator Joyce Stille said this week. | |
| A contract was awarded this month for the $21.7 million project, and ground is about to be broken for the first phase. | Many of the individual septic systems around the lakes, which are in both towns, are failing, and the state Department of Environmental Protection ordered Bolton and Vernon to build sewers around the lakes about 10 years ago. |
| The sewer system, which will affect about 360 homes in Bolton and 140 homes in Vernon, will feed into the Manchester water-treatment plant, eliminating the need at homes around the lakes for individual septic systems, many of | Town officials created the water pollution control authority in 2003 to oversee the project and because they were told that creating the district would ensure the USDA grant.<br><br>To be eligible for the grant, the city, town or |

1

which are failing.

Nearly 10 years ago the state Department of Environmental Protection ordered Vernon and Bolton to install sewers around the lakes, which straddle the two towns. The lines will run along Route 44 into Manchester. Construction Is expected to take at least five years to complete.

The water pollution control authority was established in 2003 to oversee the vast project.

Town officials were also told that creating the district would ensure the USDA grant. Bolton, on its own, qualifies as a rural area, but Vernon, with a population of 28,063 in the last census, doesn't.

In order to be eligible the city, town, or unincorporated area must have a population of 10,000 or fewer.

"In the past we had considered separate municipal districts as separate eligible areas, and calculated the population of the applicant based on the district," the July 15 letter states.

But recently, the agency's lawyers changed their minds on that, and the prior eligibility determination for the Vernon portion of the project reversed.

The majority of the work, about 70 percent, lies within Bolton's borders, but it cannot be completed without also hooking up the Vernon homes along the lake.

"The impact is huge on Bolton," said Stille, who has been told to expect about $500,000 from the state DEP Clean Water Act to offset

unincorporated area has to have a population of no more than 10,000.  Bolton qualifies, but Vernon has a population of about 28,000.

In the July 15 letter, federal officials said that the agency changed the eligibility determination for the grant, and that the prior eligibility for Vernon was reversed.

Bolton Town Administrator Joyce Stille said she was told to expect about $500,000 from the DEP Clean Water Act to offset part of the loss.

This month, a contract for the $21.7 million project was awarded, and ground is set to be broken on the first phase.

the loss.

"But that's nowhere close to what we need," she said

Town officials were hoping that the local project — as well as nine others in the northeast similarly affected — would be "grandfathered" as work had already begun.

"Before, they always looked at things In motion, and it's our understanding that they've always grandfathered in the past, but they said they won't do that either," Stille said.

Vernon and Bolton officials are now appealing to the state's congressional delegation, asking that they insert language in legislation that would restore the funding.

"We had gone through this process with rural development and had letters accepting this approach — we really feel this Is inappropriate to now deny the funds," Stille said, adding: "This is why we created the WPCA. We were working with the federal agency in order to obtain this funding."

The entire project is funded by a variety of state and federal sources, including a $850,000 Clean Water Fund grant administered by the DEP in 2006 that was used for its design.

Long-term federal loans are funding most of the project as it unfolds, and user fees will pay off the debt.

Bolton and Vernon will share the cost of the project, but Bolton has assumed a leading role because of its larger share of customers.

