## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOURNAL PUBLISHING COMPANY, INC. | : | CIVIL ACTION NO. |
| | : | 3:11CV00188 (RNC) |
| Plaintiff, | : | |
| | : | |
| V. | : | |
| | : | |
| THE HARTFORD COURANT COMPANY | : | MAY 23, 2011 |
| | : | |
| Defendant. | : | |

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
### MOTION TO DISMISS AND/OR STRIKE THE AMENDED COMPLAINT

The plaintiff Journal Publishing Company, Inc. ("JI") hereby opposes the Motion to Dismiss and/or Strike the Amended Complaint, dated May 4, 2011, that has been filed by the defendant Hartford Courant Company ("Courant"). The Courant's motion is based, to a large extent, on a narrow view of federal copyright protection, and on a misreading or misunderstanding of the factual and legal basis for the JI's state law claims. The JI's federal copyright claims arise out of the Courant's admitted plagiarism of local news stories that appeared in the JI's newspaper, which copied stories the Courant then published in its newspaper. This case also asserts state law claims, which claims are not based merely on the unauthorized reproduction and publication of the JI's news articles. Rather, the state law claims arise from the Courant's unfair competition by which the Courant misappropriated JI's commercial newsgathering efforts with respect to the publication of breaking local news stories and the JI's business investment in same, from which the Courant has unjustly benefitted without having to incur many of the costs normally associated with such newsgathering efforts.

## I.    **THE STANDARD OF REVIEW**

The Courant's motion invokes Rule 12(b)(6) and Rule 12(f) of the Federal Rules of Civil Procedure.  However, in its memorandum of law, the Courant does not present any argument or authority to support a claim for relief under Rule 12(f).  Rule 12(f) authorizes a court to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent or scandalous matter."  Yet, the Courant does not appear to make any such claim in support of its Rule 12(f) motion.  In fact, in neither its motion nor its memorandum of law does the Courant even identify what, precisely, it is seeking to have stricken under Rule 12(f) or the basis therefor.  Since the defendant has not presented any viable claim for relief under Rule 12(f), the plaintiff will not address Rule 12(f) further in this memorandum of law.

Pursuant to Rule 12(b)(6), the Courant seeks dismissal of the Amended Complaint, arguing that the complaint fails to state a claim upon which relief can be granted.  In passing upon a Rule 12(b)(6) motion, the Court is asked to "consider the legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inferences in plaintiff's favor."  Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009); Austen v. Catterton Partners V, LP, 709 F. Supp. 2d 168, 171 (D. Conn. 2010).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  Austen, 709 F. Supp. 2d at 171 (internal quotation marks omitted). Accordingly, in deciding the motion to dismiss, the Court must accept as true each of the following facts which are alleged in the Amended Complaint.

## II.   PERTINENT FACTS

This case arises out of the Courant's admitted copying of copyrighted newspaper articles which appeared in the JI's newspaper.  However, this case is not just about copyright infringement.  It is also about systematic wrongful conduct amounting to unfair competition in the newspaper publishing business that extends beyond the reproduction and distribution of copyrighted works.

### A.   Facts Pertinent to the Copyright Infringement Claims

The JI and the Courant publish competing newspapers in the Greater Hartford area. (Amended Complaint, ¶ 1, 2, 6, 7.)  In its newspaper, the JI regularly publishes articles about local news and issues involving 17 towns north and east of Hartford.  (Amended Complaint, ¶ 6.)  The JI employs news reporters to cover such local news and devotes considerable resources to its local news coverage.  (Amended Complaint, ¶ 6.)  In 2009, the Courant plagiarized local news stories that appeared in the JI, and misattributed those stories as the Courant's own work and that of its reporters.  (Amended Complaint, ¶ 8.)  A list of 10 stories first appearing in the JI that were copied by the Courant is attached as Exhibit A to the Amended Complaint.[1]  (Amended Complaint, ¶ 8; see also Amended Complaint, ¶ 14, 17, 20,

---

[1]  The details regarding the content of those copyrighted news articles, the Courant's infringement of the JI's copyrights in them, and the registration of the copyrights will be discussed in the argument portion of this memorandum of law in response to the specific legal claims that have been asserted by the defendant in support of its motion to dismiss.

As is explained in more detail in Part III.A.3 below, it should be noted here that the plaintiff has amended the complaint in order to, inter alia, withdraw three of the copyright violation claims that were originally pleaded in this action in light of defendant's claim that an award of statutory damages and attorney's fees for those copyright violations is time-barred by 17 U.S.C. § 412(2).  However, it is important to further note that while the plaintiff no longer presses its federal copyright claims with regard to the news articles that were the subject of the First, Second and Third Counts, the Courant's conduct in regard to the preparation and publication of those news stories is still part of the state law claims asserted by the JI in the Eleventh, Twelfth and Thirteenth Counts of the Amended Complaint.

22, 24, 26, 28.)  The JI holds a certificate of copyright registration for those articles.  (Amended Complaint, ¶ 14, 17, 20, 22, 24, 26, 28.)  The Courant's copying of those local news articles evidences the Courant's misuse of the JI's news stories, although that list may not be a complete cataloging of the Courant's abuse.  (Amended Complaint, ¶ 8.)  Moreover, the Courant has admitted its wrongdoing.  (Complaint, ¶ 9.)  At first, the Courant defended its misappropriation of the JI's work, but then the Courant admitted wrongdoing in an open letter from its publisher, although the letter failed to draw its readers' attention to the full extent of the improprieties that it had committed.  (Amended Complaint, ¶ 9.)

### B.  Additional Facts Pertinent to the State Law Claims

In fact, the Courant's misappropriation and plagiarizing of the JI's work is one part of a pattern of improper competition that has been exhibited by the Courant.  (Amended Complaint, ¶ 10.)  The JI gathers local news information and prepares local news stories for its newspaper at a significant cost in order to prepare and publish local content in its newspaper.  (Amended Complaint, ¶ 31.)  Newspaper stories about news events happening in the local communities served by the JI are time-sensitive in nature, and a newspaper that publishes local news stories while that news is fresh is able to market a better and more complete newspaper product.  (Amended Complaint, ¶ 32.)  Such local news coverage is an important, if not determinative, factor in drawing newspaper readership.  (Amended Complaint, ¶ 32.)  As a consequence, because the JI and the Courant are in direct competition for readership in the communities that are served by both papers, news stories concerning local events and developments affecting those communities are an important factor in drawing news readership for both papers, and an important part of the newspaper product produced by the JI. (Amended Complaint, ¶ 33.)

Moreover, in addition to the plagiarizing of local news stories appearing in the JI's published daily newspaper referenced above, the Courant engaged in additional conduct by which it misappropriated plaintiff's work product and reporting to gain financial advantage by using published stories from the JI on its website which provides news coverage to consumers in electronic form.  (Amended Complaint, ¶ 30.)  These JI stories were reproduced in substance on the Courant's Internet site, sometimes with attribution to the JI and sometimes without mention of the JI as the source of the news story.  (Amended Complaint, ¶ 30.)  At no time did the plaintiff consent to the defendant's use of the news stories on the defendant's Internet site.  (Amended Complaint, ¶ 30.)  A list that is illustrative of such stories is attached as Exhibit B to the Amended Complaint, but that list is not a complete listing of the Courant's misuse of plaintiff's news stories on its website.  (Amended Complaint, ¶ 30.)

Through its appropriation of plaintiff's local news content and publication of same soon after that content appeared in the JI, the Courant has gained an unfair advantage in its competition with the JI, particularly in light of the Courant's reduction of its overhead for reporters covering local news stories, the Courant's use of local news information gathered by the JI's reporters, and the Courant's use of the JI's stories and falsely attributing them to the Courant and the Courant's own reporters.  (Amended Complaint, ¶ 34.)  In that way, the Courant has benefited through the use of the JI's newsgathering resources and efforts, without having to incur many of the costs normally associated with such efforts.  (Amended Complaint, ¶ 34.)  In addition, as a result of the Courant's appropriation of the JI's local news content, the JI has not been able to fully realize the competitive benefit of its investment in its newsgathering resources and efforts, and the JI has not been to fully utilize the benefit of its fresh local news content to retain readership, all of which impairs the JI's economic survival.

(Amended Complaint, ¶ 34.)   The actions of the Courant described above have misappropriated not just the JI's news articles themselves, but the economically productive local newsgathering and news reporting activities of the JI, and the JI's property interest in same, which has permitted the Courant to unfairly compete with the JI, all to the special loss and damage of the JI.  (Amended Complaint, ¶ 35.)

In addition, the Courant has been unjustly enriched by virtue of its misconduct with respect to the JI's local news content, particularly in light of the Courant's reduction of its overhead for reporters covering local stories, the Courant's use of news information gathered by the JI's reporters, and the Courant's misappropriating the JI's stories and falsely attributing them to the Courant and its own reporters.  (Amended Complaint, ¶ 38.)   In that way, the Courant has unfairly benefited through its use of the JI's newsgathering resources and efforts, which has allowed the Court to thereby produce a more complete newspaper product without having to invest the time and effort in creating same, all to the plaintiff's special loss and damage.  (Amended Complaint, ¶ 38.)

Furthermore, not only is competition among newspapers is intense and becoming more so as the economy weakens, but local news stories are a major draw for newspaper readers.  (Amended Complaint, ¶ 42.)   At the same time that the Court has greatly reduced its news reporting staff in recent years, particularly staff members assigned to local news stories, in order to reduce its costs and overhead, the JI has maintained its local reporting staff, and incurred the costs of same.   (Amended Complaint, ¶ 43.)   Thus, not only does a larger newspaper like the Courant have the advantage of economies of scale, but the Courant's pirating of the JI's local news stories and the newsgathering efforts of the JI's staff members has substantially diminished the JI's ability to compete with the Courant in the newspaper

business. (Amended Complaint, ¶ 7, 44.) As a result of all of its conduct described above, the Courant has engaged in unfair competition and unfair or deceptive acts or practices which have caused the JI to suffer an ascertainable loss of money or property, all to the plaintiff's special loss and damage. (Amended Complaint, ¶ 45.)

## III.  LEGAL ARGUMENT

### A.  The Plaintiff's Copyright Claims Should Not Be Dismissed

The defendant has urged three grounds in support of its motion to dismiss the plaintiff's federal copyright infringement claims. First, the defendant argues that there has been no copyright infringement because its news articles are not "substantially similar" to the copyrighted articles that appeared in the JI. Second, the defendant relies on the "fair use" doctrine as a defense to any claim of copyright infringement. Third, the defendant claims that, for certain of the plaintiff's copyrighted articles, because the "effective date" of the copyright for those articles was more than 3 months after the publication date of the article, the plaintiff is not entitled to statutory damages for any claim of infringement with respect to those articles. The plaintiff will now respond to each argument proffered by the defendant.

### 1.  Dismissal for Purported Lack of "Substantial Similarity" Is Not Warranted

To establish a claim of copyright infringement, a plaintiff with a valid copyright must show that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a "substantial similarity" exists between the defendant's work and the protectable elements of the plaintiff's work. Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 63 (2d Cir. 2010). Here, the Courant does not contest that it actually copied the JI's work, and in fact the Courant has publically admitted to such conduct. See Amended Complaint, ¶ 9. However, the Courant contends that the JI's copyrighted news

articles and the Courant's news articles at issue in the Fourth through Tenth Counts are not sufficiently similar to support a claim of copyright infringement as a matter of law.

In addressing the defendant's claim, the Court must be mindful that "the test for infringement of a copyright is of necessity vague" and that "because the question of substantial similarity typically presents an extremely close question of fact . . .questions of non-infringement have traditionally been reserved for the trier of fact." Peter F. Gaito Architecture, 602 F.3d at 63 (internal quotation marks omitted; citation omitted).  That issue may be resolved by the Court upon motion only if the similarity between the two works concerns only non-copyrightable elements of the plaintiff's work or if no reasonable jury, properly instructed, could find that the two works are substantially similar.  Id.

In determining whether works are substantially similar, the Court is to apply the so-called "ordinary observer test" which asks whether an average lay observer would recognize the alleged copy as having been appropriated from the copyrighted work.  Id. at 66.  However, where the copyrighted work has both protectible and unprotectible elements, the analysis must be a bit more discerning, asking whether the protectible elements, standing alone, are substantially similar.  Id.  Nonetheless, even where a copyrighted work has unprotected elements, the Second Circuit has clearly "disavowed any notion that we are required to dissect the works into their separate component parts, and compare only those elements which are in themselves copyrightable.  Id. (internal quotation marks omitted).  "This is so because the defendant may infringe on the plaintiff's work not only through literal copying of a portion of it, but also by parroting properties that are apparent only when numerous aesthetic decisions embodied in the plaintiff's work of art – the excerpting, modifying, and arranging of unprotectible components . . . –  are considered in relation to one another."  Id. (internal

quotation marks omitted).  In other words, the Court should compare the "total concept and overall feel" of the two works, and the Court's inquiry must focus "on whether the alleged infringer has misappropriated the original way in which the author has selected, coordinated, and arranged the elements of his or her work."  Id. (internal quotation marks omitted). Consequently, while the defendant correctly points out that "copyright does not extend to facts" because "the law of copyright is founded on originality of expression," it is still the case that "[c]ompilations of facts . . . may be protected by copyright because they can display originality in their selection, arrangement or presentation of facts," and thus "[d]escriptions of facts afford even more room for originality."  Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc., 166 F.3d 65, 70 (2d Cir.1999).  Accordingly, "even though there can be no copyright in the news itself, copyright does protect 'the manner of expression, the author's analysis or interpretation of events, the way he structures his material and marshals facts, his choice of words, and the emphasis he gives to particular developments.'"  Id., quoting Wainright Sec. Inc. v. Wall St. Transcript Corp., 558 F.2d 91, 95-96 (2d Cir. 1977).

The Courant argues that there is no substantial similarity between the articles that it copied from the JI and the articles that appeared in the Courant.  For the convenience of the Court, the plaintiff has attached a series charts in **Exhibit 1** attached hereto, which charts highlight, in a side-by-side fashion, many of the similarities between the JI and Courant articles that are the subject of the Fourth through Tenth Counts of the Amended Complaint.  As demonstrated in **Exhibit 1**, as to the copyrighted JI news article that is the subject of the Fourth Count, the first paragraph of the Courant article mirrors the first paragraph of the JI article, and the Courant's second paragraph echoes the JI's fifth and sixth paragraphs; and as to the copyrighted JI news article is at issue in the Fifth Count, the three paragraphs that

comprise the Courant article mirror the first, second and fourth paragraphs of the JI article; and as to the copyrighted JI news article that is the subject of the Sixth Count, the two paragraphs that comprise the Courant article mirror the first three paragraphs of the JI article; and as to the copyrighted JI news article is at issue in the Seventh Count, the three paragraphs that comprise the Courant article mirror the first, sixth and last two paragraphs of the JI article; and as to the copyrighted JI news article that is the subject of the Eighth count, the Courant's second paragraph echoes the third and fourth paragraphs of the JI article, and the Courant's third paragraph mirrors the sixth paragraph of the JI article; and as to the copyrighted JI news article is at issue in the Ninth Count, the five paragraphs that comprise the Courant article mirror the structure, organization and language of the first, second, fourth, fifth, sixth and tenth paragraphs of the JI article; and as to the copyrighted JI news article that is the subject of the Tenth Count, the Courant article takes most of the language in its first, third, fourth and fifth paragraphs from the JI article.  Those facts refute the Courant's assertion that its articles were not "substantially similar" to the copyrighted JI articles.