3

| **Journal Inquirer Article** | **Hartford Courant Article** |
|---|---|
| July 31, 2009 | August 4, 2009 |
| <u>New party gets place on East Hartford ballot</u> | <u>GOP Candidates Form Tea Party Committee</u> |
| November's municipal election just got more competitive. | Two Republican-endorsed candidates joined with two others rejected by the Republican town committee last week to form the Tea Party '09 Political Action Committee. |
| On Thursday, two Republican-endorsed candidates joined with two others rejected by the Republican Town Committee in forming the East Hartford Tea Party '09 Political Action Committee. | Former Mayor Susan Kniep, Jonathan Searles, Patricia Harmon and Eileen Powers formed the committee. Searles was endorsed by the Republicans for the town council and Powers for treasurer. Harmon serves on the council but wasn't nominated for re-election. |
| Former Mayor Susan Kniep is running for Town Council on the ticket, joined by Republican Jonathan Searles and Republican Patricia Harmon, who serves on the council but wasn't nominated for re-election when the town committee met last week. | Members of the PAC have until 4 p.m. today to file as petitioning candidates for the November election. Searles and Powers intend to remain on the ballot as Republicans, and Kniep and Harmon may run as Tea Party candidates. |
| Harmon garnered more votes than any other Republican council candidate in the 2007 municipal election. Democrats hold a 6-3 majority on the council, and all six of the incumbents are endorsed for re-election. | Searles said the new party's platform calls for independent-minded candidates dedicated to solving problems with no political strings attached. |
| Eileen Powers rounds out the Tea Party committee. She is the endorsed Republican candidate for treasurer. | People throughout the country held "tea parties" to protest taxes and government spending during the spring. Searles and Kniep helped organize a tea party held at the state Capitol. |
| The slate doesn't endorse a mayoral candidate. There is no endorsed Republican either, meaning that barring a last-minute addition to the ballot or surge in write-in votes on Election Day, Democratic Mayor Melody A. Currey will win a third term. | Searles said he plans to resign as publicity chairman for the Republican town committee. |
|  | Joseph Kronen, a member of the Republican |

1

During the spring, thousands of people throughout the country held "tea parties"—Taxed Enough Already—to protest taxes and government spending.  Searles and Kniep were active in organizing people to participate in the tea party held at the state capitol.

This year, Currey's recommended budget cut all facets of town government.  She said the 2009-10 operating budget cut spending by $8 million from the previous year.

"I find it interesting in a year when taxes were not increased in our community that we have a Tea Party formed," Currey said.

Members of the PAC have until Tuesday at 4 p.m. to file as petitioning candidates, according to the secretary of the state's office.

According to Searles, the Tea Party platform calls for independent-minded candidates dedicated to solving town problems with no political strings attached.

"Unfortunately, that was something that was missing in the last municipal election," Searles said.

On taxes, the PAC proposes an annual budget cap and automatic budget referendum, as well as the elimination of abatements and "property giveaways."

The PAC also wants to reform what it calls unethical town government, reprioritize educational spending to benefit taxpayers and students, and maintain quality of life for East Hartford's older residents.

town committee, is chairman of the political action committee.

2

"I know that taxpayers want their government to work on their behalf and not to the benefit of those who are politically connected," Kniep said. "It is time for real ethics reform."

Searles said he and Powers intend to remain on the Republican line of the ballot, with Kniep and Harmon running on a third line.

The PAC members will share financing and support each other during the campaign, Searles said.

Searles will resign his position as publicity chairman for the town committee at its next meeting, he said.  He added that he plans to explain his decision to join the PAC to his fellow Republicans.

As of Thursday, Searles said, Harmon had yet to file her nomination forms.

Joseph Kronen, a member of town committee, is chairing the PAC.

Tempers flared last week when the town committee met at the Raymond Library, namemainngry she wasn't nominated for re-election.

Harmon wasn't at the meeting and an effort to open the floor for nominations failed.

Harmon couldn't be reached to comment.

Kniep was nominated from the floor to run on the Republican ticket for council.  Her nomination was defeated by paper ballot.

Searles said his decision to join the PAC was due in part to issues with town committee leadership.  Paul Roczynski, town chairman, couldn't be reached for comment.

The Republican council slate features incumbents Donald Pitkin and Eric Thompson, along with candidates Susan Skowronek, Stephen Roczynski, Debra Gaudette, and Searles.

Kniep is the last Republican elected to the mayor's office, serving from 1989 to 1993. She has run for mayor several times since.