Although the Courant contends that its articles "present[ ] summaries of the facts and reports the news with a different sentence structure, phrasing and organization"; Defendant's Memorandum of Law, p. 6; the Courant provides no analysis to support that conclusion.  In fact, as noted above, a comparison of the articles reveals that they are substantially similar in content, phrasing and organization, albeit that the JI articles provide more detail.  The fact that the Courant articles sometimes substitute synonyms for the expression in the JI articles, or that the Courant articles sometimes condense the information appearing in the JI articles, does not establish, as a matter of law, that there is no substantial similarity between the articles, especially where the structure and organization of the Courant articles is strikingly similar to

that of the JI articles.  Likewise, the Courant's claim that its articles "focused on the bare facts" that it deemed to be important; Defendant's Memorandum of Law, p. 8; should not be accepted at face value.  Instead, the Courant copied the JI articles by summarizing what the JI deemed to be important and newsworthy.  Out of all the events that occurred in the many towns covered by the JI and the Courant, the JI decided what was newsworthy, and what was important about certain specific events to be included in the JI articles, which selection, arrangement and presentation was then copied by the Courant.  Similar structure and organization, similar chronological and substantive grouping of facts, and using similar phraseology and word choice, are indicia of the kind of "substantial similarity" that will support a claim of copyright infringement.  See Nihon, 166 F.3d at 70.  Here, the comparison set forth in **Exhibit 1** attached hereto supports the conclusion that the Courant articles were, in fact, substantially similar to the JI articles which the Courant plagiarized to produce its news stories.

In light of the foregoing, there is sufficient similarity between news articles at issue in the plaintiff's federal copyright claims under the Fourth through Tenth Counts of the Amended Complaint to permit the Court to conclude that the defendant has violated the Copyright Act. At a minimum, however, there is sufficient similarity between the offending Courant articles and the JI articles that were copied by the Courant that the Court should not resolve that issue by way of a motion to dismiss.

     2.    The Defendant's Reliance on the "Fair Use" Doctrine Is Without Merit

The doctrine of "fair use" provides a privilege to others than the owner of a copyright to use the copyrighted material in a reasonable manner without the owner's consent.  Harper & Row, Publishers, Inc. v. Nation Enterprises, 471 U.S. 539, 549 (1985).  The fair use doctrine is

now codified in Section 107 of the Copyright Act[2], but the doctrine is "'an equitable rule of reason, [for which] no generally applicable definition is possible, and [therefore] each case raising the question must be decided on its own facts.'" Id. at 560, quoting H.R. Rep. No. 94-1476, p. 65 (1976), reprinted in U.S. Code Cong. & Admin. News 1976, p. 5678. The four factors that are especial relevant to determining whether a use was fair are: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect on the potential market for or value of the copyrighted work. However, those factors must be analyzed in light of the basis for the doctrine itself.[3]

_____

[2] Section 107 of the Copyright Act, entitled "Limitations on exclusive rights: Fair Use," provides:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include –
> (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
> (2) the nature of the copyrighted work;
> (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
> (4) the effect of the use upon the potential market for or value of the copyrighted work.
> The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors.

[3] The plaintiff questions whether the defendant's "fair use" claim is even a proper subject for consideration by way of a motion to dismiss. "Fair use is a mixed question of law and fact." Harper & Row, Publishers, 471 U.S. at 560. More importantly, fair use is "an affirmative defense requiring a case-by-case analysis." Id. at 561. In addition, since a proponent of a fair use claim "would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets" under the fourth "fair use" fourth factor; Campbell, 510 U.S. at 590; it is unlikely that the defense of fair use can be resolved through a motion to dismiss. Accordingly, because of the fact-driven nature of the fair use determination, the defense of fair use is unsuited for summary disposition by way of a motion to dismiss. See M. Shanken

The fair use doctrine has ancient roots.  "As early as 1841, Justice Story gave judicial recognition to the doctrine . . . [as follows:] '[A] reviewer may fairly cite largely from the original work, if his design be really and truly to use the passages for the purposes of fair and reasonable criticism.  On the other hand, it is as clear, that if he thus cites the most important parts of the work, with a view, not to criticize, but to supersede the use of the original work, and substitute the review for it, such a use will be deemed in law a piracy.' . . . As Justice Story's hypothetical illustrates, the fair use doctrine has always precluded a use that 'supersede[s] the use of the original.'"  Harper & Row, Publishers, 471 U.S. at 550, quoting Folsom v. Marsh, 9 F.Cas. 342, 344-45 (No. 4,901) (CC Mass. 1841); see also Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 578-79, 586, 590-91 (1994) (observing that the four fair use factors of Section 107 draw on Justice Story's analysis in Folsom).

In seeking dismissal based on its claim of "fair use," the defendant tries to make much of the fact that it copied plaintiff's news stories for purposes of news reporting.  However, the defendant's citations and argument is deeply misleading, and its analysis of the fair use factors is entirely misplaced.  This is not a situation where a news organization is reporting on copyrighted content because that content is news (e.g., the New York Times reporting on the Pentagon Papers, or even the Hartford Courant reporting on what the New York Times is reporting in its newspaper because that fact is itself independently newsworthy).  Rather, this

---

Communications, Inc. v. Cigar500.com, 2008 WL 2696168 at *10 (S.D.N.Y. 7/7/08) (copy attached); World Wrestling Federation Entertainment, Inc. v. Bozell, 142 F.Supp.2d 514, 530-31 (S.D.N.Y. 2001).  While defendant relies on contrary decisions mostly from courts in the Ninth Circuit; see Def. Memo. of Law, p. 8; it does not appear that those decisions are followed by the courts in the Second Circuit.

In any event, because the defendant has raised the issue of fair use as a ground for dismissal, the plaintiff will respond to the defendant's arguments, demonstrating why fair use is inapplicable here.  Nonetheless, the plaintiff does so without waiving the claim that the defense of fair use is not properly considered by way of a motion to dismiss.

is a situation where one news organization has – admittedly – stolen copyrighted content from another news organization and used it as its own because it does not want to expend the resources to create its own content.  In that light, the fair use factors necessarily break down much differently.  Thus, it is well established that a news organization does not have a free pass to simply reprint copyrighted news stories as part of its mission to report the news.  In fact, contrary to the position urged by the Courant, the Second Circuit has emphatically rejected the idea that there is a "fair use" exception merely because a defendant claims to have published "newsworthy matters."  Sarl Louis Feraud International v. Viewfinder, Inc., 489 F.3d 474, 482-83 (2d Cir. 2007) (collecting cases); see also Campbell, 510 U.S. at 581 (while holding that parody can constitute fair use, rejecting the idea that all copying for purposes of parody is protected as fair use:  "petitioners' suggestion that any parodic use is presumptively fair has no more justification in law or fact than the equally hopeful claim that any use for news reporting should be presumed fair," citing Harper & Row, Publishers, 471 U.S. at 561).

The first statutory factor to be considered  --  the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes  --  weighs against the "fair use" claim being asserted by the Courant.  First, as the Supreme Court has recognized, "[t]he fact that an article arguably is 'news' and therefore a productive use is simply one factor in a fair use analysis."  Harper & Row, Publishers, 471 U.S. at 561 (court ultimately rejected the fair use claim of a news and opinion magazine that had copied 300 words from the unpublished manuscript of former President Gerald Ford).  As noted above, the Courant does not get a "free pass" under the fair use doctrine simply because it is a news organization and because its copying of the JI's news articles can, in some distorted sense of the term, be said to be "news reporting."  Second, in examining the

first fair use factor, "[t]he fact that a publication was commercial as opposed to nonprofit is a separate factor that tends to weigh against a finding of fair use. . . . The crux of the profit/nonprofit distinction is not whether the sole motive of the use is monetary gain but whether the user stands to profit from exploitation of the copyrighted material without paying the customary price." Id. at 562. Clearly, the Courant is a commercial enterprise that stands to profit from its exploitation of the copyrighted material without incurring the expense of producing the same. Likewise, in evaluating the character and purpose of the defendant's use, the Court cannot ignore the fact that the intended purpose of the Courant's copying was to compete with the original under circumstances where the Courant sought to pass off the JI's work as if it were the work of the Courant. See id. at 562-63 (defendant's conduct relevant because "fair use" presupposes "good faith" and "fair dealing"; fair use "distinguishes between a true scholar and a chiseler who infringes a work for personal profit"). Ultimately, the fair use examination of the "the purpose and character of the use" concerns "whether the new work merely 'supersede[s] the objects' of the original creation   . . . or [whether it] instead adds something new, with a further purpose or different character, altering the first with new expression, meaning or message . . . ." Campbell, 510 U.S. at 579. As can be seen from an examination of the JI articles and the offending Courant articles, the Courant articles clearly do not add anything new, with a further purpose or different character, from the JI articles; rather, the Courant articles merely seek to copy or "supersede" the objects of the JI articles, without adding a thing, which means that the first factor should weigh against the defendant's "fair use" claim. There is little that is transformative about an infringing work for purposes of fair use analysis that merely copies from the original but does not seek to explain the original or include editorial comment on the original. Consequently, as the Second Circuit has observed, where a

defendant adds almost nothing new in its infringing work, even where the work is published for the purpose of news reporting, this factor will weigh strongly against a claim of fair use. Nihon Keizai Shimbun, Inc. v. Comline Business Data, Inc., 166 F.3d 65, 72 (2d Cir. 1999).

The second statutory factor -- the nature of the copyrighted work -- recognizes, *inter alia*, that works of fiction are entitled to more protection from a claim of fair use than works of fact. Harper & Row, Publishers, 471 U.S. at 563. Obviously, the copyrighted news articles at issue here are works of fact, not fiction. Thus, where "predominantly factual news articles" are copied, and where "their expressive elements, while protectible, are not dominant features of the works . . . this factor is at most neutral on the question of fair use." Nihon, 166 F.3d at 72-73. However, because "fair use" concerns a balancing and weighing of the several factors, no single factor is determinative. See Dr. Suess Enterprises, L.P. v. Penguin Books USA, Inc., 109 F.3d 1394, 1399 (9th Cir. 1997) (citing legislative history); see also Nihon, 166 F.3d at 73 (concluding that three of four fair use factors militate against finding of fair use, and that court's overall balancing of these factors did too).

The third statutory factor -- the amount and substantiality of the portion used in relation to the copyrighted work as a whole -- is not merely a quantitative analysis. Even where "[i]n absolute terms" the copying amounts to "an insubstantial portion" of the copyrighted work, this factor will still weigh against a claim of fair use where the portion copied was qualitatively substantial. Harper & Row, Publishers, 471 U.S. at 564-66. In other words, "this factor calls for thought not only about the quantity of the materials used, but about their quality and importance, too." Campbell, 510 U.S. at 587. Thus, the fact that a substantial portion of the infringing work has been copied is evidence of the qualitative value of the copied material, both to the originator and to the plagiarist who seeks to profit from marketing someone else's

copyrighted expression. Harper & Row, Publishers, 471 U.S. at 565.  This inquiry can parallel, to a great extent, the "substantial similarity" inquiry that is discussed in Part III.A.1 above. Nihon, 166 F.3d at 73.  As discussed there (and demonstrated in Exhibit 1 hereto), the fact that the Courant articles are substantially similar to the JI articles in their content, phrasing and organization, and in some cases reprint much of the JI articles, demonstrates that this third factor weighs against the defendant's claim of fair use.

The fourth statutory factor -- the effect of the use upon the potential market for or value of the copyrighted work -- "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market for the original." Campbell, 510 U.S. at 590.  Such market harm is evident here from the fact that the parties are competitors and the fact that local news offerings are an important part of drawing newspaper readership. See Amended Complaint, ¶ 6-7, 32-33.  Moreover, where, as here, a commercial use of a copyrighted work by a competitor amounts to its duplication such that the infringing work "supersede[s] the objects" of the original, and thereby serves as a market replacement for it, it is "likely that cognizable market harm to the original will occur." Campbell, 510 U.S. at 591.  Finally, "to negate fair use one need only show that if the challenged use should become widespread, it would adversely affect the *potential* market for the copyrighted work." Harper & Row, Publishers, 471 U.S. at 568 (emphasis in original; quotation marks omitted).  Thus, it is likely that the piracy of the JI's local news stories by the Courant has had a substantial adverse impact on the market for the JI's local news stories, and the JI's newspaper as a whole, given the importance of local news stories in drawing and maintaining readership. Nihon, 166 F.3d

at 73 (because defendant's news abstracts competed with and superseded the plaintiff's copyrighted news articles, fourth factor weighs strongly against the claim of fair use).

Based on the foregoing, the majority of the relevant factors weigh against the Courant's assertion of a fair use claim, and therefore the Courant cannot prevail on that claim. Accordingly, the Courant is not entitled to a dismissal of the Amended Complaint on grounds that its infringement constituted a "fair use" of the JI's copyrighted work.

### 3. Under the Allegations of the Amended Complaint, the Copyrights Regarding the Works At Issue In the Fourth and Fifth Counts Were Not Untimely to Support an Award of Statutory Damages and Attorney's Fees

The plaintiff makes no claim for actual damages or injunctive relief with respect to its federal copyright claims. Instead, as to those claims, the plaintiff seeks statutory damages and attorney's fees pursuant to 17 U.S.C. § 504(c) and § 505, respectively. The defendant correctly observes that, 17 U.S.C. § 412(2) provides that "no award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for . . . any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work." The defendant originally sought dismissal of the First through Fifth Counts based on the bar set forth in § 412(2), arguing that, as to each of the copyrighted works at issue in those counts, registration was not made within three months after the first publication of such work. Because the defendant's argument had merit as to the First through Third Counts, the Amended Complaint withdrew the copyright claims as to the news articles referenced therein.[4]

---

[4] It should be noted, however, that while the plaintiff no longer presses its federal copyright claims with regard to the Courant news articles that were the subject of the First, Second and Third Counts, the defendant's conduct in regard to the preparation and publication of those news stories is still part of each of the state law claims that is asserted in the Eleventh, Twelfth and Thirteenth Counts of the Amended Complaint.

However, the defendant is not entitled to a dismissal of the Fourth and Fifth Counts based on § 412 in light of the additional factual allegations that now appear in those counts of the Amended Complaint.  Those facts demonstrate that the effective date of the copyright registrations at issue in the Fourth and Fifth Counts was within three months of the date of first publication of those copyrighted works.

The JI articles at issue in the Fourth and Fifth Counts were both first published on August 5, 2009; see Amended Complaint, ¶ 14, 17; and therefore copyright registration of each article on or before November 5, 2009, was required in order for the JI to satisfy § 412 and have a viable claim for statutory damages and attorney's fees based on the Courant's infringement of JI's copyright pertaining to those articles.  17 U.S.C.§ 410(d) provides that "[t]he effective date of a copyright registration is *the day on which an application, deposit, and fee*, which are later determined by the Register of Copyrights or by a court of competent jurisdiction to be acceptable for registration, *have all been received in the Copyright Office*." (Emphasis added.)  Thus, as a matter of law, the effective date of a copyright registration turns on the day on which the application and fees have been received by the Copyright Office.