In 2007, Kniep won a primary over Skowronek, the Republican's endorsed candidate.  Both women remained on the ballot, and Currey easily won re-election.

| **Journal Inquirer Article** | **Hartford Courant Article** |
|---|---|
| August 1, 2009 | August 6, 2009 |

| | |
|---|---|
| <u>Construction of regional emergency center to begin</u> | <u>Emergency Center Gets Grant for Equipment</u> |
| Construction of a regional emergency operations center is expected to break ground on Olcott Street soon, now that the board of directors has released grant money allowing for the purchase of communications equipment. | Construction of a regional emergency operations center on Olcott Street is set to begin now that the board of directors has released grant money to buy communications equipment. |
| The center will be sited in a portion of the Public Works facility, with the renovation to begin in early August, Police Chief Marc Montminy said. | The town got nearly $445,060 through a US. Department of Justice community oriented police services grant to buy information technology, which will be installed with the construction of the building. The town also received $515,000 from the Capitol Region Council of Governments for the building construction. |
| In September the town was awarded a $444,268 U.S. Department of Justice Community Oriented Police Services, or COPS, grant to buy information technology for the center. | In the event of a regional emergency, the center will serve 23 towns, including Bolton, East Hartford, East Windsor, Manchester, South Windsor, Suffield, Vernon, Windsor and Windsor Locks. |
| "This is only one of several pots of money," Montminy said. | |
| Last year the town got $515,000 from the Capitol Region Council of Governments for the "bricks and mortar" for the building project. | |
| Initial communications and technology costs are expected to total around $94,000, and installation will coincide with actual building construction, Montminy said. | |
| Once completed, the emergency operations center will serve 23 towns, including Bolton, | |

East Hartford, East Windsor, Manchester, South Windsor, Suffield, Vernon, Windsor, and Windsor Locks, in the event of a regional emergency.

New Britain has a similar regional emergency operations center.

Should Manchester need to use the local facility because of an event isolated to its borders, it'll have priority use.

Plans call for a roughly 5,000-square-foot facility that includes space for 30 people to work, eat, and sleep as they respond to a long-term emergency such as a blizzard, flood, or terrorist attack.

That type of response now requires firefighters wheeling a cart of communications equipment from the downtown firehouse to the Lincoln Center to set up a command post there.

"Situation rooms" are also opened during large townwide events such as Cruisin' on Main and the Thanksgiving Day Road Race.  Town officials say the new center would better accommodate emergency personnel during those events.

And when not being used in an emergency, the center could serve as a training location for town staff, or as a secondary location for police dispatchers should their equipment fail, town officials say.

"This facility will be very impressive once it's completed," Mayor Louis A. Spadaccini said. "It's a wonderful resource to have in our own backyard."

2

| **Journal Inquirer Article** | **Hartford Courant Article** |
|---|---|
| August 5, 2009 | August 7, 2009 |
| Greenway trail plan gets green light from East Windsor selectmen | Grant Would Fix Bridge, Help Fund Greenway |
| Selectmen gave town staff the green light Tuesday to apply for a state grant to create a greenway trail along the Scantic River and rehabilitate the Melrose Bridge for pedestrian use. | Selectmen gave the go-ahead Tuesday for town staff to apply for a state grant to create a greenway trail along the Scantic River and rehabilitate the Melrose Bridge for pedestrians. |
| "I think there is a very good chance of getting the grant," Assistant Town Planner Robin Newton said of the matching grant that can use in-kind services as the match. | The town will request at least $52,000 from the Department of Environmental Protection to build waterway trails and 2 ½ miles of walking trails from the Enfield border to Route 140. Two canoe launch points are also being proposed. |
| Although there was no vote, the Board of Selectmen agreed to write a letter in support of the project. | |
| Newton said she already has received a letter from the town's American Heritage River Commission supporting the project. | |
| The state grant through the Department of Environmental Protection would help build waterway trails and about 2 ½ miles of walking trails from the Enfield border to North Road, or Route 140.  Two canoe launch points also are being proposed, one at the Melrose Bridge and the other on town property near North Road. | |
| The deadline for the grant application is Sept. 1.  Newton said she is going to request at least $52,000 for equipment for the project, including an all-terrain vehicle to help clear brush and make a trail along land owned by the | |

town and the DEP.