Here, the Amended Complaint alleges with respect to the claims under the Fourth and Fifth Counts that "[a]lthough the Copyright Office lists the 'effective date' of that copyright registration as November 12, 2009, the day on which the plaintiff's application and fees were received by the Copyright Office was November 2, 2009, and therefore November 2, 2009 constitutes the proper 'effective date' of the aforementioned copyright registration pursuant to 17 U.S.C. § 410(d), and for purposes of 17 U.S.C. § 412." Amended Complaint, ¶ 15, 18. Under those allegations, the issue of whether the effective date of the copyright was within 3

months of the publication of the copyrighted articles is an open question, which precludes dismissal of the Fourth and Fifth Counts on the ground asserted.

In response, the Courant argues that those allegations should be disregarded because they amount to a "bare assertion that some earlier date is the proper effective date"; Def. Memo of Law, p. 13; but that is not the case. Rather, the plaintiff has alleged a provable fact – namely, that "the day on which the plaintiff's application and fees were received by the Copyright Office was November 2, 2009" – which fact, when proved, would require the Court to conclude that, under applicable law, the "effective date" of the plaintiff's copyright registration was November 2, 2009, making the claims in the Fourth and Fifth Counts timely for purposes of an award of statutory damages and attorney's fees pursuant to 17 U.S.C. § 504(c) and § 505, respectively.[5]

Although the Courant tries to argue otherwise by asserting that "the certificate of registration . . . constitute[s] prima facie evidence . . . of the facts stated in the certificate"; 17 U.S.C. § 410(c); that argument misunderstands its own significance on the contested issue of the effective date of the registration. While a certificate of registration is prima facie evidence of the facts stated therein, it is only that; it is not conclusive evidence of such facts, and consequently such facts may be rebutted by other evidence. See Medforms, Inc. v. Healthcare Management Solutions, Inc., 290 F.3d 98, (2d Cir. 2002) (although copyright certificates of registration constituted prima facie evidence of authorship, trial court properly found that there was more than sufficient evidence from which the jury could have concluded

---

[5] Although clearly not required to do so at this procedural stage of the proceedings, in light of the defendant's claim that the allegations of Paragraphs 15 and 18 of the Amended Complaint rest upon a "bare assertion" that is intended to contradict a document, the plaintiff submits the Affidavit of Chris Powell, attached hereto as **Exhibit 2**, which provides proof of the facts alleged in Paragraphs 15 and 18 of the Amended Complaint to support of the conclusion that, as a matter of law, the effective date of the copyright registrations was November 2, 2009.

that defendants rebutted such claim); <u>Hamil America, Inc. v. GFI</u>, 193 F.3d 92, 98 (2d Cir. 1999) ("A certificate of registration from the United States Register of Copyrights constitutes prima facie evidence of the valid ownership of a copyright, although that presumption of ownership may be rebutted."); <u>Rogers v. Koons</u>, 960 F.2d 301, 306 (2d Cir. 1992) (same). Thus, while § 410(c) provides that the November 12, 2009 "effective date" stated in the JI's copyright certificates may be "prima facie" evidence that the effective date of the registration was November 12, 2009, that conclusion may be refuted by <u>other</u> evidence demonstrating that "the day on which the plaintiff's application and fees were received by the Copyright Office was November 2, 2009," as is alleged by the JI in Paragraphs 15 and 18 of the Amended Complaint, and therefore that November 2, 2009 constitutes the proper "effective date" of the copyright registration pursuant to 17 U.S.C. § 410(d), and for purposes of 17 U.S.C. § 412.

Accepting those facts as true, which the Court must do for purposes of deciding the motion to dismiss, it is clear that the JI's copyright registrations with respect to the newspaper articles at issue in the Fourth and Fifth Counts were timely, and therefore the JI has stated a legally viable claim for statutory damages and attorney's fees with respect to the copyright violations at issue in the Amended Complaint.  Accordingly, the defendant is not entitled to a dismissal of the Fourth and Fifth Counts based on the provisions of 17 U.S.C. § 412.

**B.     <u>The Plaintiff's State Law Claims Are Not Preempted By Federal Copyright Law Because Each Involves Extra Elements Beyond the Copying of Plaintiff's Articles</u>**

The defendant has moved to dismiss the plaintiff's state law claims by claiming that they are preempted by the federal copyright law.  Because the defendant has mischaracterized the essential nature of the wrongful conduct that is the gravamen of each cause of action at issue in the state law claims, the defendant's preemption analysis misses the mark.  Contrary to the

predicate upon which the defendant's preemption arguments against each of the state law claims is based, the plaintiff's state law claims are <u>not</u> based merely on the unauthorized reproduction and publication of the plaintiff's articles.  Rather, each state law claim includes an <u>extra</u> <u>element</u> that makes it qualitatively different from a copyright right infringement claim, and therefore the plaintiff's state law claims are not preempted by the federal Copyright Act.

1.     <u>The Plaintiff's Allegations that the Defendant Committed the Tort of Unfair Competition Through Misappropriation of "Hot News" Is Not Preempted by the Federal Copyright Act</u>

The plaintiff is the publisher of the Journal Inquirer, a daily newspaper that regularly publishes local news stories regarding the 17 towns north and east of Hartford.  (Amended Complaint, ¶ 6, 29.)  In order to do so, the plaintiff employs news reporters to cover those local news events, and the plaintiff devotes considerable resources to its local news coverage. (Amended Complaint, ¶ 6, 29, 31.)  The defendant publishes a competing newspaper in the greater Hartford area.  (Amended Complaint, ¶ 7, 29.)  Competition between the parties is intense, and local news stories are a major draw of news readership.  (Amended Complaint, ¶ 32, 33.)

In contrast to the plaintiff's investment of considerable resources to provide local news coverage in its newspaper, the defendant has sought to reduce its costs by greatly reduced its staff members assigned to the reporting of local news stories that appear in the Hartford Courant.  (Amended Complaint, ¶ 34, 43.)  Nonetheless, the defendant has engaged in a pattern and practice of utilizing the local news stories gathered by Journal Inquirer staff soon after those local news stories are published in the Journal Inquirer, so that the defendant can then publish the same or similar local news stories in the Hartford Courant while the same are still current events.  (Amended Complaint, ¶ 8-10, 29, 30-34.)  In so pirating the local news

gathering efforts of the Journal Inquirer as a means of presenting the local news in its competing Hartford Courant, the defendant has unjustly benefited from the plaintiff's newsgathering resources and efforts and the defendant has substantially diminished the plaintiff's ability to compete with the defendant in the newspaper business.   (Amended Complaint, ¶ 8, 29, 30-34, 38, 43, 44.)[6]

As the defendant points out in its Memorandum of Law, a state law claim that is limited to the copying of a work of authorship of another is preempted by federal copyright law. However, preemption exists "only when the state-created right may be abridged by an act that would, by itself, infringe one of the exclusive rights provided by federal copyright law." Briarpatch Limited, L.P. v. Phoenix Pictures, Inc., 373 F.3d 296, 305 (2d Cir. 2004).   Thus, if the state law claim involves any "extra element" beyond acts of reproduction or distribution that make the state law claim qualitatively different from a copyright infringement claim, then the state law claim is not preempted because it does not seek to vindicate legal or equitable rights that are equivalent to one of the bundle of exclusive rights protected by copyright law.  Id.

In International News Service v. Associated Press, 248 U.S. 215 (1918), the Supreme Court recognized that, while news, as such, is not copyrightable, one who gathers news at its expense, for the purpose of lucrative commercial publication, has a *quasi-property* interest the

---

[6]  The Eleventh, Twelfth and Thirteenth Counts not only rest on the Courant's misuse of the 10 JI print articles identified in Paragraph 8 and Exhibit A of the Amended Complaint (Amended Complaint, ¶ 29, 36, 39), but also on the additional fact that the Courant has misappropriated the JI's work product and reporting to gain financial advantage by using published stories from the JI on the Courant's website, sometimes with attribution and sometimes without mention of the JI as the source of the news story, but always without the consent of the JI (Amended Complaint, ¶ 30).  To the extent that the defendant suggests that the plaintiff's state law claims are limited to the Courant's conduct with respect to the use of JI news stories on the Courant's website, the defendant has ignored Paragraph 29 of the Eleventh Count, Paragraph 36 of the Twelfth Count, Paragraph 39 of the Thirteenth Count, as well as the additional allegations set forth in each such count, which are not limited to the website allegations.

results of his or her efforts as against a rival in the same business, and that the appropriation of those results at the expense and to the damage of the one and for the profit of the other is an act of unfair competition under federal common law.  The <u>International News Service</u> court reasoned:

> The right of the purchaser of a single newspaper to spread knowledge of its contents gratuitously, for any legitimate purpose not unreasonably interfering with complainant's right to make merchandise of it, may be admitted, but to transmit that news for commercial use, in competition with complainant – which is what defendant has done and seeks to justify – is a very different matter.  In doing this, defendant, by its very act, admits that it is taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, and that defendant, in appropriating it and selling it as its own, is endeavoring to reap where it has not sown. . . .Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not, with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gather the news. . . .
>
>         \*            \*            \*
>
> It is said that the elements of unfair competition are lacking because there is no attempt by defendant to palm off its goods as those of the complainant . . . .  In the present case, the fraud upon complainant's right is more direct and obvious.  Regarding news matter as the mere material from which these two competing parties are endeavoring to make money, and treating it therefore as *quasi*-property for the purposes of their business because they are both selling it as such, defendant's conduct differs from the ordinary case of unfair competition in trade principally in this – that, instead of selling its own goods as those of complainant, it substitutes misappropriation in the place of misrepresentation, and sells complainant's goods as its own.
>
> Besides the misappropriation, there are elements of imitation, of false pretense, in defendant's practices.  The device of rewriting complainant's news articles, frequently resorted to, carries its own comment.  The habitual failure to give credit to complainant for that which is taken is significant.  Indeed, the entire system of appropriating complainant's news and transmitting it as a commercial product to defendant's clients and patrons amounts to a false representation to them . . . that the news transmitted is the result of defendant's own investigation in the field.  But these elements, although accentuating the wrong, are not the essence of it.  It is something more than the advantage of celebrity of which complainant is being deprived.

Id. at 239-40, 241-42.  The protection recognized in the International News Service case lasts until the time that the commercial value of the complainant's news stories as news has passed. Id., 245.  For that reason, the common law misappropriation claim recognized in International News Service has been referred to as a "hot news" misappropriation claim.

In 1976, the Copyright Act was amended to include express language "preempting state law claims state law claims that enforced rights 'equivalent' to exclusive copyright protections when the work to which the state claim was being applied fell within the area of copyright protection.  See 17 U.S.C. § 301.  Based on the legislative history of the 1976 amendments, it is generally agreed that a 'hot-news' INS-like claim survives preemption.  H.R. No. 94-1476 at 132 (1976), reprinted in 1976 U.S.C.C.A.N. 5659, 5748."  National Basketball Assocation v. Motorola, Inc., 105 F.3d 841, 845 (2d Cir. 1997).[7]

In NBA v. Motorola, supra, the Second Circuit reviewed the law regarding federal copyright infringement and the tort of unfair competition by misappropriation.  The NBA court then concluded that "a narrow 'hot-news' misappropriation claim survives preemption for actions concerning material within the realm of copyright."  Id. at 852.  According to the Second Circuit, a so-called "hot news" claim based on International News Service is not preempted by federal copyright law where: "(i) a plaintiff generates or gathers information at a cost; (ii) the

---

[7]  The House Report on the 1976 amendments to the Copyright Act cited in the NBA case stated:

> Misappropriation is not necessarily synonymous with copyright infringement, and thus a cause of action labeled as "misappropriation" is not preempted if it is in fact based neither on a right within the general scope of copyright as specified by section 106 nor on a right equivalent thereto.  For example, state law should have the flexibility to afford a remedy (under traditional principles of equity) against a consistent pattern of unauthorized appropriation by a competitor of the facts (i.e., not the literary expression) constituting "hot" news, whether in the traditional mold of International News Service v. Associated Press, 248 U.S. 215 (1918), or in the newer form of data updates from scientific, business, or financial data bases.

information is time-sensitive; (iii) a defendant's use of the information constitutes free riding on

the plaintiff's efforts; (iv) the defendant is in direct competition with a product or service offered

by the plaintiffs; and (v) the ability of other parties to free-ride on the efforts of the plaintiff or

others would so reduce the incentive to produce the product or service that its existence or

quality would be substantially threatened." Id. at 845; see also id. at 852.  As the Second

Circuit explained:

> INS is not about ethics; it is about the protection of property rights in time-sensitive
> information so that the information will be made available to the public by profit
> seeking entrepreneurs.  If services like AP were not assured of property rights in the
> news that they pay to collect, they would cease to collect it.   The ability of their
> competitors to appropriate their product at only nominal cost and thereby to
> disseminate a competing product at a lower price would destroy the incentive to collect
> news in the first place.   The newspaper-reading public would suffer because no on
> would have an incentive to collect "hot news."
>     We therefore find the extra elements – those in addition to the elements of
> copyright infringement – that allow a "hot news" claim to survive preemption are: (i) the
> time-sensitive value of factual information, (ii) the free-riding by a defendant, and
> (iii) the threat to the very existence of the product or service provided by the plaintiff.

Id. at 853.

Here, the Amended Complaint alleges facts that satisfy all 5 elements of a non-

preempted "hot news" misappropriation type of claim.  The Amended Complaint alleges that

the plaintiff generates or gathers local news information at a cost in order to prepare and

publish local news stories that appear in the Journal Inquirer (Amended Complaint, ¶ 31); that

the information that it publishes are news stories about local news events, which information is

time-sensitive by its very nature (Amended Complaint, ¶ 32); that the defendant's use of the

information published in the Journal Inquirer for its own commercial purposes constitutes free

riding on the plaintiff's efforts (Amended Complaint, ¶ 8, 10, 29, 30, 31, 32, 33, 34); that the

defendant is in direct competition with the plaintiff in the publication of a newspaper that

includes local news stories that are important to the newspaper product produced by the

plaintiff (Amended Complaint, ¶ 6, 7, 29, 32, 33, 34); and that the defendant's free-riding on the efforts of the plaintiff reduces the plaintiff's incentive to produce the product or service such that its existence or quality would be substantially threatened (Amended Complaint, ¶ 34, 35). While the defendant uses its memorandum of law to dispute those allegations, that is not a proper consideration for the Court when deciding a Rule 12(b)(6) motion to dismiss.

So-called "hot news" claims have been recognized under state law in a number of states. <u>See</u> "How A Narrow Application of 'Hot News' Misappropriation Can Help Save Journalism," 60 Am. U. L. Rev. 691, 695 n. 24 (2011) (hot news misappropriation doctrine recognized in California, Illinois, Missouri, New York, and Pennsylvania) (collecting cases). While the Connecticut courts have not directly addressed the question of whether to recognize a common law tort of misappropriation of business property under the "hot news" doctrine, Connecticut common law does provide tort law protection against a variety of practices that fall "under the umbrella term of 'unfair competition' such [as] causes of action [for] tortious interference with business expectancy . . . and unjustifiable interference with any person's right to pursue his or her lawful business or occupation." <u>Larsen Chelsey Realty Co. v. Larsen</u>, 232 Conn. 480, 501-02 n. 23 (1995) (citations omitted; internal quotation marks omitted). Certainly, the "hot news" concept as explained in the <u>INS</u> and <u>NBA</u> cases discussed above is based on similar tort law protection against unjustifiable interference with a person's right to pursue his or her lawful commercial business, in this case specifically with respect to the gathering and publishing news information of a time sensitive nature. As such, there is no reason to believe that a "hot news" misappropriation claim would not be recognized in Connecticut as a business property right that is subject to legal protection, whether by way of a common law claim of unfair competition by misappropriation, and/or by way of a claim of unjust enrichment, and/or

by way of a violation of the Connecticut Unfair Trade Practices Act.  Moreover, in a different context, the Connecticut Supreme Court has commented on the New York law regarding a claim of unfair competition, without any suggestion that its understanding of New York's protection against one competitor's misappropriation of a commercial or business advantage of another competitor would conflict with Connecticut law governing unfair competition.  See QSP, Inc. v. Aetna Casualty & Surety Co., 256 Conn. 343, 370-72 (2001).  Under these circumstances, there is sufficient basis to allow this Court to conclude that the Connecticut courts would recognize hot news claims in a manner similar to the New York courts.