Other equipment needed to clear the path and waterway includes rope lines, chainsaws, and cable tows.

Town staff also hopes to repair the Melrose Bridge and build a handicapped-accessible ramp for fishing.

Newton says in a report that the project Is mentioned in the Scantic River Watershed Association's introductory booklet as an area of "considerable wildlife and canoeing and kayaking opportunities if the area was made passable."

It would be an area that also would provide educational opportunities, she said. Workers would clear the waterway only enough to allow for the boats to pass, while being sensitive to maintaining habitat for fish and wildlife.

The DEP lists the area as a place for trails, picnicking, and canoe launches in its 1989 Scantic River State Park master plan, Newton says in her report.

Richard U. Sherman, American Heritage River Commission chairman, said, "We can't disrupt the river.  All we can do is open up a thoroughfare.

However, he added, they have more flexibility with clearing the land along the waterway.

After the meeting Sherman said his group has been working to create a trail for about three years.  The long-term goal is to connect the greenway with one in South Windsor and then

2

to the Connecticut River.

"There's a lot of things that are all coming together," Sherman said.

| **Journal Inquirer Article** | **Hartford Courant Article** |
|---|---|
| August 5, 2009 | August 7, 2009 |
| Interim principal named in Hebron | Hebron Hires Principal |
| Annie Sweeney, a former South Windsor teacher, has been hired as interim principal of Hebron Elementary School for the coming school year, Superintendent Eleanor Cruz announced last week. | A former South Windsor teacher has been hired as interim principal of Hebron Elementary School. |
| Sweeney was hired to replace outgoing Principal Joanne Collins, who took a job last month in East Haddam. | Annie Sweeney will replace Principal Joanne Collins, who took a job in East Haddam in July. |
| Sweeney taught at South Windsor schools before taking a job as principal at Chapman Elementary School in Cheshire.  For the last four years, she's worked as a consultant for the Connecticut Association for Supervision and Curriculum Development. | A committee to find a permanent principal will conduct interviews this month and expects to make a recommendation to the board of education in September. |
| A committee to find a permanent principal for the school expects to conduct interviews this month, Cruz said.  The committee will make a recommendation to the Board of Education in September. | |

1

| **Journal Inquirer Article** | **Hartford Courant Article** |
|---|---|
| August 12, 2009 | August 13, 2009 |
| Selectmen raise building, zoning fees | Board Changes Fees |
| A construction fee schedule adopted unanimously by the Board of Selectmen on Thursday changes costs for building and demolition permits and for zoning compliance applications. | The board of selectmen has adopted a construction fee schedule that increases the costs for some permits and applications. |
| Certificate-of-occupancy fees changed to 25 cents for every $1,000 of work on the site from $25 total.  A new administrative review fee for buildings charges $2 for every $1,000 of work. | Certificates of occupancy changed from a $25 total fee to 25 cents for every $1,000 of work on the site.  Demolition permits will now cost $12 for every $1,000 of work and applications for zoning approvals for additions, sheds and docks will cost $25. |
| Demolition permits increased in price to $12 for every $1,000 of work from $8.  And applications for zoning approval for additions, sheds, and decks now cost $25.  A new $150 fee is charged for single-family home applications. | |
| Regional schools and other regional government agencies are exempt from town fees unless selectmen decide to charge. | |
| Responsibility to grant building permits on properties with delinquent taxes now shifts to the town manager from selectmen. | |
| Waivers apply if the work is for public safety, health, or welfare reasons. | |

1

| **Journal Inquirer Article** | **Hartford Courant Article** |
|---|---|
| August 12, 2009 | August 18, 2009 |

<table>
<tr><td>

**PZC extends special-use permit for one year allowing condo project to finish**

</td><td>

**Coleman Farms Condos Get Permit Extension**

</td></tr>
<tr><td>

Planning and Zoning Commission members voted unanimously Tuesday to extend a special-use permit for the Coleman Farms condominium complex, despite their displeasure with receiving the proposal at the last minute.