The defendant's motion to dismiss contends that the plaintiff's state law claims arise solely from the defendant's copying of the plaintiff's news articles.  However, each of the plaintiff's state law claims is rooted in the principles underlying the "hot news" doctrine – namely, (i) the time-sensitive value of the factual information in the plaintiff's local news stories, (ii) the free-riding by a defendant in using those stories, rather than investing its own resources in the kind of newsgathering efforts in which the plaintiff engaged, at considerable expense, in order to produce that product for commercial distribution, and (iii) the resulting threat to the continued existence of plaintiff's newspaper – which are "extra elements" that distinguish the plaintiff's state law claims from copyright claims, and allow those claims to survive a claim of preemption.  See, e.g., Associated Press v. All Headline News Corp., 608 F. Supp. 2d 454, 458-61 (S.D.N.Y. 2009) (where plaintiff engaged in effort and expense to gather, report, package and transmit news stories, and defendant hired individuals who found plaintiff's stories on the internet and prepared them for republication under defendant's banner by either rewriting the text or copying the stories in full, without any original reporting of the

stories, plaintiff stated a cause of action for misappropriation of hot news that was not preempted by the federal Copyright Act).

Accordingly, for all of the foregoing reasons, the defendant cannot succeed on its claim that the Eleventh Count is preempted by federal copyright law, and therefore the motion to dismiss the Eleventh Count must be denied.

### 2.    The Plaintiff's Unjust Enrichment Claim is Not Preempted

If the plaintiff's unjust enrichment claim were merely limited to the idea that the defendant benefited from its unauthorized reproduction of a work that was authored by the plaintiff, then the defendant's preemption argument might succeed, and the defendant clearly argues that that is the case.  However, the plaintiff's claim of unjust enrichment is not grounded in the protection of individual articles from piracy; instead, the plaintiff's claim of unjust enrichment is grounded in protecting the plaintiff's commercial newsgathering efforts and its business investment in same, from which the defendant has unjustly benefitted by engaging in a practice of reducing its own local newsgathering efforts but then utilizing plaintiff's local news stories as the basis for the defendant's publication of news stories on the same topics only days later in defendant's competing newspaper.  Like the NBA court's analysis of a "hot news" claim that is not preempted by the Copyright Act, the plaintiff's unjust enrichment claim here is not preempted because it, too, is based on precisely the "extra elements" that the NBA court found sufficient to survive preemption – namely, (i) the time-sensitive value of the factual information in the plaintiff's local news stories, (ii) the free-riding by a defendant in using those stories, rather than investing its own resources in the kind of newsgathering efforts in which the plaintiff engaged, at considerable expense, in order to produce that product for commercial

distribution, and (iii) the resulting threat to the continued existence of plaintiff's newspaper – all of which support the claimed unjust enrichment of the defendant at issue in this case.

In Connecticut, the doctrine of unjust enrichment is based on the principle that "one should not be permitted unjustly to enrich himself at the expense of another but should be required to make restitution of or for property received, retained or appropriated." New Hartford v. Connecticut Resources Reovery Authority, 291 Conn. 433, 452 (2009) (internal quotation marks omitted). "A claim for unjust enrichment is an equitable claim. In matters of equity, the court is one of conscience which should be ever diligent to grant relief against inequitable conduct, however ingenious or unique the form may be." Id. at 459 (internal quotation marks omitted). In such cases, the measure of recovery is the amount of the benefit received by the defendant. Id. at 460. Thus, under Connecticut law, "[u]njust enrichment is a very broad and flexible equitable doctrine that has as its basis the principle that it is contrary to equity and good conscience for a defendant to retain a benefit that has come to him at the expense of the plaintiff. . . . The doctrine's three basic requirements are that (1) the defendant was benefited, (2) the defendant unjustly failed to pay the plaintiff for the benefits, and (3) the failure of payment was to the plaintiff's detriment. . . . All the facts of each case must be examined to determine whether the circumstances render it just or unjust, equitable or inequitable, conscionable or unconscionable, to apply the doctrine." Gagne v. Vaccaro, 255 Conn. 390, 409 (2001); Hartford Whalers Hockey Club v. Uniroyal Goodrich Tire Co., 231 Conn. 276, 282-83 (1994). Ultimately, whether there has been unjust enrichment is a "highly fact-intensive inquiry." Gagne, 255 Conn. at 409.

Here, the defendant has effectively used the plaintiff's newsgathering efforts, rather than investing its own efforts in doing so, and the defendant has relied on the plaintiff's reporting of

breaking local news stories appearing in plaintiff's newspaper, in order to permit the defendant to produce a competing newspaper that has current local news stories covering such events. Moreover, the defendant's practice of free-riding on news stories having a time-sensitive value that has been gathered and published by the plaintiff at considerable expense threatens the continued existence of plaintiff's newspaper.  As such, the plaintiff's claim of unjust enrichment sufficiently alleges circumstances that go above and beyond copyright infringement, which factual allegations demonstrate (1) that the defendant has been benefitted by its conduct, (2) that the defendants unjustly did not pay the plaintiff for that benefit, and (3) that the failure of payment was to the plaintiff's detriment.  As such, the plaintiff's claim of unjust enrichment is not preempted by the Copyright Act, and the defendant is not entitled to a dismissal of the Twelfth Count on preemption grounds.

###### 3.     The Plaintiff's CUTPA Claim Is Not Preempted Either

The plaintiff's CUTPA claim is likewise not based merely on the fact that the defendant used the plaintiff's original work of authorship for commercial purposes, nor is it based on a claim that the unauthorized use of copyrighted material is "unfair" for CUTPA purposes, which claim might well be preempted by the Copyright Act.  Rather, the plaintiff's CUTPA claim is patterned on the "unfair competition" misappropriation contours with respect to "hot news" that have been recognized and outlined by the courts in the INS and NBA cases.

The Connecticut Unfair Trade Practices Act (CUTPA) proscribes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).  The CUTPA claim here relies on both CUTPA's prohibition of "unfair methods of competition" and CUTPA's prohibition against "unfair or deceptive acts or practices."  "It is well settled that in determining whether a practice violates CUTPA [the

Connecticut courts] have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise--in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." Votto v. American Car Rental, Inc., 273 Conn. 478, 484 (2005).

In this regard, the INS case recognized that, as between rival newspaper organizations, one who gathers news at its own expense, for the purpose of lucrative commercial publication, has a *quasi-property* interest the results of his or her efforts as against a rival in the same business, and the appropriation of those results at the expense and to the damage of the one and for the profit of the other is an act of unfair competition. International News Service, 248 U.S. at 239-40, 241-42. The misappropriation claim articulated by the Supreme Court in INS is fully consistent with the type of conduct that CUTPA is intended to proscribe:

> [D]efendant, by its very act, . . . is taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, and that defendant, in appropriating it and selling it as its own, is endeavoring to reap where it has not sown. . . .Stripped of all disguises, the process amounts to an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not, with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gather the news. . . .

\*                    \*                    \*

32

. . . In the present case, the fraud upon complainant's right is . . . direct and obvious. Regarding news matter as the mere material from which these two competing parties are endeavoring to make money, and treating it therefore as *quasi*-property for the purposes of their business because they are both selling it as such, defendant's conduct differs from the ordinary case of unfair competition in trade principally in this – that, instead of selling its own goods as those of complainant, it substitutes misappropriation in the place of misrepresentation, and sells complainant's goods as its own.

Besides the misappropriation, there are elements of imitation, of false pretense, in defendant's practices.  The device of rewriting complainant's news articles, frequently resorted to, carries its own comment.  The habitual failure to give credit to complainant for that which is taken is significant.   Indeed, the entire system of appropriating complainant's news and transmitting it as a commercial product to defendant's clients and patrons amounts to a false representation to them . . . that the news transmitted is the result of defendant's own investigation in the field.  But these elements, although accentuating the wrong, are not the essence of it.  It is something more than the advantage of celebrity of which complainant is being deprived.

Id. at 239-40, 242.

Here, the plaintiff's CUTPA claim is grounded in protecting the plaintiff's commercial newsgathering efforts and business investment in regard to breaking local news from the defendant's free-riding, and the plaintiff's CUTPA claim therefore rests on the fact that the defendant has engaged in a practice of reducing its own local newsgathering efforts but then misappropriating plaintiff's local news stories as the basis for the defendant's publication of news stories on the same topics only days later in defendant's competing newspaper, all of which has the effect of destroying the commercial value of plaintiff's newsgathering efforts and substantially diminishing the plaintiff's ability to compete in the news business.  Although the defendant seeks to dispute those factual allegations in the presentation of its preemption argument, those allegations must be accepted as true by the Court for purposes of deciding the motion to dismiss.  Moreover, like the NBA court's analysis of a "hot news" claim that is not preempted by the Copyright Act, the plaintiff's CUTPA claim here is not preempted because it, too, is based on precisely the "extra elements" that the NBA court found sufficient to survive

preemption – namely, (i) the time-sensitive value of the factual information in the plaintiff's local news stories, (ii) the free-riding by the defendant in using those stories, rather than investing its own resources in the kind of newsgathering efforts in which the plaintiff engaged, at considerable expense, in order to produce that product for commercial distribution, and (iii) the resulting threat to the continued existence of plaintiff's newspaper; <u>National Basketball Assocation</u>, 105 F.3d at 845, 852; all of which support the claimed unfair competition and unfair trade practice by the defendant at issue in the CUTPA claim in this case.

For all of the foregoing reasons, the plaintiff's CUTPA claim is not preempted by the Copyright Act, and the defendant is not entitled to a dismissal of the Thirteenth Count on preemption grounds.

## C.   <u>The Plaintiff Has Stated A Legally Cognizable CUTPA Claim</u>

As a separate ground for dismissal of the plaintiff's CUTPA claim, the defendant contends that the CUTPA claim should be dismissed because it fails to allege facts that are necessary to support a violation of CUTPA.

In this regard, the defendant first argues, in just one paragraph, that the CUTPA claim is conclusory, devoid of any factual support for the claim that the defendant's conduct "offended public policy; was immoral, oppressive, unethical and unscrupulous; and caused substantial injury to readers, competitors, and advertisers." However, as the preceding argument makes clear, the Complaint alleges sufficient facts to support that conclusion.

The plaintiff and the defendant are competitors in regard to the publication of rival newspapers in the Hartford area. (Amended Complaint, ¶ 6, 7, 39.) The plaintiff's Journal Inquirer regularly publishes local news stories regarding 17 towns north and east of Hartford, which towns the defendant's Hartford Courant also serves. (Amended Complaint, ¶ 6, 7, 39.)

Competition among newspapers is intense, and the publication of local news stories is a major draw of newspaper readership. (Complaint, ¶ 32, 33, 40, 42.) Consequently, the plaintiff employs news reporters to cover those local news events, and the plaintiff devotes considerable resources to its local news coverage. (Amended Complaint, ¶ 6, 31, 39, 40, 43.) However, in contrast to the plaintiff's investment of considerable resources to provide local news coverage in its newspaper, the defendant has sought to reduce its costs by greatly reducing its staff members assigned to the reporting of local news stories that appear in the Hartford Courant. (Amended Complaint, ¶ 34, 38, 40, 43.) Nonetheless, the defendant has engaged in a pattern and practice of utilizing the local news stories gathered by Journal Inquirer staff soon after those local news stories are published in the Journal Inquirer, so that the defendant can then publish the same or similar local news stories in the Hartford Courant while the same are still current events. (Amended Complaint, ¶ 8-10, 31-34, 39, 40.) In so pirating the local news gathering efforts of the Journal Inquirer as a means of presenting the local news in its own competing Hartford Courant, the defendant has unjustly benefited from the plaintiff's newsgathering resources and efforts and the defendant has substantially diminished the plaintiff's ability to compete with the defendant in the newspaper business. (Amended Complaint, ¶ 30, 34, 38, 40, 41, 43, 44.) Those factual allegations are sufficient to support the conclusion that the defendant has engaged in unfair competition and has engaged in an unfair or deceptive act or practice in violation of CUTPA, under the analysis set forth by the Supreme Court in INS. The conduct alleged in the complaint regarding the defendant's free-riding on plaintiff's newsgather efforts with respect to fresh local news is, by its nature, regarded as a violation of public policy, unethical and unscrupulous, and likely to cause injury to competition, competitors and the public:

[D]efendant, by its very act, . . . is taking material that has been acquired by complainant as the result of organization and the expenditure of labor, skill, and money, and which is salable by complainant for money, and that defendant, in appropriating it and selling it as its own, is endeavoring to reap where it has not sown. . . .Stripped of all disguises, the process amounts to <u>an unauthorized interference with the normal operation of complainant's legitimate business precisely at the point where the profit is to be reaped, in order to divert a material portion of the profit from those who have earned it to those who have not, with special advantage to defendant in the competition because of the fact that it is not burdened with any part of the expense of gather the news</u>. . . .

*   *   *

In the present case, the <u>fraud upon complainant's right</u> is . . . direct and obvious. Regarding news matter as the mere material from which these two competing parties are endeavoring to make money, and treating it therefore as *quasi*-property for the purposes of their business because they are both selling it as such, <u>defendant's conduct differs from the ordinary case of unfair competition in trade principally in this – that, instead of selling its own goods as those of complainant, it substitutes misappropriation in the place of misrepresentation, and sells complainant's goods as its own</u>.

 Besides the misappropriation, <u>there are elements of imitation, of false pretense, in defendant's practices</u>. The device of rewriting complainant's news articles, frequently resorted to, carries its own comment. The habitual failure to give credit to complainant for that which is taken is significant. Indeed, <u>the entire system of appropriating complainant's news and transmitting it as a commercial product to defendant's clients and patrons amounts to a false representation to them . . . that the news transmitted is the result of defendant's own investigation in the field</u>. But these elements, although accentuating the wrong, are not the essence of it. It is something more than the advantage of celebrity of which complainant is being deprived.

<u>Id.</u> at 239-40, 241-42 (emphasis added). The allegations of fact regarding the defendant's conduct, then, are precisely the kind of unfair commercial conduct that offends CUTPA.

 The defendant separately argues, again in just one paragraph, that the plaintiff's CUTPA claim is deficient because the Amended Complaint fails to identify any "ascertainable loss" to the plaintiff. The defendant's argument, however, is based entirely on a narrow and incorrect reading of the Amended Complaint and the legal injury to the plaintiff that has been caused by the defendant's conduct in violation of CUTPA.