</td><td>

The planning and zoning commission unanimously agreed last week to extend a special-use permit for the Coleman Farms condominium complex.

</td></tr>
<tr><td>

"I just got this dumped in my lap.  I am very disappointed," commission Chairman Joseph Ouellette said.

</td><td>

The condominium complex for older residents has 47 finished units, but has 10 set for construction as well as a clubhouse and roadway to be completed.

</td></tr>
<tr><td>

Vice Chairman Frank Gowdy agreed, "It seems to me someone was negligent in their work."

</td><td>

The permit was extended until August 2010, but the commission required that completion of the road be included in the site work.  If the developer fails to agree by the agreement, the commission authorized town staff to withhold certificates of occupancy.

</td></tr>
<tr><td>

But Harold R. Cummings, lawyer for the Coleman Farms homeowners association, told the PZC he had been working on the agreement to provide the project more funding since June and didn't finish the final details until 3 p.m. Tuesday.

</td><td></td></tr>
<tr><td>

Cummings and Leonard Jacobs, lawyer for the developer of Coleman Farms East Windsor LLC, crafted the agreement, he said.

</td><td></td></tr>
<tr><td>

The condominium complex for older residents has 47 finished units, with 10 more set for construction, as well as a clubhouse and roadway to be finished.

</td><td></td></tr>
<tr><td>

Jacobs said the poor economy dried up condominium sales in East Windsor and

</td><td></td></tr>
</table>

elsewhere.  Consequently, the developer and homeowner's association agreed to reinvest the profits from future condo sales back into the project.

Jacobs will manage the account, he said, and the accounting would be available to the association to review.

This account, plus some $175,000 bond amount being held in escrow, should be enough to finish the project, both sides said.

"The one thing that will never be a problem is the accounting," Jacobs said.  "The problem is the sale of the units."

The units start at $275,000, Jacobs said after the meeting, adding, "The project is beautiful."

Town Planner Laurie Whitten said it isn't unusual for planning and zoning commissions to work with homeowner's associations, although it hasn't been done in East Windsor.

"I don't think it is going to become a big issue," Whitten said.

Coleman Farms Homeowners Association President Melvin Ressler said, "The whole association group feels the agreement is to our benefit.  We are wholeheartedly in support of it."

The development on Tromley Road began in 2003, but has yet to be finished.  The PZC voted unanimously to extend a special-use permit until August 2010, and agreed that the completion of the road be included in the site work.

Additionally, the PZC agreed that town staff would work with the homeowner's association and withhold certificates of occupancy if the developer fails to abide by the agreement.

| **Journal Inquirer Article** | **Hartford Courant Article** |
|---|---|
| August 17, 2009 | August 21, 2009 |
| Hebron Ed Board happy with superintendent | Board Extends Contract |
| Superintendent Eleanor Cruz received rave reviews from the Board of Education, and her contract was extended for another year, until June 2012. | The board of education has extended the contract of Superintendent Eleanor Cruz another year, until June 2012. |
| "We're very fortunate to have her," Board of Education Chairwoman Jane Dube said of Cruz. "The whole board is very pleased with her. She's an effective administrator." | Cruz, who volunteered to forgo her annual raise for the 2009-10 school year, will receive $131,000, five personal days, tuition payments as she pursues a doctoral degree and a $2,000 boost in her annuity income to $16,000. |
| Cruz volunteered to forego her annual raise for the 2009-10 school year when the school board was creating its budget. She'll receive the same $131,000 salary for next year, but got five personal days, tuition payments to pursue a doctoral degree, and a boost in her annuity income, a yearly payment in addition to salary. | Cruz plans to take evening and weekend courses at the University of Massachusetts this fall to pursue a doctoral degree in educational leadership. |
| Cruz's annuity was increased by $2,000 to $16,000 for 2009-10, Dube said. | |
| The five personal days are in line with other administrators in the district. It was a mistake that they weren't included in the superintendent's contract already, Dube said. | |
| Cruz also will be reimbursed for tuition payments. She plans to take evening and weekend classes this fall at the University of Massachusetts toward a doctoral degree in educational leadership, Cruz said. | |
| In an evaluation of Cruz's performance, the | |