Conn. Gen. Stat. § 42-110g(a) "affords a cause of action to '[a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b . . . .'" Service Road Corp. v. Quinn, 241 Conn. 630, 638 (1997). The "ascertainable loss" requirement "'is a threshold barrier which limits the class of persons who may bring a CUTPA action seeking either actual damages or equitable relief.' . . . An ascertainable loss is a 'deprivation, detriment [or] injury' that is 'capable of being discovered, observed or established.' Id., quoting Hinchliffe v. American Motors Corp., 184 Conn. 607, 615, 613 (1981). However, a plaintiff is not required to prove "a particular loss or the extent of the loss" in order to recover under CUTPA. Service Road Corp., 241 Conn. at 644.

Here, the plaintiff has suffered an ascertainable loss of money or property as a result of the defendant's conduct in the following respects. First, and most directly, as noted above, the INS decision recognizes that, as between rival newspaper organizations, one who gathers news at its own expense, for the purpose of lucrative commercial publication, has a quasi-property interest in the results of his or her efforts as against a rival in the same business, and therefore the appropriation of those results at the expense of the one and for the profit of the other represents a loss of business property. International News Service, 248 U.S. at 239-40. Thus, because the plaintiff, in the context of its competitive business relationship with the defendant as competing newspaper publishers, has a quasi-property interest in the fresh local news that it has endeavored to gather and publish for profit, the plaintiff suffered an ascertainable loss when the defendant engaged in conduct amounting to unfair competition which has deprived the plaintiff of the full benefit of that valuable property to which the plaintiff is legally entitled. Second, it is certainly reasonable to infer from the allegations of the

Complaint that the defendant's conduct has caused, or is likely to have the effect of causing, the plaintiff to lose subscribers to its newspaper, especially in light of the allegations that competition among newspapers is intense and that local news stories are a major draw of newspaper readers (Amended Complaint, ¶ 6, 7, 32, 33, 42), and the additional allegations that through its pirating of the plaintiff's local news stories the defendant has been able to publish local news stories on the same subjects as the plaintiff so soon after those stories appear in the plaintiff's paper as to impair the plaintiff's ability to maintain the advantage that otherwise comes with its investment in local newsgathering efforts (Amended Complaint, ¶ 8-10, 31, 34, 35, 39, 40, 43, 44).  Where, because of the defendant's improper conduct, patrons are likely to refrain from using the plaintiff's product or service, the plaintiff has demonstrated an ascertainable loss, even if the plaintiff cannot provide any evidence of lost revenue or even identify a single customer who has refrained from patronizing the plaintiff.  Service Road Corp., 241 Conn. at 639-44.  Under the allegations of the Amended Complaint, it is reasonable to infer that the defendant's use of the plaintiff's local news stories as the source of its own local news stories during the period of time when that local news was "hot" news, which is a major source for drawing newspaper customers, would diminish the plaintiff's ability to distinguish its newspaper from the defendant's newspaper, and would likely lead to the loss of customers to the defendant who, because of its misconduct, is able to publish a newspaper with fresh local news stories, thereby eliminating what would otherwise be an important commercial and competitive difference between the parties' competing newspaper products.  While the loss of such patrons may not be quantifiable, the likelihood of such loss is "ascertainable" for the purposes of establishing legal standing to bring a cause of action under CUTPA.  Id.  A plaintiff is not required to prove a particular loss or the extent of its loss to recover under CUTPA.  Id.

Based on the foregoing, it is clear that the Complaint alleges that the plaintiff suffered an "ascertainable loss of money or property" as a result of the defendant's actionable conduct because the plaintiff plainly suffered a "deprivation, detriment [or] injury" which is "capable of being discovered, observed or established." Hinchliffe, 184 Conn. at 613.   Accordingly, the defendant has failed to show that the Amended Complaint fails to allege the necessary facts to state a claim for relief under CUTPA, and therefore the motion to dismiss the Thirteenth Count on that ground must be denied.[8]

---

[8]  The defendant's suggestion that the Court's determination of whether the plaintiff has sufficiently alleged an "ascertainable loss" for CUTPA purposes should be guided by the fact that the plaintiff seeks only statutory damages, and not actual damages, for the federal copyright claims asserted in the Fourth through Tenth counts, is an argument that cannot withstand analysis.

First of all, the defendant's suggestion that lack of damages somehow equates to lack of "ascertainable loss" is contrary to legal authority.  As noted previously in the text, the Connecticut courts have made clear that, under CUTPA's "ascertainable loss" requirement, "plaintiffs are not required to prove actual damages of a specific dollar amount" because "'damage' . . . is only a species of loss" and "[t]he term 'loss' necessarily encompasses a broader meaning than the term 'damage.'"   Hinchliffe, 184 Conn. at 613.  The Hincliffe court emphatically rejected the idea that "ascertainable loss" is equivalent to "actual damages" because that "would eviscerate the private remedy provided by CUTPA"; id. at 615; and ruled that proof of actual damages is not required in order to prevail under CUTPA. Id. at 614-19.

Secondly, the common law legal rights and property interests at issue in the CUTPA claim are qualitatively different from the bundle of rights protected by the Copyright Act. Consequently, the fact that the plaintiff seeks only statutory damages under the latter provides no guidance with respect to the loss suffered by the plaintiff with respect to the former.  In fact, the plaintiff does have actual damages under CUTPA, including the local news staffing costs incurred by the plaintiff in its newsgathering efforts that were pirated by the defendant and/or the benefit to the defendant of its piracy of plaintiff's newsgathering efforts, and the resulting competitive injury to the plaintiff.  Thus, the plaintiff's failure to seek actual damages for the defendant's copyright violations is legally and logically irrelevant to the very different question of whether the plaintiff has pleaded and can prove an "ascertainable loss" for CUTPA purposes as a result of defendant's unfair methods of competition and defendant's unfair or deceptive acts or practices in the conduct of its trade or commerce.

## IV.    CONCLUSION

For all of the foregoing reasons, the defendant's Motion to Dismiss and/or Strike the Amended Complaint should be denied in its entirety.

Respectfully submitted,

PLAINTIFF,

By _____
Richard P. Weinstein, Esquire of
WEINSTEIN & WISSER, P.C.
29 South Main Street, Suite 207
West Hartford, CT  06107
Telephone No. (860) 561-2628
Federal Bar No. ct06215

## CERTIFICATION

I hereby certify that on this 23rd day of May, 2011, a copy of the foregoing was filed electronically and served by mail upon anyone unable to accept electronic filing.   Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

_____
Richard P. Weinstein

# <u>EXHIBIT  1</u>

**Side-by-Side Comparison of the Journal Inquirer and Courant Articles that are the Subject of the Fourth through Tenth Counts of the Amended Complaint**

# EXHIBIT 1

Fourth Count

The Courant story on August 7, 2009, "Grant Would Fix Bridge, Help Fund Greenway," copies language from the JI story of August 5, 2009, "Greenway trail plan gets green light from East Windsor selectmen" -- the first paragraph of the Courant article mirrors the first paragraph of the JI article, and the Courant's second paragraph echoes the JI's fifth and sixth paragraphs.

| Journal-Inquirer | Courant |
|---|---|
| "Selectmen gave town staff the green light Tuesday to apply for a state grant to create a greenway trail along the Scantic River and rehabilitate the Melrose Bridge for pedestrian use."<br><br>          *          *          *<br><br>"The state grant through the Department of Environmental Protection would help build waterway trails and about 2½ miles of walking trails from the Enfield border to North Road, or Route 140.  Two canoe launch points also are being proposed, one at the Melrose Bridge and the other on town property near North Road.<br><br>"The deadline for the grant application is Sept. 1.  [Assistant Town Planner] Newton said she is going to request at least $52,000 for equipment for the project, including an all-terrain vehicle to help clear brush and make a trail along land owned by the town and the DEP." | "Selectmen gave the go-ahead Tuesday for town staff to apply for a state grant to create a greenway trail along the Scantic River and rehabilitate the Melrose Bridge for pedestrians."<br><br>"The town will request at least $52,000 from the Department of Environmental Protection to build waterway trails and 2½ miles of walking trails from the Enfield border to Route 140.  Two canoe launch points are also being proposed." |

Fifth Count

The Courant story on August 7, 2009, "Hebron Hires Principal," copies language from the JI story of August 5, 2009, "Interim principal named in Hebron" -- the three paragraphs of the Courant article mirror the first, second and fourth paragraphs of the JI article.

| Journal-Inquirer | Courant |
|---|---|
| "Annie Sweeney, a former South Windsor teacher, has been hired as interim principal of Hebron Elementary School for the coming school year, Superintendent Eleanor Cruz announced last week. | "A former South Windsor teacher has been hired as interim principal of Hebron Elementary School. |
| "Sweeney was hired to replace outgoing Principal Joanne Collins, who took a job last month in East Haddam."<br><br>        *              *              * | "Annie Sweeney will replace Principal Joanne Collins, who took a job in East Haddam in July. |
| "A committee to find a permanent principal for the school expects to conduct interviews this month, Cruz said.  The committee will make a recommendation to the Board of Education in September." | "A committee to find a permanent principal will conduct interviews this month and expects to make a recommendation to the board of education in September." |

Sixth Count

The Courant story on August 13, 2009, "Board Changes Fees" tracks the JI story of August 12, 2009, "Selectmen raise building, zoning fees" -- the two paragraphs of the Courant article mirror the first three paragraphs of the JI article.

| Journal-Inquirer | Courant |
|---|---|
| "A construction fee schedule adopted unanimously by the Board of Selectmen on Thursday changes costs for building and demolition permits and for zoning compliance applications.<br><br>"Certificate-of-occupancy fees changed to 25 cents for every $1,000 of work on the site from $25 total.  A new administrative review fee for buildings charges $2 for every $1,000 of work.<br><br>"Demolition permits increased in price to $12 for every $1,000 of work from $8.  And applications for zoning approval for additions, sheds, and decks now cost $25.  A new $150 fee is charged for single-family home applications." | "The board of selectmen has adopted a construction fee schedule that increases the costs for some permits and applications.<br><br>"Certificates of occupancy changed from a $25 total fee to 25 cents for every $1,000 of work on the site. Demolition permits will now cost $12 for every $1,000 of work and applications for zoning approvals for additions, sheds and docks will cost $25." |

Seventh Count

The Courant story on August 18, 2009, "Coleman Farms Condos Get Permit Extensions," copies from the JI story of August 12, 2009, "PZC extends permit for one year to allow completion of condo project" -- the three paragraphs of the Courant article mirror the first, sixth and last two paragraphs of the JI article.

| Journal-Inquirer | Courant |
|---|---|
| "Planning and Zoning Commission members voted unanimously Tuesday to extend a special-use permit for the Coleman Farms condominium complex, despite their displeasure with receiving the proposal at the last minute."<br><br>*     *     * | "The planning and zoning commission unanimously agreed last week to extend a special-use permit for the Coleman Farms condominium complex. |
| "The condominium complex for older residents has 47 finished units, with 10 more set for construction, as well as a clubhouse and roadway to be finished."<br><br>*     *     * | "The condominium complex for older residents has 47 finished units, but has 10 set for construction as well as a clubhouse and roadway to be completed. |
| "The development on Tromley Road began in 2003, but has yet to be finished.  The PZC voted unanimously to extend a special-use permit until August 2010, and agreed that the completion of the road be included in the site work.<br><br>Additionally, the PZC agreed that town staff would work with the homeowner's association and withhold certificates of occupancy if the developer fails to abide by the agreement." | "The permit was extended until August 2010, but the commission required that completion of the road be included in the site work.  If the developer fails to agree by the agreement, the commission authorized town staff to withhold certificates of occupancy." |

Eighth Count

The Courant story on August 21, 2009, "Board Extends Contract," copies language from the JI story of August 17, 2009, "Board of Education happy with superintendent" -- the Courant's second paragraph echoes the third and fourth paragraphs of the JI article, and the Courant's third paragraph mirrors the sixth paragraph of the JI article.

| Journal-Inquirer | Courant |
|---|---|
| "Cruz volunteered to forego her annual raise for the 2009-10 school year when the school board was creating its budget.  She'll receive the same $131,000 salary for next year, but got five personal days, tuition payments to pursue a doctoral degree, and a boost in her annuity income, a yearly payment in addition to salary.<br><br>"Cruz's annuity was increased by $2,000 to $16,000 for 2009-10, [Board of Education Chairwoman] Dube said."<br><br>     *        *        *<br><br>"Cruz also will be reimbursed for tuition payments.  She plans to take evening and weekend classes this fall at the University of Massachusetts toward a doctoral degree in educational leadership, Cruz said." | "Cruz, who volunteered to forego her annual raise for the 2009-10 school year, will receive $131,000, five personal days, tuition payments as she pursues a doctoral degree and a $2,000 boost in her annuity income to $16,000.<br><br><br>"Cruz plans to take evening and weekend courses at the University of Massachusetts this fall to pursue a doctoral degree in educational leadership." |

Count Nine

The Courant story on August 20, 2009, "Water Company Seeks 19 Percent Rate Hike," copies from the JI story of August 18, 2009, "Hazardville Water Co. wants 19% increase"  -- the five paragraphs of the Courant article mirror the structure, organization and language of the first, second, fourth, fifth, sixth and tenth paragraphs of the JI article.

| Journal-Inquirer | Courant |
|---|---|
| "The Hazardville Water Co. wants state regulators to approve a 19.05 percent rate hike and a $566,000 or 18.4 percent revenue increase.  The last rate hike occurred August 21, 2006. | "The Hazardville Water Co. is asking state regulators to approve a 19.05 percent rate hike that would result in a $566,000, or 18.4 percent, increase in revenue. |
| "A typical customer using 2,200 cubic feet of water per quarter, now paying $82.23 per quarter, would pay $97.89 with the rate hike, or $5.22 more per month, the company said." | "A typical customer using 2,200 cubic feet or water per quarter would see a cost increase from 82.23 per quarter to $97.89.  The last rate hike occurred Aug. 21, 2006. |
| *          *          * | |
| "The water company serves over 7,000 customers in the Hazardville section of Enfield, about 400 in Somers, and 10 in East Windsor.  Most are residential.  It has 300 commercial and 23 municipal customers. | "The water company – which serves about 7,000 customers in the Hazardville section of Enfield, about 400 in Somers and 10 in East Windsor – said it needs the rate hike because of increased expenses. |
| "The rate hike is necessary, Hazardville President Jonathan Avery testified, due to increased operation and maintenance expenses, including payroll, pension, purchased power, and rent expenses rising over what the DPUC allowed, 'and the overall continuing decline over the last 10 years in average consumption per customer.' | |
| "Also, the company said in the first year of new rates it intends to install 9,850 feet of new main pipes to 'eliminate | "The company also said it intends to install 9,850 feet of new main pipes in the first year of the new rates and |

| | |
|---|---|
| hydraulic constraints and improve fire flows.' Because of the $1.5 million cost, Avery said that in mid-2010 the company expects to ask for a 5 to 6 percent rate hike starting in the fall after finishing the project.<br><br>    \*       \*       \*<br><br>"The DPUC scheduled a public hearing on the company's requests on Monday from 9:30 a.m. to 4 p.m. at DPUC offices at 10 Franklin Square, New Britain.  The hearing for public comment only will resume at 7 p.m. in the Enfield Room, lower level, in the Enfield Town Hall at 820 Enfield Street." | intends to ask for another 5 to 6 percent rate hike in the fall of 2010 after it finishes the $1.5 million project.<br><br><br>"The state Department of Public Utility Control has scheduled a public hearing on the request Monday from 9:30 a.m. to 4 p.m. at DPUC offices at 10 Franklin Square in New Britain.  A hearing for public comment also will be held Monday at 7 p.m. at Enfield Town Hall.      " |