board gave her a score of "far exceeds expectations" in every category.  Last year, she received a few "exceeds expectations," Cruz said.  The categories include community relations, educational leadership, business and finance management, and staff and personnel relationships.

"Since joining the district four years ago, she has Implemented a vision of learning that is shared and supported by the staff and the local community," the report says.

The review comes on the heels of recognition as one of the highest-achieving districts on state standardized tests this spring.

Board of Education members learned Thursday that the district met state and federal standards for progress except with special education students.

The district started running into difficulty meeting progress goals with the group three years ago, Cruz said.

A plan to increase professional development and analysis of student achievement will include more special education teachers next year, Cruz said.

| **Journal Inquirer Article** | **Hartford Courant Article** |
|---|---|
| August 18, 2009 | August 20, 2009 |

<table>
<tr>
<td>

Hazardville Water Co. wants 19% increase

The Hazardville Water Co. wants state regulators to approve a 19.05 percent rate hike and a $566,000, or 18.4 percent revenue increase. The last rate hike occurred Aug. 21, 2006.

A typical customer using 2,200 cubic feet of water per quarter, now paying $82.23 per quarter, would pay $97.89 with the rate hike, or $5.22 more per month, the company said.

The rate hike would not apply to the Rye Hill customers in Somers, now paying rates above the proposed rate.

The water company serves over 7,000 customers in the Hazardville section of Enfield, about 400 in Somers, and 10 in East Windsor. Most are residential. It has 300 commercial and 23 municipal customers.

The rate hike is necessary, Hazardville President Jonathan Avery testified, due to increased operation and maintenance expenses, including payroll, pension, purchased power, and rent expenses rising over what the DPUC allowed, "and the overall continuing decline over the last 10 years in average consumption per customer."

Also, the company said in the first year of new rates it intends to install 9,850 feet of new main pipes to "eliminate hydraulic constraints and improve fire flows." Because of the $1.5

</td>
<td>

Water Company Seeks 19 Percent Rate Hike

The Hazardville Water Co. is asking state regulators to approve a 19.05 percent rate hike that would result in a $566,000, or 18.4 percent, increase in revenue.

A typical customer using 2,200 cubic feet or water per quarter would see a cost increase from $82.23 per quarter to $97.89. The last rate hike occurred Aug. 21, 2006.

The water company—which serves about 7,000 customers in the Hazardville section of Enfield, about 400 in Somers and 10 in East Windsor—said it needs the rate hike because of increased expenses.

The company also said it intends to install 9,850 feet of new main pipes in the first year of the new rates and intends to ask for another 5 to 6 percent rate hike in the fall of 2010 after it finishes the $1.5 million project.

The state Department of Public Utility Control has scheduled a public hearing on the request Monday from 9:30 a.m. to 4 p.m. at DPUC offices at 10 Franklin Square in New Britain. A hearing for public comment also will be held Monday at 7 p.m. at Enfield Town Hall.

</td>
</tr>
</table>

million cost, Avery said that In mid-2010 the
company expects to ask for a 5 to 6 percent
rate hike starting in the fall after finishing the
project.

The state Office of Consumer Counsel
objected, arguing for a lower rate hike.