Count Ten

The Courant story on August 21, 2009, "DPW Vacancy Prompts Abrupt End to Meeting," copies from the JI story of August 19, 2009, "Democrats walk out on McCoy over DPW director issue" --  the Courant article takes most of the language in its first, third, fourth and fifth paragraphs from the JI article.

| Journal-Inquirer | Courant |
| --- | --- |
| "Upset with Republican Mayor Jason L. McCoy's handling of the Department of Public Works director's vacancy, Town Council Democrats and one Republican walked out of Tuesday's meeting, abruptly stalling business. | "Town council Democrats and one Republican walked out of a meeting this week to protest Republican Mayor Jason L. McCoy's handling of the department of public works director's vacancy." |
| "Democratic Councilman Michael Winkler said fellow Democrats had asked the mayor to bring forward an appointment for the position at Tuesday's meeting, after McCoy's desired candidate, fellow Republican and former Councilman Robert Kleinhans was rejected at a meeting in July. | *                *                * <br><br> "Democrats asked the mayor to bring forward an appointment for the position at Tuesday's meeting after McCoy's initial candidate, former Republican Councilman Robert Kleinhans, was rejected at a meeting in July. |
| "McCoy said during Tuesday's meeting that he did not see Winkler's request, and that he'd planned to comply with their request next month.  Apparently unsatisfied with his answer, Winkler, fellow Democrats, and Republican Nancy Herold left the council chambers." | "McCoy said during the meeting that he did not see the Democrats' request, but that he'd comply with their request next month, at which point the Democrats and Republican Nancy Herold left the council chambers and abruptly ended the meeting. |
| *                *                * <br><br> "Immediately following the meeting, McCoy said that since the meeting was abruptly adjourned, it could cost the town an estimated $200,000 in grants for improvements at Valley Falls Park and federal stimulus dollars for energy saving initiatives." | "McCoy said the failure to finish the meeting could cost the town about $200,000 in grants." |

# EXHIBIT  2

## Affidavit of Chris Powell

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**


JOURNAL PUBLISHING COMPANY, INC.     :     CIVIL ACTION NO.
                      :     3:11CV00188 (RNC)
         Plaintiff,           :
                      :
V.                       :
                      :
THE HARTFORD COURANT COMPANY     :     MAY _11_, 2011
                      :
         Defendant.         :

## <u>AFFIDAVIT OF CHRIS POWELL</u>

Chris Powell, having been duly sworn, deposes and says as follows:

1.     I am over the age of eighteen (18) years, and I understand and believe in the obligations of an oath.

2.     I am the Managing Editor of the Journal inquirer, the daily newspaper that is published by the Journal Publishing Company, Inc., the plaintiff in the above-entitled matter.

3.     I am familiar with the allegations of the Complaint, as amended, in the above-entitled matter.

4.     On October 29, 2009, I completed and signed an application for copyright registration (Form TX for a literary work) for each newspaper article that is referenced in Exhibit A to the Complaint, as amended.

1

5. On October 30, 2009, those completed copyright applications, together with registration fees of $65 per application, were mailed to the Register of Copyrights, Library of Congress, Washington, D.C. 20559-6000, as directed on the application form.

6. That mailing was sent through the United States Postal Service by Express Mail next day delivery service. A copy of the Express Mail receipt that was provided by the United States Postal Service at the time of mailing is attached to this Affidavit.

7. I subsequently accessed the "Track & Confirm" service on the United States Postal Service website, which showed that the aforementioned Express Mail package was delivered to the Register of Copyright in Washington, D.C. at 8:21 AM on November 2, 2009, and signed for by R. Williams. A copy of that Track & Confirm information is also attached to this Affidavit.

8. No further materials or fees were requested by or provided to the Copyright Office in support of the copyright applications that were delivered to the Copyright Office on November 2, 2009, and the Copyright Office subsequently issued the certificates of registration that are referenced in the Complaint.

CHRIS POWELL

Sworn to and subscribed before me
on this 11th day of May, 2011.

Notary Public
My Commission expires:

*NOTARY PUBLIC*
MY COMMISSION EXPIRES OCT. 31, 2013

2



**EXPRESS MAIL**

Label 11-B, March 2004

Customer Copy

UNITED STATES POSTAL SERVICE ®

**Post Office To Addressee**

EH 412778650 US

**DELIVERY (POSTAL USE ONLY)**

| Delivery Attempt | Time | ☐ AM ☐ PM | Employee Signature |
| Mo. Day | | | |
| Delivery Attempt | Time | ☐ AM ☐ PM | Employee Signature |
| Mo. Day | | | |
| **Delivery Date** | Time | ☐ AM ☐ PM | Employee Signature |
| Mo. Day | | | |

**CUSTOMER USE ONLY**

PAYMENT BY ACCOUNT
Express Mail Corporate Acct. No.

☐ **WAIVER OF SIGNATURE** (Domestic Mail Only)
Additional merchandise insurance is void if customer requests waiver of signature. I wish delivery to be made without obtaining signature of addressee or addressee's agent (if delivery employee judges that article can be left in secure location) and I authorize that delivery employee's signature constitutes valid proof of delivery.

Federal Agency Acct. No. or
Postal Service Acct. No.

☐ **NO DELIVERY**
☐ Weekend   ☐ Holiday     ☐ Mailer Signature

**ORIGIN (POSTAL SERVICE USE ONLY)**

PO ZIP Code

Day of Delivery  ☐ Next ☐ 2nd ☐ 2nd Del. Day

Postage  $

Date Accepted

Scheduled Date of Delivery  Month _____ Day _____

Return Receipt Fee  $

Time Accepted  ☐ AM ☐ PM

Scheduled Time of Delivery  ☐ Noon ☐ 3 PM

COD Fee  $     Insurance Fee  $

Flat Rate ☐ or Weight

Military  ☐ 2nd Day ☐ 3rd Day

Total Postage & Fees  $

_____ lbs. _____ ozs.

Int'l Alpha Country Code

Acceptance Emp. Initials

**FROM:** (PLEASE PRINT)   PHONE (     )  860-646-0500x307

Chris Powell, Managing Editor
Journal Inquirer
306 Progress Drive
Manchester, CT 06045-0510

**TO:** (PLEASE PRINT)   PHONE (     )

Register of Copyrights
Library of Congress
Washington, D.C. 20559-6000

ZIP + 4 (U.S. ADDRESSES ONLY. DO NOT USE FOR FOREIGN POSTAL CODES.)

2 0 5 5 9 + 6 0 0 0

FOR INTERNATIONAL DESTINATIONS, WRITE COUNTRY NAME BELOW.

**FOR PICKUP OR TRACKING**
Visit **www.usps.com**
Call 1-800-222-1811

**EMS**


**UNITED STATES POSTAL SERVICE®**

Home | He

Track & Confirm

# Track & Confirm

## Search Results

Label/Receipt Number: EH41 2778 650U S
Class: Express Mail®
Status: **Delivered**

Your item was delivered at 8:21 AM on November 2, 2009 in
WASHINGTON, DC 20559 to COPYRIGHT 20559 R03 . The item was
signed for by R WILLIAMS.

Detailed Results:

- **Delivered, November 02, 2009, 8:21 am, WASHINGTON, DC 20559**
- Notice Left, November 01, 2009, 1:28 pm, WASHINGTON, DC 20559
- Notice Left, October 31, 2009, 10:35 am, WASHINGTON, DC 20559
- Arrival at Post Office, October 31, 2009, 10:00 am, WASHINGTON, DC 20022
- Processed through Sort Facility, October 30, 2009, 6:29 pm, HARTFORD, CT 06199
- Acceptance, October 30, 2009, 11:45 am, MANCHESTER, CT 06040

**Track & Confirm**

Enter Label/Receipt Number.

## Notification Options

### Track & Confirm by email

Get current event information or updates for your item sent to you or others by email.  ( **Go >** )

### Proof of Delivery

Verify who signed for your item by email, fax, or mail.  ( **Go >** )

Site Map    Customer Service    Forms    Gov't Services    Careers    Privacy Policy    Terms of Use    Business Customer Gatewa

Copyright© 2009 USPS. All Rights Reserved.    No FEAR Act EEO Data    FOIA



# UNREPORTED DECISION CITED IN MEMORANDUM OF LAW

Westlaw.

Not Reported in F.Supp.2d, 2008 WL 2696168 (S.D.N.Y.)
**(Cite as: 2008 WL 2696168 (S.D.N.Y.))**

**C**
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
M. SHANKEN COMMUNICATIONS, INC.,
Plaintiff,
v.
CIGAR500.COM, et al., Defendants.

No. 07 Civ. 7371(JGK).
July 7, 2008.

### OPINION AND ORDER

JOHN G. KOELTL, District Judge.

*1 The plaintiff, M. Shanken Communications, Inc., brings this action against Cigar500.com, Inc. ("Cigar500" or "the Company"), Anthony Masciangelo, and Monique Masciangelo (collectively, "the defendants") for copyright infringement under 17 U.S.C. § 501, et seq. (the "Copyright Act"). The plaintiff also asserts claims of trademark infringement, unfair competition, and trademark dilution under 15 U.S.C. §§ 1114, 1116, 1125(a) & 1125(c) (collectively, the "Lanham Act claims"), and defamation. The plaintiff alleges that the defendants infringed upon the plaintiff's trademarks and copyrights pertaining to the magazine *Cigar Aficionado,* through their operation of an online retailing website. The plaintiff seeks to recover damages and to enjoin the defendants from further infringing or otherwise violating the plaintiff's rights in its protected marks and material.

The defendants move to dismiss all claims against them pursuant to Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. They also move to dismiss the complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that the plaintiff has failed to state claims upon which relief can be granted.

I.

Unless otherwise stated, the following facts are

accepted as true for the purposes of these motions.

The plaintiff is a New York corporation with its principal place of business in the Southern District of New York. (Compl.¶ 5.) The plaintiff is in the magazine-publishing business, and has published several magazines, including *Cigar Aficionado,* a source of information for cigar smokers, in which it owns several trademarks and copyrights. (*Id.*)

Cigar500 is a Canadian corporation with its principal place of business in Woodbridge, Ontario, Canada which operates an Internet website at www.cigar500.com. (*Id.* ¶ 6.) Cigar500.com is an online source of cigars, including Cuban cigars, as well as related products. (*Id.;* Declaration of Anthony Masciangelo, Jan. 10, 2008 ("AM Decl.") ¶ 9.) The defendants assert that Cigar500 does not have an office, bank account, or other property in New York, maintain a phone listing in New York, have agents or employees located in New York, or specifically target New York residents in its advertising or public relations. (AM Decl. ¶ 11.) Cigar500 does business internationally and the website specifically guarantees delivery of authentic Cuban cigars to residents in the United States. (Compl.¶ 33.)

Mr. Masciangelo is a principal of Cigar500 and resides and works in Canada. (Compl.¶ 7.) Mr. Masciangelo founded Cigar500 in February 2006 and is currently a 51% shareholder in the Company. (AM Decl. ¶¶ 3, 9.) He is also listed as the "Administrative Contact" and "Technical Contact" for the Cigar500.com domain name. (Compl.¶ 2.)

Ms. Masciangelo resides in Canada and is listed as the registrant for the Cigar500.com domain name. (Compl.¶ 8.) The plaintiff also alleges that. Ms. Masciangelo is a principal of Cigar500. (*Id.*) However, in her responsive affidavit, Ms. Masciangelo asserts that she is not a principal, shareholder, or employee of Cigar500.com. (Declaration of Monique Masciangelo, Jan. 11, 2008 ("MM Decl.")¶

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2696168 (S.D.N.Y.)
**(Cite as: 2008 WL 2696168 (S.D.N.Y.))**

2.) Ms. Masciangelo confirms that in January 2006 her credit card was used to secure the registration of the domain name Cigar500.com. (*Id.* ¶ 4.)

**\*2** In the spring of 2007, Mr. Masciangelo engaged in several telephone discussions with the plaintiff, on behalf of Cigar500, regarding placing advertisements in *Cigar Aficionado.* (AM Decl. ¶ 17.) Following these conversations, Cigar500 entered into a written contract with the plaintiff for the placement of nine advertisements in *Cigar Aficionado* during 2007 and 2008. (*Id.*) Cigar500's first advertisement ran in the July/August 2007 edition of *Cigar Aficionado.* (*Id.* ¶ 19.)

The alleged copyright and trademark violations relate to the defendants' use of the "Cigar Aficionado" mark, as well as portions of the May/June 2007 issue of *Cigar Aficionado* (collectively, the "Work") on their website. (Compl.¶ 10.) [FN1] The front cover of the Work bears an artistic rendering of two palm trees against a blue sky, with the caption "Cuba Tomorrow" and, as a trademark, a stylized version of the words "Cigar Aficionado." (*Id.* ¶ 12.) Page 128 of the Work lists several Cuban cigars alongside a *Cigar Aficionado* "rating" of each cigar on a scale of 1-100 and a brief narrative or "tasting note" describing the particular cigar. (*Id.* ¶ 13.)

> FN1. For the purposes of this motion the defendants do not dispute the validity of the plaintiff's copyright

In July 2007, Cigar500 launched a promotion on its website in which it prominently displayed the Work and the "Cigar Aficionado" marks. (*Id.* ¶ 22, Exs. E, F.) The Cigar500.com homepage is divided into several "frames." (*Id.* ¶ 24.) On the top left of the homepage, the frame is headed with a salutation saying "Welcome *Cigar Aficionado* Readers!" (Compl.Ex. E.) The top frame on the right side of the homepage contains a photographic image of the cover of the Work, under the words "ON SALE! The 6 Cuban Cigars *Cigar Aficionado* Rated 91 or Better! Click Here to ORDER NOW!" (*Id.* ¶¶

11-12, Exs. E, F.) If the user clicks on the "Order Now" text they are brought to a web page that contains another image of the Work. At the top of this page is a heading, which states: "RATED 91 OR BETTER BY *CIGAR AFICIONADO.* 6 AUTHENTIC CUBAN CIGARS. The 6 Cubans that *Cigar Aficionado* calls 'Outstanding' showcase the best that Cuba has to offer." (*Id.* ¶¶ 25-27, Ex. F.) Beneath this heading is an image of six cigars, alongside verbatim copies of the "ratings" and "tasting notes" from page 128 of the Work, complete with prices and a link to purchase the cigars in question. (*Id.*) The plaintiff commenced this action on August 17, 2007.

The plaintiff has alleged five causes of action against the defendants, including a claim for copyright infringement based on the defendants' use of the Work on their website (Compl.¶¶ 44-55.); trademark infringement and unfair competition under the Lanham Act based on the defendants' use of the plaintiffs' "Cigar Aficionado" marks (Compl.¶¶ 56-73.); trademark dilution (Compl.¶¶ 74-80.); and defamation (Compl.¶¶ 81-90.)

II.
A.

The defendants move to dismiss the complaint for lack of personal jurisdiction pursuant to Rule 12(b)(2).