Hazardville does not recognize that its long-
term debt will soon be towered when it
recapitalizes it, OCC Technical Analysis
Supervisor Richard Sobolewski said.  Also, he
said, the capitalization is "equity-rich and
results in a higher overall cost of capital that
leads to higher revenue requirements that are
proposed to be collected by ratepayers."

Enfield resident Michael Rinaldi complained:
"In a time when people are denied salary
increases, if they even still have a job, these
endless requests to burden the citizens with
more charges is unfair. … Companies may see
it as 'only' a 19 percent increase, but allow that
over the course of several years and the costs
become unmanageable."

The DPUC scheduled a public hearing on the
company's requests on Monday from 9:30 a.m.
to 4 p.m. at DPUC offices at 10 Franklin
Square, New Britain.  The hearing for public
comment only will resume at 7 p.m. in the
Enfield Room, lower level, in the Enfield
Town Hall at 820 Enfield St.

The company has also requested an extension
of the hearing schedule "to explore possible
settlement opportunities with the Office of
Consumer Counsel," DPUC spokesman Phil
Dukes said.

| **Journal Inquirer Article** | **Hartford Courant Article** |
|---|---|
| August 19, 2009 | August 21, 2009 |
| Dems walk out on McCoy over handling of DPW director | DPW Vacancy Prompts Abrupt End to Meeting |
| Upset with Republican Mayor Jason L. McCoy's handling of the Department of Public Works director's vacancy, Town Council Democrats and one Republican walked out of Tuesday's meeting, abruptly stalling business. | Town council Democrats and one Republican walked out of a meeting this week to protest Republican Mayor Jason L. McCoy's handling of the department of public works director's vacancy. |
| Democratic Councilman Michael Winkler said fellow Democrats had asked the mayor to bring forward an appointment for the position at Tuesday's meeting, after McCoy's desired candidate, fellow Republican and former Councilman Robert Kleinhans, was rejected at a meeting in July. | George Fetko, currently Ellington's public works chief resigned from the same position in Vernon nearly six months ago and the town has not yet found a replacement. |
| McCoy said during Tuesday's meeting that he did not see Winkler's request and that he'd planned to comply with their request next month.  Apparently unsatisfied with his answer, Winkler, fellow Democrats, and Republican Nancy Herold left the council chambers. | Democrats had asked the mayor to bring forward an appointment for the position at Tuesday's meeting after McCoy's initial candidate, former Republican Councilman Robert Kleinhans, was rejected at a meeting in July. |
| "Your failure to hire a full-time director of public works will cost you your quorum tonight," Winkler told the mayor and the rest of the council before leaving Town Hall. | McCoy said during the meeting that he did not see the Democrats' request, but that he'd comply with their request next month, at which point the Democrats and Republican Nancy Herold left the council chambers and abruptly ended the meeting. |
| The move elicited some grumbling from council Republicans as they packed up their things and headed into the mayor's office. | McCoy said the failure to finish the meeting could cost the town about $200,000 in grants. |
| Republican Bill Campbell called the move | |

1

"more political posturing."

Immediately following the meeting, McCoy said that since the meeting was abruptly adjourned, it could cost the town an estimated $200,000 in grants for improvements at Valley Falls Park and federal stimulus dollars for energy-saving initiatives.

McCoy said he'd call an emergency special meeting today at 9:30 p.m. to address those items.

Council Democrats haven't been the only ones taking the mayor to task over his handling of the director's vacancy.

George Fetko, Ellington's public works chief, lashed out recently at the mayor, his former boss, for failing to hire a new department head nearly six months after Fetko's resignation.

And a couple residents gave McCoy an earful at Tuesday's meeting over the failed attempt to hire Kleinhans in July, in a meeting room packed with public works employees.

"I'm concerned about the public works department, I'm concerned about my leaf pickup," one resident told McCoy.  "I'm not proud of who I voted for."