**\*3** A district court has "broad discretion" in deciding a motion to dismiss pursuant to Rule 12(b)(2), including the discretion to conduct an evidentiary hearing if the Court believes one is warranted. *See CutCo Indus. v. Naughton,* 806 F.2d 361, 364 (2d Cir.1986); *see also Clarendon Nat'l Ins. Co. v. Lan,* 152 F.Supp.2d 506, 515 (S.D.N.Y.2001). To survive a motion to dismiss where no evidentiary hearing is held, the plaintiff need only make a prima facie case that the defendant is subject to the Court's personal jurisdiction. *See In re Magnetic Audiotape Antitrust Litig.,* 334 F.3d 204, 206 (2d Cir.2003) ("Prior to discovery, a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction."); *PDK*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2696168 (S.D.N.Y.)
**(Cite as: 2008 WL 2696168 (S.D.N.Y.))**

*Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir.1997); *Rubinbaum LLP v. Related Corporate Partners V, L.P.,* 154 F.Supp.2d 481, 486 (S.D.N.Y.2001). However, the Court may rely on matters outside the pleadings, and "where [the] defendant rebuts [the] plaintiff's unsupported allegations with direct, highly specific, testimonial evidence regarding a fact essential to jurisdiction-and the plaintiffs do not counter that evidence-the allegation may be deemed refuted." *GCG Int'l, Inc. v. Eberhardt,* 05 Civ. 2422, 2005 WL 2647942, at *2 (S.D.N.Y. Oct. 17, 2005) (internal quotation marks omitted); *see also Bensusan Rest Corp. v. King,* 937 F.Supp. 295, 298 (S.D.N.Y.1996), *aff'd,* 126 F.3d 25 (2d Cir.1997). The Court must construe the pleadings and supporting affidavits in the light most favorable to the plaintiff. *See CutCo Indus.,* 806 F.2d at 365; *Bensusan,* 937 F.Supp. at 298; *see also Berwick v. New World Network Int'l,* 06 Civ. 2641, 2007 WL 949767, at *9(S.D.N.Y. Mar. 28, 2007).

Because neither the Copyright Act nor the Lanham Act provide for nationwide service of process, this Court must look to the personal jurisdiction rules of the forum state. *See Sunward Elecs., Inc. v.. McDonald,* 362 F.3d 17, 22 (2d Cir.2004); *Fort Knox Music Inc. v. Baptiste,* 203 F.3d 193, 196 (2d Cir.2000). The Court must therefore determine whether New York law allows the exercise of personal jurisdiction and, if so, whether doing so comports with constitutional due process guarantees. *See Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945); *Clarendon,* 152 F.Supp.2d at 515; *see also Landau v. New Horizon,* 02 Civ. 6802, 2003 WL 22097989, at *3 (S.D.N.Y. Sept. 8, 2003).

In this case the plaintiff argues that the Court has specific jurisdiction over the defendants under New York Civil Practice Law & Rules ("CPLR") §§ 302(a)(1) and 302(a)(3).

**B.**

The plaintiff first argues that jurisdiction is proper under CPLR § 302(a)(1) because the defendants are "doing business" in New York. CPLR §

302(a)(1) authorizes jurisdiction where the defendant "transacts any business within the state or contracts anywhere to supply goods or services in the state." C.P.L.R. § 302(a)(1). Under New York law, for § 302(a)(1) to apply, the cause of action must "arise out of" a defendant's activities in New York. *See, e.g., CutCo Indus., Inc.* 806 F.2d at 365.

*4 Transacting business "has been interpreted to require a certain quality, rather than a specific quantity, of contacts with New York." *Broad Horizons, Inc. v. Central Crude Ltd.,* No. 94 Civ. 1593, 1994 WL 623075, at *2 (S.D.N.Y. Nov. 9, 1994) (citation omitted); *see also Int'l Customs Assocs., Inc. v. Ford Motor Co.,* 893 F.Supp. 1251, 1259 (S.D.N.Y.1995), *aff'd,* 201 F.3d 431 (2d Cir.1999); *Cavalier Label Co., Inc. v. Polytam, Ltd.,* 687 F.Supp. 872, 876 (S.D.N.Y.1988). Courts in New York focus on "whether the defendant's conduct constitutes purposeful [ ] avail[ment] of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." *Best Van Lines, Inc., v. Walker,* 490 F.3d 239, 247 (2d Cir.2007) (internal quotation marks omitted) (citations omitted); *accord Fort Knox Music, Inc. v. Baptiste,* 203 F.3d 193, 196 (2d Cir.2000); *see also CutCo Indus., Inc.,* 806 F.2d at 365; *Ainbinder v. Potter,* 282 F.Supp.2d 180, 187 (S.D.N.Y.2003); *Clarendon,* 152 F.Supp.2d at 516 (S.D.N.Y.2001). The courts consider a range of "purposeful activity," and even a single transaction of business is sufficient to give rise to personal jurisdiction under CPLR § 302(a)(1), if the claim arises out of the transaction. *See Citigroup Inc. v. City Holding Co.,* 97 F.Supp.2d 549, 564 (S.D.N.Y.2000) (collecting cases); *see also Obabueki v. I.B.M. Corp.,* Nos. 99 Civ. 11262, 99 Civ. 12486, 2001 WL 921172, at *2 (S.D.N.Y. Aug. 14, 2001) (internal citations omitted).

i.

The plaintiff contends that although there are multiple bases for finding that the defendants "transact business" in New York, operation of the Cigar500 website is sufficient grounds for the Court

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2696168 (S.D.N.Y.)
**(Cite as: 2008 WL 2696168 (S.D.N.Y.))**

to have jurisdiction over the Company. Operation of an internet website gives rise to personal jurisdiction over a non-domiciliary pursuant to CPLR § 302(a)(1) depending on the "nature and quality of the commercial activity that the entity conducts via the internet." *Citigroup Inc.,* 97 F.Supp.2d at 565 (internal citations omitted); *Realuyo v. Villa Abrille,* No. 01 Civ. 10158, 2003 WL 21537754, at *6-7 (S.D.N.Y. July 8, 2003). Courts in this district have found that the various uses of an internet website fall within three basic categories along a spectrum. Jurisdiction over a defendant is generally not appropriate where the "defendant makes information available on what is essentially a 'passive' web site" which residents of New York may visit. *See Citigroup Inc.,* 97 F.Supp.2d at 565 (internal citations omitted); *see also Realuyo,* 2003 WL 21537754, at *6. At the other end of the spectrum, jurisdiction is proper when "a defendant clearly does business over the internet" and "enters into contracts with residents of a foreign jurisdiction that involve the knowing and repeated transmission of computer files ... if the claim arises from that business activity." *Best Van Lines, Inc.* 490 F.3d at 251. The middle category of internet activity consists of "defendants who maintain an interactive website which permits the exchange of information between users in another state and the defendant." *Id.* The exercise of jurisdiction in these situations depends on the "level of interactivity and the commercial nature of the exchange of information that occurs on the Web site." *Best Van Lines, Inc.* 490 F.3d at 251; *see also Citigroup,* 97 F.Supp. at 565; *Hsin Ten Enter. USA, Inc. v. Clark Enters.,* 138 F.Supp.2d 449, 456 (S.D.N.Y.2000). The Court of Appeals for the Second Circuit has cautioned that a website's interactivity may be useful for analyzing personal jurisdiction under § 302(a)(1), "but only insofar as it helps to decide whether the defendant ... purposefully avail[ed] himself of the privilege of conducting activities within New York, thus invoking the benefits and protections of its laws." *Best Van Lines, Inc.* 490 F.3d at 252 (internal quotation marks and citations omitted).

*5 The Cigar500 website is clearly interactive and actually used to effect commercial transactions with customers in New York. The defendants acknowledge that the primary function of Cigar500.com is "an online source for cigars and related products." (AM Decl. ¶ 9.) On Cigar500.com, customers in New York can create a personal account with a password; "log-in" to this account on subsequent visits; place orders for products on the site and "checkout" online; request a catalog; and contact customer service by an automatically prompted email. (Compl.Ex. E). Furthermore, the record reflects that Cigar500 guarantees delivery in the United States, and has specifically conducted business transactions with New York residents, deriving approximately 10% of their total international revenue from sales to New York. (AM Decl. ¶ 22.) This activity would also appear to fall squarely within the portion of § 302(a)(1) that provides specific jurisdiction where a defendant contracts anywhere "to supply goods or services in the state."

Although the defendants argue that jurisdiction is inappropriate because the website does not specifically target consumers in New York, this argument is irrelevant. Courts in this district have never required that a substantially interactive website target the residents of New York when there is evidence that the defendant was transacting business via the website in such a way that it "purposefully avail[ed] [itself] of the privilege of conducting activities within New York." *Best Van Lines, Inc.,* 490 F.3d at 252. Here, it could not have escaped Cigar500's notice that 10% of its international revenue was being derived from sales into New York-especially in light of the fact that the website specifically solicits United States consumers. Thus, these activities clearly establish that Cigar500 "purposefully avail[ed] [itself] of the privilege of conducting activities within New York" and therefore was "transacting business" in New York pursuant to § 302(a)(1). *Best Van Lines, Inc.,* 490 F.3d at 252; *See Mattel, Inc. v. Adventure Apparel,* No. 00 Civ. 4085, 2001 WL 286728, at *3 (S.D.N.Y. Mar. 22, 2001) (finding personal jurisdiction based on

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2696168 (S.D.N.Y.)
**(Cite as: 2008 WL 2696168 (S.D.N.Y.))**

sale to New York customer through an interactive website); *Philip Morris USA Inc., v. Veles Ltd.,* No. 06 CV 2988, 2007 WL 725412, at *4-5 (S.D.N.Y. Mar. 12, 2007) (same); *see also Warner Bros. Entertainment Inc. v. Ideal World Direct,* 516 F.Supp.2d 261, 266-267 (S.D.N.Y.2007); *Student Advantage, Inc. v. Int'l Student Exchange Cards, Inc.,* No. 00 Civ.1971, 2000 WL 1290585, at *4 (S.D.N.Y. Sept. 13, 2000) (jurisdiction based in part on the defendant's operation of interactive commercial website); *cf. Seldon v. Direct Response Techs. Inc.,* No. 03 Civ. 5381, 2004 WL 691222, at *4-*5 (S.D.N.Y. Mar. 31, 2004) (maintenance of a website where the sole interactive feature is a message board accessible nationwide insufficient grounds for long-arm jurisdiction unless the defendant intended to target New York users).

**\*6** Section 302(a)(1) also requires the plaintiff to show a "substantial relationship" or some "articulate nexus between the business transacted and the cause of action." *McGowan v. Smith,* 419 N.E.2d 321, 323 (N.Y.1981). Here, all five of the claims arise from the operation of the Cigar500.com website and have a substantial relationship to the actual commercial transactions that Cigar500 conducts with its United States customers, including those in New York. The Lanham Act and copyright claims arise from the use and placement of the plaintiff's protected "Cigar Aficionado" trademark and copyrightable material on the Cigar500 website. In addition, the plaintiff argues that the defendant's use was intended to create the "false impression that *Cigar Aficionado* promotes the Cigar500 website." (Pl. Opp. Mem. at 18.) The unfair competition, trademark dilution, and defamation claim are based on the similar allegation that Cigar500 used the "Cigar Aficionado" mark to imply the plaintiff's sponsorship and to encourage customers to register on the website and purchase Cuban cigars. Thus, it's clear that the plaintiff's claims are substantially related to the commercial transactions that Cigar500 conducts via its website. *See Mattel, Inc.,* 2001 WL 286728 at *4 (finding that copyright and trademark claims pertaining to infringing web-

site "arise from" defendant's sale of product to New York customer). Thus, personal jurisdiction over Cigar500 pursuant to § 302(a)(1) is proper.

ii.

The plaintiff contends that long-arm jurisdiction extends to Mr. and Ms. Masciangelo individually based on the business transactions of Cigar500. Under New York law, individuals may be subject to jurisdiction "even if their dealings with the forum State were solely in the corporate capacity" because the "fiduciary shield doctrine" does not apply to the New York long-arm statute. *Kreutter v. McFadden Oil Corp.,* 522 N.E.2d 40, 42 (N.Y.1988); *see Retail Software Servs., Inc. v. Lashlee,* 854 F.2d 18, 22 (2d Cir.1988). However, "the fact that New York does not adopt the fiduciary shield doctrine does not mean that a corporate officer is automatically subject to long-arm jurisdiction." *Merck & Co., Inc. v. Mediplan Health Consulting,* 425 F.Supp.2d 402, 419 (S.D.N.Y.2006). The plaintiff still must show that the corporation transacted business in New York as the officer's agent. *See Retail Software Servs., Inc.,* 854 F.2d at 22.

In order to make a prima facie showing of jurisdiction under an agency theory, the plaintiff does not need to establish a "formal agency relationship." *See Merck & Co., Inc.,* 425 F.Supp.2d at 420. The plaintiff must demonstrate that Cigar500 "engaged in purposeful activities in this State in relation to plaintiff's transaction for the benefit of and with the knowledge and consent of the ... defendants, and that they each exercised some control over [the corporation] in the matter." *Karabu Corp. v. Gitner,* 16 F.Supp.2d 319, 323 (S.D.N.Y.1998) (quoting *Kreutter,* 71 N.Y.2d at 467). "At the heart of this inquiry is whether the out-of-state corporate officers were primary actor[s] in the transaction in New York that gave rise to the litigation, and not merely some corporate employee[s] ... who played no part in it." *Id.* (quoting *Retail Software Servs., Inc.,* 854 F.2d at 22). To make a prima facie showing of control "a plaintiff's allegations must 'sufficiently detail the defendants conduct so as to

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2696168 (S.D.N.Y.)
**(Cite as: 2008 WL 2696168 (S.D.N.Y.))**

persuade a court that the defendant was a 'primary actor' in the specific matter in question; control cannot be shown based merely upon a defendant's title or position ... or upon conclusory allegations that the defendant controls the corporation." *Id.*

**\*7** Here, the plaintiff argues that the individual defendants' alleged involvement with the Cigar500 website is sufficient to establish their knowledge of and control over the alleged copyright and trademark infringements, as well as the benefit they would derive therefrom. Construing the pleadings and supporting affidavits in the light most favorable to the plaintiff, there is a prima facie showing that Mr. Masciangelo is subject to personal jurisdiction under an agency theory. The complaint alleges that he is "a principal of Cigar500.com" and that he is the "administrative contact" and "technical contact" for that domain name. (Compl.¶ 2.) Mr. Masciangelo corroborates his position as a principal, and also asserts that he is a founder and 51% shareholder in Cigar500. (AM Decl. ¶ 15.) Furthermore, Mr. Masciangelo acknowledges that he initiated contract negotiations with the plaintiff, and that it was actually his idea to post the infringing material on the website as a part of a promotion for Cigar500. (AM Decl. ¶¶ 16-18.) Thus, there is a prima facie showing that Mr. Masciangelo was a "primary actor" in the infringing transactions, that he exercised control over the website, and that the infringing material was placed on the website with his knowledge and for his benefit. Therefore the assertion of jurisdiction over Mr. Masciangelo under an agency theory is appropriate.

With respect to Ms. Masciangelo, the complaint solely alleges that she is a "principal of Cigar500.com" and that she is the "registrant" of the domain name. (Compl.¶ 8.) These facts are insufficient to establish a prima facie showing of agency. As an initial matter, the plaintiff clearly fails to satisfy the "control" prong of the test. The plaintiff has not argued that Ms. Masciangelo was a "primary actor" in the use of the alleged infringing material, or alleged that she had any involvement

whatsoever. The allegation that Ms. Masciangelo is a principal of the Company is insufficient because control cannot be shown based on title alone. *Karabu Corp.,* 16 F.Supp.2d at 324 (collecting cases). Furthermore, this allegation is in direct conflict with Ms. Masciangelo's affidavit that states that she is not a principal, employee, shareholder, officer, or director of Cigar500.com. (MM Decl. ¶ 3.) The plaintiff acknowledges this contradiction, yet fails to offer evidence or facts to refute the defendants' position.

The plaintiff also argues that because Ms. Masciangelo is the registered owner of the site, she is an agent of the corporation and therefore in "a position to exercise control over the Cigar500 Website's infringing content." (Pl. Opp. Mem. at 15.) However, the plaintiff fails to establish any "specific actions on the part of [Ms. Masciangelo], and a presumption is not enough." *Merck & Co., Inc.,* 425 F.Supp.2d at 419-420. *see also Karabu Corp.,* 16 F.Supp.2d at 324 ("Courts have also routinely granted 12(b) (2) motions ... where the plaintiff made only broadly worded and vague allegations about a defendant's participation in the specific matter at hand.") Furthermore, the plaintiff's presumptions are undercut by Ms. Masciangelos' affidavit in which she admits that she is the registered owner of the domain name, but asserts that Cigar500.com Inc. is the true and beneficial owner. (MM Decl. ¶ 4, Ex. A.) Nor is the plaintiff's argument that Ms. Masciangelo is an "agent" of the company sufficient to establish jurisdiction. *See, e.g., Sargent v. Budget Rent-A-Car Corp.,* No. 94 Civ. 9215, 1996 WL 413725, at *3 (S.D.N.Y. July 24, 1996) ("Pursuant to New York law, 'the acts of an agent may subject a foreign principal to personal jurisdiction; however, th[e relevant] statutory provision [s] do[ ] not provide for the "reverse." [They] do [ ] not permit the acts of a principal to be imputed to a foreign agent to confer jurisdiction over the agent." (citation omitted) and (alterations in original).

**\*8** Based on the facts in the record, the plaintiff

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2696168 (S.D.N.Y.)
(Cite as: 2008 WL 2696168 (S.D.N.Y.))

Page 7

has not made a prima facie showing of personal jurisdiction with respect to Ms. Masciangelo. However, the plaintiff has asked for leave to replead in the event that the Court found the factual allegations of the Complaint insufficient. Generally, leave to amend should be freely granted. *See Foman v. Davis,* 371 U.S. 178, 182 (1962). Leave to amend should be granted in the absence of "evidence of undue delay, bad faith or dilatory motive on the part of the movant, undue prejudice to the opposing party, or futility." *Monahan v. New York City Dep't of Corrections,* 214 F.3d 275, 283 (2d Cir.2000). The defendants have made no showing that they would be prejudiced by the Court's granting the motion to amend the petition at this time, or that the plaintiff has engaged in undue delay or is acting in bad faith in seeking the amendment. Because it cannot be determined at this stage of the pleadings that the plaintiff will be unable to replead an adequate basis for jurisdiction with respect to Ms. Masciangelo, the Court grants the plaintiff leave to file an amended complaint within twenty days of the date of this opinion and order.

## C.

The plaintiff argues in the alternative that the Court has jurisdiction over the defendants pursuant to CPLR § 302(a)(3). That section generally provides for specific jurisdiction over out-of-state defendants who, subject to certain limitations, commit a tortious act without the estate causing injury to a person or property within the state. Because the Court finds that there is jurisdiction over Cigar500 and Mr. Masciangelo under § 302(a)(1), there is no need to address this allegation as to these two defendants. Because there are insufficient allegations that Ms. Masciangelo committed any tortious act without the state, jurisdiction over her cannot be founded on CPLR § 302(a)(3).

## D.

Jurisdiction over the defendants must also comport with the constitutional requirement of due process. There are two parts to the due process test for personal jurisdiction: the "minimum contacts" inquiry and the "reasonableness" inquiry. *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 567 (2d Cir.1996). The minimum contacts inquiry requires that the court determine whether a defendant has sufficient contacts with the forum state to justify the court's exercise of personal jurisdiction over the defendant. *See Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316 (1945); *Metropolitan Life,* 84 F.3d at 567. In determining whether minimum contacts exist, courts must examine the "quality and nature" of the contacts under a totality of circumstances test, to determine whether the defendant has "purposefully avail [ed] itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws ... such that [the defendant] should reasonably anticipate being haled into court there." *Best Van Lines, Inc.,* 490 F.3d at 242-243 (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474-75 and (1985)) (internal citations omitted). The court should consider the relationship among the defendant, the forum, and the litigation. *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 775 (1984); *Shaffer v. Heitner,* 433 U.S. 186, 204 (1977); *Chew v. Dietrich,* 143 F.3d 24, 28 (2d Cir.1998). The reasonableness inquiry requires the court to determine whether the assertion of personal jurisdiction over the defendant comports with "traditional notions of fair play and substantial justice" under the circumstances of the particular case. *Calder,* 465 U.S. at 788 (quoting *Milliken v. Meyer,* 311 U.S. 457, 463 (1940)). The Court must take into account five factors in this inquiry: (1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies. *See Asahi Metal Industry Co. v. Superior Court,* 480 U.S. 102, 113-14 (1987); *see also Burger King Corp.,* 471 U.S. at 476-77; *World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 292 (1980); *Metropolitan Life,* 84 F.3d at 568; *Lechner*

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2696168 (S.D.N.Y.)
**(Cite as: 2008 WL 2696168 (S.D.N.Y.))**

*v. Marco-Domo Internationales Interieur GMBH,*
03 Civ. 5664, 2005 WL 612814, at *3 (S.D.N.Y.
Mar. 14, 2005).

**\*9** The exercise of jurisdiction over Cigar500
and Mr. Masciangelo would not violate the consti-
tutional guarantee of due process because it satis-
fies the minimum contacts requirement and com-
ports with "traditional notions of fair play and sub-
stantial justice." *Calder,* 465 U.S. at 788 (quoting
*Milliken,* 311 U.S. at 463). Cigar500 and Mr. Mas-
ciangelo have sufficient minimum contacts with the
state of New York. The Company operates an inter-
active, commercial website, which guarantees de-
livery of its products in the United States, and as a
result has derived 10% of its international revenue
from sales made to New York residents. In addi-
tion, there is evidence that Mr. Masciangelo has ne-
gotiated and entered into a contract on behalf of Ci-
gar500 with the New York-based plaintiff for the
placement of advertisements in one of the plaintiff's
magazines. Although the contract was not the direct
cause of the present action, it was during the nego-
tiation process that the defendants posted the in-
fringing material on their website. (*Id.* ¶¶ 15-20.)
Thus, Cigar500 and Mr. Masciangelo could reason-
ably have expected to be subject to suit in New
York where: 1) Cigar500, acting on half of Mr.
Masciangelo, transacted steady business with New
York residents via an interactive website; 2) Mr.
Masciangelo, on behalf of Cigar500, was in the
process of negotiating a business transaction with a
New York-based company; and 3) these defendan ts
chose to use this New York-based company's intel-
lectual property for the purposes of soliciting com-
mercial transactions in New York and elsewhere.

The exercise of jurisdiction over Cigar500 and
Mr. Masciangelo would also be reasonable. While
the defendants argue that defending a lawsuit in
New York would place an unfair financial burden
on a small company, this argument is not persuas-
ive in light of the purposeful actions that Cigar500
and Mr. Masciangelo took with respect to New
York. Furthermore, New York has a substantial in-

terest in protecting the intellectual property rights
of copyright and trademark holders. Thus, jurisdic-
tion over Cigar500 and Mr. Masciangelo comports
with due process requirements. *See Sterling Interi-
ors Group, Inc.,* No. 94 Civ. 9216, 1996 WL
426379, at 15, n. 7 (S.D.N.Y. July 30, 1996)
(noting that the Court of Appeals for the Second
Circuit has held that an exercise of jurisdiction pur-
suant to the rule of *Kreutter* comported with due
process requirements) (citing *Retail Software
Servs., Inc.,* 854 F.2d at 22-24)).

### III.
### A.

The defendants also move to dismiss the com-
plaint under Rule 12(b)(6) for failure to state a
claim upon which relief can be granted. In deciding
a motion to dismiss pursuant to Rule 12(b) (6), the
allegations in the complaint are accepted as true
and all reasonable inferences must be drawn in the
plaintiff's favor. *McCarthy v. Dun & Bradstreet
Corp.,* 482 F.3d 184, 191 (2d Cir.2007); *Gant v.
Wallingford Bd. of Educ,* 69 F.3d 669, 673 (2d
Cir.1995). The Court should not dismiss the com-
plaint if the plaintiff has stated "enough facts to
state a claim to relief that is plausible on its face."
*Twombly v. Bell Atlantic Corp,* 127 S.Ct. 1955,
1974 (2007); *see Iqbal v. Hasty,* 490 F.3d 143,
157-58 (2d Cir.2007). In deciding the motion, the
Court may consider documents that are referenced
in the complaint, documents that the plaintiff relied
on in bringing suit and that are either in the
plaintiff's possession or the plaintiff knew of when
bringing suit, or matters of which judicial notice
may be taken. *Chambers v. Time Warner, Inc.,* 282
F.3d 147, 153 (2d Cir.2002); *see also Brass v. Am.
Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993);
*Joseph v. Terrence Cardinal Cooke Health Care
Center,* No. 07 Civ. 9325, 2008 WL 892508, at *1
(S.D.N.Y. Apr. 2, 2008).

### B.
### i.

**\*10** The defendants argue that the Court should
dismiss the copyright claim because their use of the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2696168 (S.D.N.Y.)
**(Cite as: 2008 WL 2696168 (S.D.N.Y.))**

protected material constitutes "fair use" as a matter of law pursuant to 17 U.S.C. § 107. "Fair use [in the copyright context] is a mixed question of law and fact." *Harper & Row Publishers v. Nation Enters.,* 471 U.S. 539, 560 (1985). "The four factors identified by Congress as especially relevant in determining whether the use was fair are: (1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the substantiality of the portion used in relation to the copyrighted work as a whole; (4) the effect on the potential market for or value of the copyrighted work." *Id.* at 560-561; *see* 17 U.S.C. § 107.

The defendant has not pointed to any cases in this Circuit that have granted a motion to dismiss on the grounds of fair use. In fact, the Court of Appeals for the Second Circuit has cautioned that due to the "fact-driven nature of the fair use determination," courts should be cautious in finding fair use as a matter of law even on a motion for summary judgment, although the fact intensive inquiry does not protect a copyright holder from summary disposition where there are no material factual disputes. *Wright v. Warner Books, Inc.,* 953 F.2d 731, 735 (2d Cir.1991); *see also Blanch v.. Koons,* 467 F.3d 244, 251 (2d Cir.2006) (the determination of fair use is "an open-ended context-sensitive inquiry.")

In this case, the material that was used-both the magazine cover and the "Tasting Notes," which were not insubstantial copying-were allegedly copied verbatim from the plaintiff's magazine. This factor weighs heavily against a finding of fair use. *See Harper & Row Publishers, Inc.,* 471 U.S. at 565 (reproducing portions of copyrighted work verbatim is evidence of the qualitative value of the copied material and works against a finding of fair use). In addition, there are, at the very least, issues of material fact as to the adverse impact of the defendants' use of the copyrighted works on the market for the plaintiff's product. For these reasons defendants' claim of fair use cannot be decided on a motion to dismiss. The motion to dismiss the copy-

right claim is therefore denied.

ii.

The defendants also move to dismiss the plaintiff's claims under the Lanham Act for trademark infringement, unfair competition, and trademark dilution. The defendants do not argue that the plaintiff has not adequately pleaded these claims; but rather that the defenses of classic fair use and nominative fair use defeat these claims at the pleading stage. Specifically, the defendants contend that their use of the "Cigar Aficionado" trademark was a truthful and descriptive reference, and thus not likely to cause confusion as a matter of law.

The defendants argue that their use of the "Cigar Aficionado" mark constitutes permissible fair use because it was used in the descriptive sense to make a truthful and accurate reference to the *Cigar Aficionado* magazine. The Lanham Act provides that a truthful, non-deceptive, good faith use of a trademark may be permitted where "the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark ... which is descriptive of and used fairly and in good faith, only to describe the goods or services of ... [a] party or their geographic origin." 15 U.S.C. § 1115(b)(4); *see EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulus Inc.,* 228 F.3d 56, 64 (2d Cir.2000); *see also Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc.,* 166 F.3d 65, 73 (2d Cir.1999) ("[F]air use permits others to use a protected mark to describe aspects of their own goods.") (citation omitted).

**\*11** Here, the Court could not conclude as a matter of law that the defendants' use of the plaintiff's marks was primarily in a descriptive sense, and not in a trademark sense. *See Merck & Co., Inc.,* 425 F.Supp.2d at 412-413(S.D.N.Y.2006) (denying motion to dismiss trademark infringement claim based on affirmative defense of classic fair use because plaintiff should have an opportunity to prove consumer confusion). The Court could not conclude as a matter of law on this motion that consumers would not be confused as to the plaintiff's

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2696168 (S.D.N.Y.)
**(Cite as: 2008 WL 2696168 (S.D.N.Y.))**

possible sponsorship of the defendants' website based on the use of the plaintiff's mark.

The defendants also contend that their use constitutes nominative fair use as a matter of law. To establish a defense of nominative fair use: "[f]irst, the product or service in question must be one not readily identifiable without use of the trademark; second, only so much of the mark or marks may be used as is reasonably necessary to identify the product or service; and third, the user must do nothing that would, in conjunction with the mark, suggest sponsorship or endorsement by the trademark holder.' " *New Kids on the Block v. News Am. Publ'g, Inc.,* 971 F.2d 302, 308 (9th Cir.1992); *see Chambers,* 282 F.3d at 156.

This issue also cannot be decided on a motion to dismiss because there are issues of fact, at least with respect to both the second and third elements of the defense, including whether the defendant infringed the plaintiff's mark by using the plaintiff's design, font or "other identifying characteristics" and whether the defendants' use of the trademark created a likelihood of confusion as to the plaintiff's sponsorship, endorsement, or affiliation. *See Merck & Co., Inc.,* 425 F.Supp.2d at 412-413 (citing *George Basch Co. v.. Blue Coral, Inc.,* 968 F.2d 1532, 1541 (2d Cir.1992)). The defendants contend that their use of the "Cigar Aficionado" mark does not suggest endorsement or sponsorship by the plaintiff of the Cigar500 website. "[T]he existence of consumer confusion necessitates focusing on "the minds of the relevant purchasers-an analysis based on a factual inquiry inappropriate to a motion to dismiss." *Id.* at 414(internal citation omitted). The Court cannot decide as a matter of law that the use of the "Cigar Aficionado" mark on a website entitled Cigar500.com, in conjunction with a salutation welcoming *"Cigar Aficionado* Readers!" and an offer to sell the "6 Cuban Cigars *Cigar Aficionado Rated 91 or Better!,"* would not create consumer confusion as to sponsorship or endorsement among consumers.

CONCLUSION

The Court has considered all of the parties' arguments. To the extent its not explicitly discussed above, the arguments are either moot or without merit. For the reasons explained above, the defendants' motion to dismiss for lack of personal jurisdiction is denied as to Cigar500 and Anthony Masciangelo, and granted as to Monique Masciangelo. The plaintiff is granted leave to file an amended complaint within twenty (20) days of the date of this opinion and order. The defendants' motion to dismiss for failure to state a claim is denied.

**\*12 SO ORDERED.**

S.D.N.Y.,2008.
M. Shanken Communications, Inc. v. Cigar500.com
Not Reported in F.Supp.2d, 2008 WL 2696168 (S.D.N.Y.)

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.